

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION



United States District Court
Souther

DEC 1 1 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| THE NATIONAL HISPANIC CIRCUS, INC. A NEW YORK NOT-FOR-PROFIT CORPORATION Plaintiff | § § § § § | |
| V. | § § | CIVIL ACTION NO. B-02-135 |
| REX TRUCKING, INC., A TEXAS CORPORATION Defendant | § § § § | |
| AND | § § | |
| THE MASON AND DIXON, LINES, INC. A MICHIGAN CORPORATION Defendant/Counter-Plaintiff | § § § § | JURY DEMANDED |
| V. | § § | |
| THE NATIONAL HISPANIC CIRCUS, A NEW YORK NOT-FOR-PROFIT CORPORATION Counter-Defendant. | § § § § § | |

## DEFENDANT, THE MASON AND DIXON LINES, INC.'S, MOTION FOR FINAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant, **THE MASON AND DIXON LINES, INC.** ("Defendant"), and in accordance with the dates set forth in the Scheduling Order, submits this *Motion for Final Summary Judgment, or in the alternative, Motion for Partial Summary Judgment* pursuant to Rule 56 of the Federal Rules of Civil Procedure, and in support thereof, respectfully would respectfully show the Court the following:

## I. MOTION FOR SUMMARY JUDGMENT

1.       In its complaint, **THE NATIONAL HISPANIC CIRCUS, INC.** ("Plaintiff"), sets forth claims and allegation for damages relative to Defendant resulting from the temporary loss of a set of bleachers that were owned by Plaintiff and transported by Defendant. Specifically, Plaintiff alleges two (2) causes of action against Defendant. First, Plaintiff first alleges that Defendant is liable under 49 U.S.C. §14706 ("the Carmack Amendment"). Secondly, Plaintiff alleges that Defendant may be liable under a common law claim for Breach of Agreement.

2.       Plaintiff's claims are not supported by the facts or law. Particularly, Plaintiff's non-Carmack Amendment claims are preempted by the Carmack Amendment and Plaintiff cannot prove, with competent evidence, that it was damaged by Defendant's acts, negligent or otherwise. Further, Plaintiff cannot prove that it is entitled to recover damages from Defendant. Therefore, Defendant is entitled to the entry of a Summary Judgment in its favor. In the alternative, Defendant would show that Plaintiff's recovery, if any, is limited to the amounts stated in Defendant's tariff. Defendant's counter-claim in the amount of **EIGHTEEN THOUSAND FOUR HUNDRED AND FORTY-FIVE DOLLARS AND 00/100** ($18,485.00) is not at issue in this Motion for Summary Judgment.

## II. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, for the reasons set forth in the Memorandum in Support, *infra*, Defendant, **THE MASON AND DIXON LINES, INC.**, respectfully requests that this Court grant its Motion for Final Summary Judgment and enter a Final Judgment. In the alternative, Defendant respectfully requests that this Court grant its Motion for Partial Summary Judgment and limit Plaintiff's damages to those amounts expressed in Defendant's tariff and for all such other and further relief, both general and special, at law or in equity, to which Defendants may be justly entitled.

## II. MEMORANDUM IN SUPPORT OF THE
## MOTION FOR SUMMARY JUDGMENT

1.      Defendant files this Memorandum in Support of its Motion for Summary Judgment, or in the alternative, Motion for Partial Summary Judgment, showing the Court as follows:

### A.  Introduction

2.      Plaintiff, **THE NATIONAL HISPANIC, INC.** ("Plaintiff") is a self-described non-profit traveling bilingual circus that formerly performed throughout the United States. The Defendant is a trucking company that transports and delivers cargo.

### B.  Statement of Facts

3.      On July 7, 2003, Plaintiff filed its Second Amended Complaint ("the Complaint")(a copy of which is attached hereto as Exhibit "A"). In the Complaint, Plaintiff alleges that it contracted with Defendant for the transport of seven (7) trailers from Harlingen to Chicago. *See* Exhibit "A." However, one of the trailers containing a one-half (1/2) set of bleachers, did not arrive. *See* Exhibit "A." Plaintiff alleges that because the trailer containing the bleachers did not arrive in Chicago before the date of the scheduled performances, Plaintiff was forced to rent bleachers. *See* Exhibit "A", ¶16. However, the bleachers that were rented by Plaintiff contained less seating capacity than the bleachers that were temporarily lost. *See* Exhibit "A", ¶17. Therefore, Plaintiff alleges that it suffered loss of ticket sales for the originally scheduled performances **AND** the extended run of Plaintiff's performances in Chicago. *See* Exhibit "A", ¶18. Plaintiff also contends that on or about September 19, 2001, Plaintiff ordered replacement bleachers. *See* Exhibit "A", ¶19.

4.      Plaintiff cancelled its scheduled performance in Philadelphia and New York due to the tragedies of September 11, 2001, and not because of the temporary loss of the bleachers. *See*

Exhibit "B", Deposition of Edwin Rivera, page 10. line 13-page 10, line 23, *see also* Exhibit "C",

Deposition excerpts of the deposition of Rigoberto Garcia Santiago, page 16, line 7-page 19 and

page 17, line 1. The only shows that Plaintiff performed for the remainder of its 2001 season were

the shows scheduled in Miami, Florida on November 21, 2001 through December 2, 2001. *See*

Exhibit "B", page 10, line19-page 10, line 20, *see also* Exhibit "1" attached to Exhibit "B."

5.      Plaintiff alleges that it purchased replacement bleachers on September 19, 2001,

less than three (3) weeks after the original bleachers were temporarily lost. *See* Exhibit "A", ¶20.

According to the testimony detailed above, Plaintiff was not performing at the time that it

ordered the replacement bleachers.

6.      Plaintiff learned that the missing trailer was recovered on November 21, 2001. *See*

Exhibit "D", Plaintiff's Responses to Defendant's First Set of Interrogatories, Number 7. An Air

Waybill produced by Plaintiff prepared by Kuehne and Nagel, S.P.A. indicates that the

replacement bleachers were not shipped from Italy until November 28, 2001, one (1) week after

the original bleachers were recovered. *See* Exhibit "E." However, further documents produced by

Plaintiff indicate that Plaintiff could have cancelled the order, suffering a penalty of seventy-five

percent (75%) of the cost of the shipment of the freight. *See* Exhibit "F." Plaintiff alleges that the

total cost for the shipment of the freight was **THIRTY-SIX THOUSAND ONE HUNDRED**

**AND FOUR DOLLARS AND 00/100** ($36,104.00) *See* Exhibit "A", ¶20. Therefore, the freight

charges could have been reduced to **TWENTY-SEVEN THOUSAND SEVENTY-EIGHT**

**DOLLARS AND 00/100** ($27,078.00).

## C. Motion for Summary Judgment Standard

7.      A Motion for Summary Judgment is governed by Rule 56 of the Federal Rules of

Civil Procedure, and the jurisprudence that interprets same.  Under federal jurisprudence, the

trial Court must determine whether there is any genuine issue of material fact relative to the substance of the Motion before the Court. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 – 252 (1986). The trial Court must also determine whether the movant is entitled to judgment as a matter of law. *See* Cleveland *v. Policy Management Sys. Corp.*, 526 U.S. 795, 804 (1999).

8.    Upon filing a Motion for Summary Judgment, the initial burden of proof is with the movant. However, this burden shifts during the motion process. Once the movant establishes that there is an absence of evidence in support of the non-movant's claim(s) at issue, the burden then shifts to the non-movant to show that a genuine issue of material fact remains in spite of that alleged within the Motion for Summary Judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

9.    Furthermore, the burden, once shifted to the non-movant, is not met by simply proffering a "plausible scenario," in the abstract, that could potentially defeat the movant's motion. The non-movant must meet its burden through direct, contrary, and competent evident. *See Swanson v. Leggett & Platt, Inc.*, 154 F.3d 730, 733 (7th Cir. 1998); *see also Hawking v. Ford Motor Credit Co.*, 210 F.3d 540, 545 (5th Cir. 2000).

10.    Therefore, once a Motion for Summary Judgment has been properly supported by the movant, the failure of the non-movant party to produce evidence of a material factual dispute mandates the granting of said Motion. *See id.*

### D. <u>Summary Judgment Evidence</u>

11.    In support of its motion, Defendant includes evidence in the attached appendix.

      a.    <u>Documentary Evidence:</u>

          A.  Plaintiff's Complaint, attached as Exhibit "A."

          B.  Plaintiff's Responses to Defendant's First set of Interrogatories, attached as Exhibit "D".

   C.  Air Waybill issued by Kuehne and Nagel, S.P.A, attached hereto as Exhibit "E."

   D.  Email correspondence between Ernesto Villanova and Connobio regarding the canceling of the shipment of the replacement bleachers, attached hereto as Exhibit "F."

   E.  Defendant's Second Amended Answer and Counter-claim, attached as Exhibit "G."

   F.  Tariff published by Defendant, attached as Exhibit "I."

  b.  <u>Deposition Testimony:</u>

   A.  Deposition Excerpts of the Deposition of Edwin Rivera and attached exhibits collectively referred to herein as Exhibit "B."

   B.  Deposition Excerpts of the Deposition of Rigoberto Garcia Santiago and attached exhibits, collectively referred to herein as Exhibit "C."

   C.  Deposition Excerpts from the Deposition of Leo Blumenauer and attached exhibits, attached hereto as Exhibit "H."

  c.  <u>Affidavits.</u>    The affidavits of the following persons:

   A.  Affidavit of Michael A. Pita to verify the accuracy of the previously attached deposition transcripts, attached as Exhibit "J."

### E.  Argument and Analysis

### i. The Carmack Amendment Preempts all of Plaintiff's State Law Claims

12.    The Carmack Amendment was enacted in 1906 as an amendment to the Interstate Commerce Act of 1887. It codifies a carrier's liability for goods lost or damages in shipment and governs this action. *See* 49 U.S.C. §14706.

13.    Every federal court to consider this matter, including the Fifth Circuit, has either held, or indicated that it would hold, that the Carmack Amendment preempts all state statutory and common law remedies against a carrier for damages sustained by a shipper for the shipment of goods under a bill of lading. *See Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 382 (5th

Cir. 1998), *see also Underwriters at Lloyds of London v. North Am. Van Lines*, 890 F.2d 1112, 1120-21 (10th Cir. 1998)(extensive citations omitted). Specifically, the Fifth Circuit held in *Covan*,

> In actions seeking damages for the loss of property shipped in interstate commerce by a common carrier under a receipt or bill of lading, the Carmack Amendment is the shipper's sole remedy. That is, the Carmack Amendment preempts any common law remedy that increases the carriers liability beyond "the actual loss or injury to the property," 49 U.S.C. §11707(a)(1) (now 49 U.S.C. 14706), unless the shipper alleges injuries separate and apart from those resulting directly from the loss of shipped property.

*See Covan*, 144 F.3d at 382.

14.     Similar to the plaintiff in *Covan*, Plaintiff herein has alternatively plead common law breach of agreement only if the Court finds that the Carmack Amendment does not apply to this case. *See* Exhibit "A", ¶¶25-30. However, since the Carmack Amendment applies plaintiff's common law count for Breach of Agreement is preempted.

### iii.  Pursuant to the Carmack Amendment, Plaintiff is not Entitled to the Recovery of Consequential/Delay Damages

15.     Plaintiff also alleges that it is entitled to the recovery of consequential damages for the loss of seating capacity resulted from the alleged loss of the bleachers. Thus, Plaintiff's claim is for lost profits.

16.     The Carmack Amendment does not allow for the recovery of lost profits, delay damages, or consequential damages, if those damages are speculative. *See Camar Corp. v. Preston Trucking Company, Inc.*, 221. F.3d 271, 277(1st Cir. 2000). In this circuit, the Carmack Amendment incorporates common law principles of damages. *See Hector Martinez & Co. v. Southern Pac. Transport. Co.*, 606 F.2d 106, 108 (5th Cir. 1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2962 (1980). Under the common law as incorporated by the Carmack Amendment, courts award consequential damages

only where a shipper actually and clearly notified the carrier that the goods required special handling of some kind, thereby giving the carrier notice and making the consequential damages foreseeable. *See The Paper Magic Group, Inc. v. J.B. Hunt Transport, Inc.*, 318 F.3d 458, 462 (3rd Cir. 2003). This principle has not changed since *Hadley v. Baxendale. See id.* at 462.

17.    The bills of lading for the shipment of the circus do not indicate that Plaintiff informed Defendant of the need to deliver the bleachers to Chicago at a specific time. *See* Exhibit "H." Additionally, no other evidence has been produced that would indicate that Defendant received notice that the bleachers had to be delivered to Chicago by a certain date.

18.    Assuming, arguendo, that Defendant received notice from Plaintiff that the bleachers had to be delivered to Chicago by a certain date, the consequential damages allegedly incurred by Plaintiff are **speculative** and, therefore, not recoverable. *See Camar*, 221 F.3d 271, 277 (1st Cir. 2000). Plaintiff's Complaint alleges that it suffered consequential damages in the amount of **SIX THOUSAND DOLLARS AND 00/100** ($6,000.00) per show over the course of its twenty-six (26) shows in Chicago. *See* Exhibit "A", ¶18. However, Plaintiff's Complaint indicates that the Chicago show was extended after the circus already began to perform in Chicago. Defendant could not reasonably foresee that the circus would extend its run in Chicago by one (1) week. Therefore, Plaintiff is not entitled to the recovery of the consequential damages for the extension of the circus in Chicago. As for the original run of the show, Plaintiff's support for consequential damages is apparently based on an assumption that every show in Chicago would have been sold out, even with the seating capacity provided by the bleachers that were temporarily lost. Again, this assumption is speculative and the claim for such damages is not supported. Edwin Rivera testified that about three hundred (300) people were not admitted to each show in Chicago due to the lack of seating capacity. *See* Exhibit "B", page 40,

line 20-page 40, line 21. However, Rigoberto Garcia Santiago testified that Plaintiff charged different ticket prices for children and adults. *See* Exhibit "C", page 15, line 1-page 15, line 3. Determining the number of children and adults that would have attended the circus would require speculation. Therefore, such damages are not recoverable under the Carmack Amendment.

### iii. Because the Bleachers were Recovered, Plaintiff Suffered No Loss Entitling Plaintiff to Recovery for the Replacement of the Bleachers

19.    It is undisputed that the bleachers that were temporarily lost were later recovered and were made available for return to Plaintiff in West Memphis, Arkansas on or about November 21, 2001. *See* Exhibit "D", Number 7.

20.    While damages may be recoverable for **delay** in the delivery of goods, Plaintiff is not entitled to these types of damages in this case because the bleachers were recovered. In *Moffit v. Bekins Van Lines, Co.*, 6 F.3d 305 (5th Cir. 1993), in facts very similar to this case, the plaintiffs alleged a claim for the delay in shipment of their household goods from Texas to Colorado. *See id.* at 306. The Fifth Circuit found that the Carmack Amendment applied to the plaintiffs' claims. *See id.* at 307. In cases when the Carmack Amendment applies and a temporary loss of goods is at issue, the only allowable damages available to the shipper arise out of the delay of the delivery of the goods. *See Duerrmeyer v. Alamo Moving and Storage One, Corp*, 49 F.Supp.2d 934, 936 (W.D. Texas 1999). As stated above, delay damages are only allowable when notice has been provided. Therefore, Plaintiff is not entitled to damages for the replacement bleachers.

## IN THE ALTERNATIVE, DEFENDANT, THE MASON AND DIXON LINES, INC.'S, MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

21.     Defendant incorporates by reference paragraphs one (1) though twenty-five (20) and pleads the following in the alternative.

### A. Argument and Analysis

### i. If Plaintiff is Entitled to Recovery in this Case, Plaintiffs Recovery is Limited to THREE THOUSAND NINE HUNDRED NINETY-EIGHT DOLLARS AND 80/100 ($3,998.80).

22.     The Carmack Amendment allows a carrier to limit its liability "to a value established by written or electronic declaration of the shipper..." 49 U.S.C. §14706(c)(1)(A). Liability is governed exclusively by such an agreement irrespective of the degree of negligence alleged against the carrier. *See Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29 (1936), *see also Adams Express Co v. E.H. Croninger*, 226 U.S. 491, 509, 510 (1913)("a carrier may, by fair, open, just, and reasonable agreement, limit the amount recoverable by a shipper in case of loss or damage to an agreed value, made for the purposes of obtaining the lower of two or more rates of charges proportioned by the amount of risk").

23.     In this case, Defendant's tariff, which was authenticated during to Leo Blumenauer's deposition and is attached hereto as Exhibit "I", expressly states, in pertinent part in paragraph 37, as follows:

> Shipments of any **used commodity** (not manufactured by the shipper, previously owned and shipping for re-use or as a result of re-sale) will be released at a rate not to exceed ten (10) cents per pound per package. Carrier's liability, if any, for any loss or damage to such shipment, regardless of the cause of the loss or damage, shall not exceed this released value. Exhibit "I", ¶37 (emphasis added).

However, Plaintiff seeks the full recovery for the temporary loss of the bleachers, totaling $293,844.46, which includes claims for actual and consequential damages.  *See* Exhibit "A",

coverage for which Plaintiffs did not contract for or pay for and is not entitled to such full recovery.

24.     In 1995, the Carmack Amendment was amended to state that the carrier "must provide to the shipper, **on request of the shipper**, a ... copy of the rate, classification, rules, and practices upon which any rate is based." *See Jackson v. Brook Ledge, Inc.*, 991 F. Supp. 640, 645 (E.D. Ky. 1997)(holding that a carrier is not obligated to supply a copy of the rules to the shipper where the shipper failed to affirmatively request same). *See also* 49 U.S.C. 14310(a)(1).

25.     Plaintiff has not presented any evidence that it requested, but was denied a copy of the applicable tariff before the shipment of the bleachers. Additionally, the Carmack Amendment does not require that the classification and/or tariff be received by the shipper in order to be enforceable. It is established law that Plaintiff is charged with knowledge of what the tariff contains. *See American Ry. Express Co. v. Daniel*, 269 U.S. 40, 41, 42 (1925); *see also W.C. Smith, Inc. v. Yellow Freight Sys., Inc.*, 596 F. Supp. 515, 517 (E.D. Pa. 1983).

26.     It is undisputed that the bleachers that were temporarily lost in this case were used at the time of the alleged loss. *See* Exhibit "B," page 37, line 1-page 37, line 7. Therefore, the loss, if any, is subject to the terms of the tariff. It is also undisputed that the replacement bleachers that were ordered by Plaintiff were replacement bleachers of the same design and size made in order to fit the tent owned by Plaintiff. *See* Exhibit "B", page 42, line 21-page 42, line 23. and page 42, line 25-page 43, line 2. According to the invoice for the replacement bleachers, the weight of the replacement bleachers was 39,968 pounds. *See* Exhibit "E." Therefore, Plaintiff's recovery, according to the terms of the tariff, is limited to **THREE THOUSAND NINE HUNDRED NINETY SIX DOLLARS AND 80/100 ($3,996.80).**

## III. CONCLUSION

27.     The Carmack Amendment applies. Therefore, Plaintiff's state law claims are preempted. Plaintiff is not entitled to damages in this case because Plaintiff has not suffered a loss under the Carmack Amendment. Additionally, Plaintiff is not entitled to delay damages or consequential damages because Plaintiff (1) did not provide notice to Defendant of the damages that could result from the delay of the arrival of the bleachers and (2) these damages are speculative, and (3) Defendant recovered the missing bleachers.

28.     In the alternative, due to the limitations in Defendants tariff, Plaintiffs damages, if any, are limited to **THREE THOUSAND NINE HUNDRED NINETY SIX DOLLARS AND 80/100** ($3,996.80).

WHEREFORE, PREMISES CONSIDERED, Defendant, **THE MASON AND DIXONS LINES, INC.**, respectfully requests that this Court grants its *Motion for Summary Judgment*, and enter a Final Judgment in its favor, or, in the alternative, grant its *Motion for Partial Summary Judgment* and for all such other and further relief, both general and special, at law or in equity, to which Defendant may be justly entitled.

Respectfully Submitted,

*JEANSONNE & REMONDET, L.L.C.*

By: _____

Michael A. Pita
State Bar No. 24034628
Federal Bar No. 32169
ATTORNEY-IN-CHARGE
1200 Smith Street, Suite 2220
Houston, Texas 77002
Telephone:  (713) 752-0300
Telecopier:  (713) 752-0410

**ATTORNEY FOR DEFENDANT,
THE MASON AND DIXON LINES**

OF COUNSEL:

**JEANSONNE & REMONDET, L.L.C.**
1200 Smith Street, Suite 2220
Houston, Texas 77002
Telephone:  (713) 752-0300
Telecopier:  (713) 752-0410

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to the following counsel of record by hand delivery and/or certified mail, return receipt requested, and/or first class mail on this the 10th day of December 2003.

Stephen J. Chapman
BARKER, LEON, FANCHER & MATTHYS, L.L.P.
Tower II- Suite 1200
555 N. Carancahua St.
Corpus Christi, Texas 78478
**VIA OVERNIGHT MAIL – AIRBORNE EXPRESS # 7072058674**


G. Stephen Parrott
HOOVER SLOVACEK, LLP
5847 San Felipe, Suite 2200
Houston, Texas 77057
**VIA OVERNIGHT MAIL – AIRBORNE EXPRESS # 7072058770**

Michael A. Pita

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| THE NATIONAL HISPANIC CIRCUS, INC. A NEW YORK NOT-FOR-PROFIT CORPORATION<br>        Plaintiff | §<br>§<br>§<br>§<br>§ | |
| V. | §<br>§ | CIVIL ACTION NO. B-02-135 |
| REX TRUCKING, INC., A TEXAS CORPORATION<br>        Defendant | §<br>§<br>§<br>§ | |
| AND | §<br>§ | |
| THE MASON AND DIXON, LINES, INC. A MICHIGAN CORPORATION<br>        Defendant/Counter-Plaintiff | §<br>§<br>§<br>§ | JURY DEMANDED |
| V. | §<br>§ | |
| THE NATIONAL HISPANIC CIRCUS, A NEW YORK NOT-FOR-PROFIT CORPORATION<br>        Counter-Defendant. | §<br>§<br>§ | |

## FINAL JUDGMENT

BE IT REMEMBERED, that on this date, came to be heard Defendant, **THE MASON AND DIXON LINES, INC.'S**, Motion for Summary Judgment. After having considered the Motion, the pleadings, and all other evidence on file, and after hearing arguments of counsel, if any, the Court is of the opinion that the Motion is meritorious and should, in all things, be GRANTED. It is therefore

ORDERED, ADJUDGED AND DECREED that all claims asserted by Plaintiff, **THE NATIONAL HISPANIC CIRCUS**, against Defendant, **THE MASON AND DIXON LINES,**

INC., are dismissed with prejudice, and that Plaintiff take nothing from Defendant, THE MASON AND DIXON LINES, INC.

All relief not expressly granted herein is DENIED.

SIGNED this _____ day of _____, 2003.


_____
JUDGE PRESIDING


APPROVED AS TO FORM AND SUBSTANCE:

JEANSONNE & REMONDET, L.L.C.

By: _____
        Michael A. Pita
        State Bar No. 24034628
        Federal Bar No. 32169
        ATTORNEY-IN-CHARGE
        1200 Smith Street, Suite 2220
        Houston, Texas 77002
        Telephone: (713) 752-0300
        Telecopier: (713) 752-0410

ATTORNEY FOR DEFENDANT,
THE MASON AND DIXON LINES

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| THE NATIONAL HISPANIC | § | |
| CIRCUS, INC. A NEW YORK | § | |
| NOT-FOR-PROFIT CORPORATION | § | |
|     Plaintiff | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-02-135 |
| | § | |
| REX TRUCKING, INC., A TEXAS | § | |
| CORPORATION | § | |
|     Defendant | § | |
| | § | |
| AND | § | |
| | § | |
| THE MASON AND DIXON, LINES, | § | JURY DEMANDED |
| INC. A MICHIGAN CORPORATION | § | |
|     Defendant/Counter-Plaintiff | § | |
| | § | |
| V. | § | |
| | § | |
| THE NATIONAL HISPANIC CIRCUS, | § | |
| A NEW YORK NOT-FOR-PROFIT | § | |
| CORPORATION | § | |
|     Counter-Defendant. | § | |

## PARTIAL JUDGMENT

BE IT REMEMBERED, that on this date, came to be heard Defendant, **THE MASON AND DIXON LINES, INC.'S**, Motion for Partial Summary Judgment. After having considered the Motion, the pleadings, and all other evidence on file, and after having heard arguments of counsel, if any, the Court is of the Opinion that the Motion is meritorious and should, in all things, be GRANTED. It is therefore

ORDERED, ADJUDGED, AND DECREED, that the damages suffered by Plaintiff, **THE NATIONAL HISPANIC CIRCUS**, if any, are limited to the terms of Defendant's tariff. It is further

ORDERED, ADJUDGED, AND DECREED, that Plaintiff's damages, if any, are limited to

**THREE THOUSAND NINE HUNDRED NINETY SIX DOLLARS AND 80/100** ($3,996.80).

All relief not expressly granted herein is denied.

SIGNED this _____ day of _____, 2003.


_____

JUDGE PRESIDING



**APPROVED AS TO FORM AND SUBSTANCE:**

*JEANSONNE & REMONDET, L.L.C.*

By: _____

Michael A. Pita
State Bar No. 24034628
Federal Bar No. 32169
ATTORNEY-IN-CHARGE
1200 Smith Street, Suite 2220
Houston, Texas 77002
Telephone: (713) 752-0300
Telecopier: (713) 752-0410

**ATTORNEY FOR DEFENDANT,
THE MASON AND DIXON LINES**

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| THE NATIONAL HISPANIC CIRCUS, INC., A New York not-for-profit Corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION No. B-02-135 |
| REX TRUCKING, INC., a Texas Corporation, and THE MASON AND DIXON LINES, INC., a Michigan Corporation | ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT
## AND JURY DEMAND

Plaintiff, The National Hispanic Circus, Inc., by its attorney Stephen Chapman, for its Complaint against Rex Trucking, Inc. and The Mason and Dixon Lines, Inc., hereby alleges upon knowledge with respect to its own acts, and upon information and belief with respect to all other matters, as follows:

### INTRODUCTION

1.    On or about August 27, 2001 Rex Trucking, Inc. was hired by the Plaintiff to transport and deliver tractors and trailers, one of which contained a set of bleachers, from Harlingen, Texas to Chicago, Illinois.

2.    This action arises from Rex Trucking and/or Mason and Dixon's failure to deliver the Plaintiff's bleachers prior to the Plaintiff's scheduled performance in Chicago, Illinois on August 31, 2001, as a result of the trailers being stolen shortly after

Rex Trucking Inc and/or Mason and Dixon took exclusive possession of the trailer containing the bleachers.

3.    During August of 2001, Rex Trucking and/or its assets were purchased by the Mason and Dixon Lines, Inc., a Michigan Corporation.

4.    As will be detailed below, the Plaintiff seeks redress for significant financial losses and damages suffered as a result of the loss of the trailer and bleachers owned by the Plaintiff which had been entrusted by the Plaintiff into the exclusive care, custody and control of Rex Trucking, Inc. and/or the Mason and Dixon Lines, Inc.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. The matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different States.

6.    This Court has personal jurisdiction over the Defendants because the Defendants entered the contract and provided shipping services to the Plaintiff in the State of Texas.

7    Venue is proper in this District under 28 U.S.C. §1391(c) because a substantial part of the events and transactions giving rise to the claim occurred in this District.

## THE PARTIES

8    The National Hispanic Circus, Inc., d b a Circo Mundial (the "Circus"), is a New York State not-for-profit corporation with offices at 315 East Kingsbridge Road, Bronx, New York 10458  The Circus is a traveling bilingual circus that performs

throughout the United States and was performing in Harlingen, Texas at the time the contract was entered.

9.    The Defendant Rex Trucking, Inc. ("Rex Trucking") is a Texas corporation that has been served on its registered agent, G. Stephen Parrott, C/O Hoover Slovaceck, LLP., 5847 San Felipe, Suite 2200, Houston, Texas 77057. Rex Trucking is a trucking company which transports and delivers cargo.

10.    The Mason and Dixon Lines, Inc. ("Mason and Dixon") is a Michigan Corporation that has been served upon its registered agent Willard Lindley, 12225 Stephens, Warren, Michigan 48089. Mason and Dixon is a trucking company which transports and delivers cargo.

<u>FACTUAL ALLEGATIONS</u>

11.    On or about August 27, 2001 the Circus and Rex Trucking entered into an agreement pursuant to which Rex Trucking was to provide drivers and trucks to transport from Harlingen, Texas to Chicago, Illinois, seven (7) Circus trailers, one of which contained a set of bleachers.  During this same period Rex Trucking and/or its assets were purchased by the Mason and Dixon Lines, Inc.

12.    Under the terms of the agreement, Rex Trucking and/or Mason And Dixon was required to deliver the Circus' trailers and their respective loads to Chicago, Illinois prior to August 31, 2001, the commencement date of the Circus' scheduled tour in Chicago  The Circus required the trailers, specifically the bleachers, to be delivered prior to that date so that the Circus could set up for its performance in Chicago

13    Based on this agreement, the Circus placed its trailers and their respective loads under Rex Trucking and/or Mason and Dixon's sole and exclusive custody, care, supervision, direction and control.

14.    During the term of this agreement, Rex Trucking and/or Mason and Dixon had exclusive control over its drivers and its trucks, in addition to the means, methods, and details of delivering the trailers to the Circus in Chicago.

15.    Shortly after Rex Trucking and/or Mason and Dixon took possession of the trailers, the truck transporting the Circus' trailer containing the bleachers was stolen while in the exclusive possession of and otherwise under the custody and control of Rex Trucking and/or Mason and Dixon. The trailer and bleachers never arrived in Chicago.

16.    As a result of the theft of the trailer and the loss of the bleachers, the Circus was delayed in setting up the circus and was forced to rent bleachers to carry out its performances in Chicago. The cost of renting replacement bleachers was $9,000.00.

17.    The rented bleachers, however, provided approximately 1/3rd fewer seats than the Circus' stolen bleachers. The Circus' bleachers had been specifically purchased based on the design of the tent. The Circus was unable to obtain larger or additional rented bleachers to compensate for the 1/3rd fewer seats because the rented bleachers did not conform to the size and shape of the tent.

18.    Based on the success of the show, the Circus extended its original tour dates in Chicago of August 29, 2001 through September 9, 2001, by one week, through September 16, 2001, for a total of twenty-six (26) performances. However, as a result of the fewer bleacher seats, the Circus suffered consequential damages of $6,000.00 per performance over twenty-six (26) performances for a total of $156,000.00.

19.    At the conclusion of the Circus' performance in Chicago the bleachers had not been recovered and the Circus was preparing for the remainder of its 2001 National Tour.  The Circus, therefore, was required to purchase new bleachers from Canobbio, the Circus' supplier for its tent and its bleachers, in Italy.

20.    On or about September 19, 2001 the Circus ordered new bleachers from Canobbio.  The cost of the new bleachers was $92,740.00.  The Circus also incurred shipping costs in the amount of $36,104.46 for shipping the bleachers from Italy to the United States.  The Circus suffered damages in the amount of $128,844.46 for the purchase and shipment of the new bleachers.

21.    As a result of the loss of the bleachers, the Circus incurred damages totaling $293,844.46 for the cost of rented bleachers, the resulting loss of ticket sale revenues and the costs related to purchasing replacement bleachers.

22.    On February 19, 2002, the Circus through its attorneys, demanded payment of the $293,844.46 due and owing for the damages the Circus incurred as a result of Rex Trucking and/or Mason and Dixon's failure to transport and deliver the Circus' bleachers for its performances during its 2001 National Tour.

23.    Rex Trucking and/or Mason and Dixon have failed to make any payments despite demands by the Circus and its attorneys.

## FIRST CLAIM FOR RELIEF (COUNT I)
## CARMACK AMENDMENT

24.    Defendants violated the Carmack Amendment, 49 U.S.C  14706(a)(1), by failing to deliver goods in good condition at the required place.  Said bleachers were delivered in good condition to defendants in McAllen to be shipped to Chicago.  The

Plaintiff's Second Amended Complaint Page 5

bleachers were not delivered as requested and Plaintiff was required to purchase replacement bleachers.

### SECOND CLAIM FOR RELIEF (COUNT II)
### BREACH OF AGREEMENT

25.     The Circus repeats and realleges each and every allegation contained in Paragraphs 1 through 24 with the same force and effect as if here set forth in full.

26.     Should the court find the Carmack Amendment inapplicable, Plaintiff alleges breach of contract. Rex Trucking and/or Mason and Dixon have refused and continue to refuse to pay the Circus for the cost of renting replacement bleachers in the amount $9,000.00 in accordance with the agreement between Rex Trucking and the Circus although the Circus has demanded payment.

27.     Rex Trucking and/or Mason and Dixon have refused and continue to refuse to pay the Circus for the loss of ticket sale revenues in the amount $156,000.00 in accordance with the agreement between Rex Trucking and the Circus although the Circus has demanded payment.

28.     Rex Trucking and/or Mason and Dixon have refused and continue to refuse to pay the Circus for the purchase and shipment of the new bleachers in the amount of $128,844.46 in accordance with the agreement between Rex Trucking and the Circus although the Circus has demanded payment.

29.     As a result of Rex Trucking's and/or Mason and Dixon's failure and refusal to pay the Circus these sums, $293,844.46 is due and owing by Rex Trucking and/or Mason and Dixon for damages as a result of the cost of rented bleachers, the

resulting loss of ticket sale revenues and the costs related to purchasing replacement bleachers, which constitutes a breach of the parties' agreement.

30.    Consequently, the Circus has been damaged in the amount of $293,844.46, with interest from February 19, 2002.

<u>JURY DEMAND</u>

31.    Plaintiff hereby demands to bring this action before a jury.

WHEREFORE, Plaintiff the Circus respectfully prays that the Court grant the follow relief:

A.    A prompt jury trial on the merits;

B.    Expedited discovery;

C.    Damages as allowed under 49 U.S.C. 14706 et seq.

C.    Findings of fact and conclusions of law that Rex Trucking and/or Mason and Dixon are liable for the actual and consequential damages the Circus suffered in the amount of $293,844.46, with interest from February 19, 2002;

D.    Compensatory damages for the Circus's significant losses incurred as a result of Rex Trucking and/or Mason and Dixon's failure to transport and deliver the Circus' bleachers for its performances during its 2001 National Tour in the amount of $293,844.46, with interest from February 19, 2002; and

E.    Costs, attorney's fees, interest, disbursements of this action, and such other and further relief as this Court may deem proper.

Respectfully Submitted,

_____

Stephen J. Chapman
State Bar No. 24001870
Federal Bar No. 32677
Attorney In Charge
BARKER, LEON, FANCHER
& MATTHYS, L.L.P.
Tower II - Suite 1200
555 N. Carancahua St.
Corpus Christi, Texas 78478
Telephone: (361) 881-9217
Facsimile: (361) 882-9437

COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument

has been served in accordance with the Texas Rules of Civil Procedure on this the ___7th___

day of __July__, 2003, to all counsel of record as follows:

Mr. Michael Pita
Jeansonne & Remondet
Two Allen Center
1200 Smith Street, Suite 2265
Houston, Texas 77002

Patrick Sullivan
Hoover Slovaceck, LLP.
5847 San Felipe, Suite 2200
Houston, Texas 77057

_____
Stephen J. Chapman

Plaintiff's Second Amended Complaint Page 8

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION


THE NATIONAL HISPANIC CIRCUS, INC.,    *
A New York Not-For-Profit              *
Corporation,                           *
                    Plaintiff,         *
                                       *
             vs.                       * CIVIL NO. B-02-135
                                       *
REX TRUCKING, INC., A Texas            *
Corporation, and THE MASON AND DIXON   *
LINES, INC., A Michigan Corporation.   *
                    Defendants.        *
-------------------------------------- *


The deposition of:

                    EDWIN RIVERA,

a non-party witness, was held at the offices of

SALDAÑA & CARVAJAL, ESQS., Vig Building, 1225 Ponce De Leon

Avenue, Santurce, Puerto Rico, on Thursday, October 23,

2003, at 10:15 a.m.






BARBARA DACHMAN, CSR, RPR
U.S. OFFICIAL COURT REPORTER
787-722-0132

APPEARANCES:

COUNSEL FOR PLAINTIFF

BARKER, LEON, FANCHER & MATTHYS, L.L.P.
Tower II, Suite 1200
555 N. Carancahua
Corpus Christi, Texas  78478
BY:  STEPHEN J. CHAPMAN,  ESQ.

DAVIDOFF & MALITO, L.L.P.
605 Third Avenue
New York, New York  10158
BY:  RICARDO E. OQUENDO, ESQ.
       (Corporate Counsel)


COUNSEL FOR DEFENDANTS

JEANSONNE & REMONDET, L.L.P.
Two Allen Center
1200 Smith Street, Suite 2265
Houston, Texas  77002
BY:  Michael Pita,  ESQ.


NOTARY PUBLIC

FRANCES COLON RIVERA, ESQ.


CERTIFIED INTERPRETER

EDIE NUÑEZ


COURT REPORTER

BARBARA DACHMAN, CSR, RPR, USOCR

Edwin Rivera - Exam By Mr. Pita

(The reporter, interpreter and deponent are

duly sworn by the notary public.)

MS. COLON:  And I am excused, right?

MR. PITA:  Thank you.

MR. OQUENDO:  Thank you very much.

Whereupon,

EDWIN RIVERA,

After first having been duly sworn by the notary public, was

examined and, through the interpreter, deposed as follows:

EXAMINATION

BY MR. PITA:

Q.    Mr. Rivera, my name is Michael Pita, and I

represent The Mason and Dixon Lines in this lawsuit.  And I

know I briefly met you.  I just wanted to introduce myself

for the record.

Before we start with the deposition, I need to

make a few agreements with your lawyer, okay?

MR. PITA:  Steve, we can take this deposition

pursuant to the Federal Rules of Procedure; however, we are

going to reserve all objections to the time of trial, except

as to form.

MR. CHAPMAN:  Right, and I will just say,

"Objection to form," and you can ask me the basis.

MR. PITA:  Is Mr. Rivera going to read and

sign?

### Edwin Rivera - Exam By Mr. Pita

1  document is?

2          A.   Well, that's the schedule of the circus

3  visits at those locations.

4          Q.   Do you know when that schedule was made?

5          A.   No.  No, I don't remember.

6          Q.   Except for the Chicago show, does that

7  schedule accurately reflect the shows that were performed by

8  the National Hispanic Circus during the 2001 season?

9          A.   No, I see there that there were changes.

10  There were changes made to it.

11          Q.   Are the changes reflected on that document?

12          A.   No.

13          Q.   I am going to hand you -- I am going to hand

14  you a black pen.  With that pen, could you mark on that

15  document the changes that were made to the 2001 season, to

16  the best of your recollection.

17          Actually, let's do it this way:  Use my blue pen,

18  and I will use the black pen.

19          A.   Well, everything that I have circled was

20  eliminated, and we only did Miami.

21          Q.   Did you --

22          A.   To the best of my recollection, this was on

23  this date, in Miami.

24          Q.   Okay.  Thank you.

25          There is some writing on the bottom of this

Edwin Rivera - Exam By Mr. Pita

Q.    To your knowledge, The National Hispanic Circus did not manufacture the bleachers that were lost, did they?

A.    That's correct.

Q.    Do you know how old the bleachers were that were lost?

A.    About a year.

Q.    Do you have any knowledge as to how much the bleachers weighed?

A.    No.

Q.    Do you have any knowledge as to how much the trailer and all its contents -- the trailer that was lost and all its contents weighed?

A.    No, negative.

Q.    Do you know if the trailer was ever found?

A.    Yes, it was found.

Q.    To your knowledge, when was the trailer found?

A.    I was informed, if my memory serves me correctly, in November.

Q.    Were you informed -- to your knowledge, were you informed in the beginning, middle, or latter part of

### Edwin Rivera - Exam By Mr. Chapman

I thank you very much for your time.

        **MR. CHAPMAN:**  I have a few questions for you,
Mr. Rivera, just to clarify some things and in case you are
not available to testify at trial, so that we cover some
areas.

        (To the interpreter) And you can translate that.

        (Whereupon, the interpreter translates to the
        deponent.)

        EXAMINATION

BY MR. CHAPMAN:

    **Q.**   Now, just to clarify something that was
testified earlier.

    As far as the invoice exhibits -- I believe it's
either 2 or 3 through 5 -- you have no personal knowledge of
those exhibits, do you, sir?

    **A.**   That's correct.

    **Q.**   Now, you also mentioned earlier that the
Chicago shows were all sold out.  Did you actually have to
turn people away from the shows?

    **A.**   In each show we turned about 300 people away,
average.

    **Q.**   If you would have had the bleachers, would
you have been able to seat those individuals?

    **MR. PITA:**  Objection.  Form.

    **THE DEPONENT:**  Yes, positively.

)SITION
HIBIT

42

**Edwin Rivera - Exam By Mr. Chapman**

accommodate those people.

BY MR. CHAPMAN:

    **Q.**   Do you recall when you first suggested that
the circus needed to order bleachers from Canobbio?

    **A.**   No, that's the management who made the
decision on their own.

    **Q.**   Do you recall whether the bleachers were
ordered during the Chicago show?

    **A.**   Yes.  Yes.

    **Q.**   Do you understand anything about how the
construction of the bleachers takes place at Canobbio?

    **A.**   Well, as we were explained the first time we
received the bleachers, they explained to us the way that
they manufacture them and how we had to instruct to set them
up.

    **Q.**   Are these bleachers special made to fit your
tent?

    **MR. PITA:**  Objection.  Form.

    **THE DEPONENT:**  That's correct.

BY MR. CHAPMAN:

    **Q.**   When you ordered replacement bleachers, did
they have replacement bleachers in storage that they could
just provide you, or did they have to manufacture them?

    **MR. PITA:**  Objection.

    **THE DEPONENT:**  No, negative.  They had to

SITION
IBIT

Edwin Rivera - Exam By Mr. Chapman

1  order them.  They said that they had to stop and make them

2  to our measurements.

3  BY MR. CHAPMAN:

4          Q.   Do you know if the circus had to pay in

5  advance in order to get these replacement bleachers?

6          A.   Yes, that's what the management told me, that

7  they had to pay in advance, plus the premium.  In other

8  words, an extra advance because it was a new order.

9              THE INTERPRETER:  Excuse me.

10         "Because it was a quick order, a special order."

11             THE DEPONENT:  (In English) Rush order.

12  BY MR. CHAPMAN:

13         Q.   Do you recall how the bleachers were

14  delivered to the circus?

15         A.   (In Spanish) I heard the management say they

16  had to bring them in by plane.

17         Q.   Did the circus have to pay for that, or was

18  that done by Canobbio?

19             MR. PITA:  Objection.  Form.

20             THE DEPONENT:  The management told me they

21  had to pay it all.

22  BY MR. CHAPMAN:

23         Q.   Now, in addition to 9/11, which you've talked

24  about, did the absence of the bleachers cause any problems

25  with opening up the shows after Chicago?

# THE NATIONAL HISPANIC CIRCUS, INC.
# TRIX *CIRCO MUNDIAL*

## OUR YEAR 2001 SEASON

1.  Los Angeles .......... April 27 – May 10 ...... San Fernando Swap Meet, S.Fernando, CA.

2.  Tuscon, AZ .......... May 11 – 20 ........... Southgate Shopping Center

3.  Phoenix .............. May 25 – June 3[2] ...... Metrocenter Mall          *10 days*

4.  El Paso .............. June 8 – 17[3] ........... Coliseum Parking Lot      *10 days*

5.  San Antonio .......... June 22 – July 1 ........ Windsor Park Mall[4]       *10 days*

6.  Houston .............. July 6 – 15 ............. t/b/d                      *10 days*

7.  Dallas ............... July 20 – 29 ........... t/b/d                      *10 days*

8.  Corpus Christi ....... August 3 – 12 .......... Fair Park (?)              *10 days*

9.  McAllen-Harlingen ... August 17 – 26 ........ Bella Vista Mall            *10 days*

10. Chicago .............. August 31 – Sept. 9[5] ... Cicero & 31st St. (Cicero) *10 days*

11. New York #1 ....... Sept. 14 – 23[6] ........... t/b/d[7]                  *10 days*

12. New York #2 ....... Sept. 26 – Oct. 8[8] ..... t/b/d                      *13 days*

13. New York #3 ....... Oct. 12 – 21 ............. t/b/d                      *10 days*

14. New York #4 ....... Oct. 26 – Nov. 4 ....... t/b/d                      *10 days*

15. Philadelphia ......... Nov. 9 – 18 ............. t/b/d[9]                  *10 days*

16. Miami ................ Nov. 21 – Dec. 2[10] ...... Bicentennial Park         *12 days*



145 days on this schedule
× 170.⁰⁰ = #24,650.⁰⁰
for financing CGL
×5  (#1mm) #3700.⁰⁰
×5  (#3mm) #4700.⁰⁰
3/9/01

DEPOSITION EXHIBIT

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

THE NATIONAL HISPANIC CIRCUS, INC.,    *
A New York Not-For-Profit    *
Corporation,    *
                Plaintiff,    *
                          *
          vs.    * CIVIL NO. B-02-135
                          *
REX TRUCKING, INC., A Texas    *
Corporation, and THE MASON AND DIXON    *
LINES, INC., A Michigan Corporation.    *
                Defendants.    *
-------------------------------------    *

The deposition of:

RIGOBERTO GARCIA SANTIAGO,

a non-party witness, was held at the offices of

SALDAÑA & CARVAJAL, ESQS., Vig Building, 1225 Ponce De Leon

Avenue, Santurce, Puerto Rico, on Thursday, October 23,

2003, at 1:20 p.m.



BARBARA DACHMAN, CSR, RPR
U.S. OFFICIAL COURT REPORTER
787-722-0132

APPEARANCES:

<u>COUNSEL FOR PLAINTIFF</u>

BARKER, LEON, FANCHER & MATTHYS, L.L.P.
Tower II, Suite 1200
555 N. Carancahua
Corpus Christi, Texas  78478
BY:  STEPHEN J. CHAPMAN,  ESQ.

DAVIDOFF & MALITO, L.L.P.
605 Third Avenue
New York, New York  10158
BY:  RICARDO E. OQUENDO, ESQ.
      (Corporate Counsel)

<u>COUNSEL FOR DEFENDANTS</u>

JEANSONNE & REMONDET, L.L.P.
Two Allen Center
1200 Smith Street, Suite 2265
Houston, Texas  77002
BY:  Michael Pita,  ESQ.

<u>NOTARY PUBLIC</u>

LUIS SALDAÑA, ESQ.

<u>CERTIFIED INTERPRETER</u>

EDIE NUÑEZ

<u>COURT REPORTER</u>

BARBARA DACHMAN, CSR, RPR, USOCR

### Rigoberto Garcia - Exam By Mr. Pita

1              (The deponent is duly sworn by the notary

2                  public.  The reporter and interpreter remain

3                  under a previously administered oath.)

4   Whereupon,

5                  RIGOBERTO GARCIA SANTIAGO,

6   After first having been duly sworn by the notary public, was

7   examined and, through the interpreter, deposed as follows:

8                          EXAMINATION

9   BY MR. PITA:

10        Q.   Mr. Garcia, my name is Michael Pita, and I

11   represent The Mason and Dixon Lines.

12        Do you understand that?

13        A.   Yes.

14        Q.   Before I begin, I need to speak with your

15   lawyer about a few things.  If you give me just a second, I

16   will get right back to you.

17        Is that okay?

18        A.   Okay.

19        Do you want me to step out?

20        Q.   No, you are fine.

21             MR. PITA:  The same stipulations as before?

22             MR. CHAPMAN:  Yes, exactly the same as the

23   first deposition.

24             MR. PITA:  About the rules, object to form.

25             MR. CHAPMAN:  Exactly.

15

### Rigoberto Garcia - Exam By Mr. Pita

1  Q.    Did the circus offer different prices for

2  adults as opposed to children?

3  A.    That's correct.

4  Q.    At some point during the run of the Chicago

5  show, the show was extended; is that correct?

6  A.    That's correct.

7  Q.    How many shows were added?  Do you recall?

8  A.    About nine.

9  Q.    Okay.

10  How many shows were originally scheduled?  Do you

11  recall?

12  A.    About 17 or 18.  I don't remember exactly.

13  Q.    Now, my understanding from Mr. Rivera's

14  testimony is that after the Chicago show, The National

15  Hispanic Circus was originally supposed to have shows in New

16  York, Philadelphia, and Miami; is that correct?

17  A.    That's correct.

18  Q.    And the --

19  A.    But originally -- not until the last day that

20  we stayed.  In other words, without the extension.

21  Q.    What did the extension have to do with the

22  New York show?

23  A.    9/11.

24  Q.    You didn't have any shows -- you didn't have

25  the shows in New York because of 9/11, correct?

16

### Rigoberto Garcia - Exam By Mr. Pita

1   A.   That's correct.

2   Q.   But you still had shows after 9/11 in

3   Chicago; is that correct?

4   A.   Until the 16th, if my memory serves me

5   correctly.

6   Q.   To your knowledge, the decision to have the

7   shows in Chicago had nothing to do with the loss of the

8   bleachers, right?

9   MR. OQUENDO:   That's objectionable.

10   MR. CHAPMAN:   Objection as to form.

11   BY MR. PITA:

12   Q.   You can go ahead and answer the question.

13   THE INTERPRETER:   I am sorry, what was the

14   question again?   To your knowledge?

15   MR. PITA:   To his knowledge.

16   THE INTERPRETER:   The decision to what?

17   MR. PITA:   The cancellation of the shows in

18   New York didn't have anything to do with the loss of the

19   bleachers; is that correct?

20   MR. CHAPMAN:   The same objection.

21   THE DEPONENT:   In other words, not going to

22   New York?

23   BY MR. PITA:

24   Q.   Didn't have anything to do with losing the

25   bleachers.

Rigoberto Garcia - Exam By Mr. Pita

1      **A.**   No, not that I know of.

2      **Q.**   At some point after the bleachers were lost,

3   The National Hispanic Circus called a company in Italy,

4   right?

5            **MR. OQUENDO:**  I really have to object.  I am,

6   Steve.

7            Can you pose questions and not statements?

8            **MR. CHAPMAN:**  What he's saying is, I think

9   he's probably thinking that you are leading him a little bit

10  along the way.  You might be able to just ask.  But it is

11  your deposition, and I will object when necessary.

12           **MR. PITA:**  It is cross-examination.

13           **MR. CHAPMAN:**  I understand.

14           **MR. PITA:**  And I can lead --

15           **MR. OQUENDO:**  But you have to ask him a

16  question.  You don't say -- you can ask him what The

17  National Hispanic Circus did.  You can't tell him that they

18  did this and then ask him to affirm it.  You can lead to

19  some extent, but that's --

20           **MR. PITA:**  With all due respect, in

21  cross-examination I can lead and I can ask questions like

22  that.

23           You can make your objections for the record, but

24  that's the way I am doing it.

25           **MR. CHAPMAN:**  Okay.

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

THE NATIONAL HISPANIC          )
CIRCUS, INC., A New York       )
not-for-profit Corporation,    )
                               )
        Plaintiff,             )
                               )
    vs.                        )
                               )        CIVIL ACTION No.  B-02-135
REX TRUCKING, INC., a Texas    )
Corporation, and THE MASON AND )
DIXON LINES, INC., a Michigan  )
Corporation                    )
                               )
        Defendants.            )

## PLAINTIFF'S RESPONSES TO DEFENDANT THE MASON AND DIXON LINES, INC.'S FIRST SET OF INTERROGATORIES

COMES NOW, THE NATIONAL HISPANIC CIRCUS, INC., Plaintiff in the above-entitled

and numbered cause and files these his Responses to Defendant The Mason and Dixon Lines, Inc.'s

First Set Of Interrogatorries herein and pursuant to the Federal Rules of Civil Procedure.

Respectfully submitted,

BARKER, LEON, FANCHER
& MATTHYS, L.L.P.
Tower II - Suite 1200
555 N. Carancahua St.
Corpus Christi, Texas 78478
Telephone: (361) 881-9217
Facsimile: (361) 882-9437

Stephen J. Chapman
State Bar No. 24001870
Attorneys for Plaintiff
National Hispanic Circus, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served in accordance with the Federal Rules of Civil Procedure on this the ___20th___ day of ___August___, 2003, to all counsel of record as follows:

Mr. Patrick Sullivan
HOOVER SLOVACEK, L.L.P.
5847 San Felipe, Suite 2200
Houston, Texas 77057

Mr. Michael Pita
Mr. Michael Remondet, Jr.
Jeansonne & Remondet
200 West Congress Street
Lafayette, Louisiana 70509

Stephen J. Chapman

## INTERROGATORIES

**INTERROGATORY NO. 1:**    Describe, in your words, the circumstances surrounding the disappearance of a truck that was hauling the bleachers for the Chicago show.

**ANSWER**:

Objection.  Said requests is vague and seeks information in the care custody and control of Defendants.  Subject to said objection:

On or about August 27, 2001 the Circus hired Rex Trucking, Inc., a division of Louisiana Transportation, Inc. to provide drivers and trucks to transport from Harlingen, Texas to Chicago, Illinois, seven (7) Circus trailers, one of which contained a set of bleachers.

The Circus' trailers and their respective loads were placed under Rex Trucking's sole and exclusive custody, care, supervision, direction and control. Rex Trucking had exclusive control over its drivers and its trucks, in addition to the means, methods, and details of delivering the trailers to the Circus in Chicago.   The truck transporting the Circus' trailer containing the bleachers was stolen and the trailer and bleachers never arrived in Chicago.

**INTERROGATORY NO. 2:**   Please state the seating capacity of the bleachers that were being hauled in the truck, the disappearance of which is the basis of this lawsuit.

**ANSWER:**

The seating capacity of the bleachers was 950 seats.

**INTERROGATORY NO. 3:** Please describe, in detail, the security measures you took to insure the safe transport of the bleachers from Harlingen, Texas to Chicago, Illinois

**ANSWER:**

Objection.  Said requests is vague and seeks information in the care custody and control of Defendants. Subject to said objection:

All responsibility and security measures as included in the signed Agreement were placed on the Defendants. Plaintiff is unaware of any security measures taken by the defendant responsible for doing so.

**INTERROGATORY NO. 4:** Please describe, in detail, all steps you took to mitigate your damages, if any, that resulted from the temporary loss of the bleachers.

**ANSWER:**

As a consequence of the stolen bleachers, the Circus was forced to rent bleachers to carry out its 26 performances in Chicago from August 31, 2001 through September 16, 2001. The cost of renting replacement bleachers was $9,000.00. The missing bleachers are custom made and custom fit to the tents. The rented bleachers, however, provided approximately 1/3 fewer seats than the Circus' bleachers. The Circus, therefore, suffered consequential damages of $6,000.00 per performance over 26 performances for a total of $156,000.00.

**INTERROGATORY NO. 5:** Please describe the particular needs of Plaintiff that allegedly required the need to order custom bleachers.

**ANSWER:**

The bleachers that were lost/ stolen were designed to conform to the shape of the circus tent, therefore, only custom made bleachers could be ordered to fit the circus tent for maximum seating and be in full compliance with all the applicable security and safety regulations.

**INTERROGATORY NO. 6:** Please describe all estimates you obtained with regard to the cost of replacement bleachers. In particular, please provide the names of all companies from which you received cost estimates for replacement. Also, please include the amount of each estimate, including the cost of shipping.

**ANSWER:**

Since the lost/stolen bleachers were custom made, the Circus only contacted Cannobio, the tent designers and provider of the original custom made bleachers. Cannobio had the correct specifications, size and shape of the tent to make the custom replacement bleachers. The Circus suffered damages in the amount of $128,844.46 for the purchase and shipment of the new bleachers.

**INTERROGATORY NO. 7:** Please state the date on which you learned that the bleachers made the basis of this lawsuit had been recovered.

**ANSWER:**

On or about November 21, 2001.

**INTERROGATORY NO. 8:** Please state the last date on which you could have cancelled the order you made for the replacement bleachers.

**ANSWER:**

The replacement bleachers could not be cancelled because it was a custom order for the Circus' tent. The Circus had already paid for the new bleachers by the time the old bleachers were found.

**INTERROGATORY NO. 9:** Please describe in detail any delays in performances that resulted from the temporary disappearance of the bleachers made the basis of this lawsuit.

**ANSWER:**

There were no delays in performances as a result of the lost/stolen bleachers, however, as a consequence of the stolen bleachers there were approximately 1/3 fewer seats available than the Circus' bleachers during the performances.

**INTERROGATORY NO. 10:** Please describe, in detail, the seating capacity of the bleachers you rented for your performances in Chicago, Illinois between August 31, 2001 to September 16, 2001.

Responses to Interrogatories Page 5

**ANSWER:**

The rented bleachers only provided 300 seats.


**INTERROGATORY NO. 11:** Please describe, in detail, the seating capacity of the bleachers you purchased as alleged replacements for the bleachers, the temporary disappearance of which is the basis of this lawsuit.


**ANSWER:**

The replacement bleachers provide 950 seats.


**INTERROGATORY NO. 12:** Please state the originally scheduled dates for the Chicago show before you extended its run until September 16, 2001. Please include the number of shows you originally scheduled in Chicago, Illinois before you extended the show's run.


**ANSWER:**

The original dates were August 29, 2001 and September 9, 2001. There were originally 18 performances scheduled during this period.


**INTERROGATORY NO. 13:** Please state the number of additional performances you added in Chicago, Illinois between August 29, 2001 and September 16, 2001.


**ANSWER:**

The Circus added an additional 8 performances between August 29, 2001 and September 16, 2001.

**INTERROGATORY NO. 14:** Please describe the date on which you received shipment of the replacement bleachers you purchased.

**ANSWER:**

The replacement bleachers were shipped to Florida on or about November 28, 2001.

**INTERROGATORY NO. 15:** Please state the last date you could have cancelled the order for the replacement bleachers you purchased as alleged replacements for the bleachers, the disappearance of which forms the basis of this lawsuit.

**ANSWER:**

See response to Interrogatory #8.

**INTERROGATORY NO. 16:** Please list all persons that assisted in the preparation of your answers to these Interrogatories.

**ANSWER:**

Ernesto Vilanova Velez, Jorge Gonzalez, Rigoberto Garcia, Edwin Rivera and The National Hispanic Circus' counsel assisted in the preparation of the answers to these Interrogatories.

**INTERROGATORY NO. 17:** Please state whether or not the person (2) answering these Interrogatories has been convicted of a crime or of a felony within the last ten (10) years, of released from confinement within the last ten (10) years. If so, please state the nature of the conviction, the country in which the conviction occurred, and the date of conviction or release from confinement, whichever is later.

**ANSWER:**

Responses to Interrogatories Page 7

Objection. Said request is a fishing expedition and is not calculated to lead to the discovery of admissible evidence.  Subject to said objection, None.

**INTERROGATORY NO. 18:** Please list all lawsuits that you have been involved in.  Please include the court in which the lawsuits were filed, the nature of the lawsuits, and the disposition of the lawsuit.

**ANSWER:**

The Plaintiff objects to this Interrogatory on the grounds that it is not relevant to the facts or subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| THE NATIONAL HISPANIC | § | |
| CIRCUS, INC. A NEW YORK | § | |
| NOT-FOR-PROFIT CORPORATION | § | |
| Plaintiff | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-02-135 |
| | § | |
| REX TRUCKING, INC., A TEXAS | § | |
| CORPORATION, AND THE MASON | § | JURY DEMANDED |
| AND DIXON LINES, INC. A MICHIGAN | § | |
| CORPORATION | § | |
| Defendants | § | |

## VERIFICATION

[FORM 2]

TERRITORY                    §
                             §
_____

BEFORE ME, the undersigned authority, a Notary Public, personally appeared
_Ernesto Villanueva Velez_____, known to me to be the person whose name is
subscribed below, who after being duly sworn by me, upon his/her oath deposed and stated:

1.   that he/she is an authorized representative of Plaintiff, THE NATIONAL
     HISPANIC CIRCUS, INC.;

2.   that he/she has read the Answers to Interrogatories; and

3.   that all the information and statements contained in the Answers to Interrogatories
     save and except the legal terminology are true and correct based upon The National
     Hispanic Circus, Inc.'s information and belief.

Signed this _20_ day of _August_ 2003.

_____
REPRESENTATIVE OF THE NATIONAL
HISPANIC CIRCUS, INC.

Page 1

AFFIDAVIT — 3314

SUBSCRIBED AND SWORN TO BEFORE ME on this _20_ day of _August_ 2003, to certify which witness my hand and seal of office.

NOTARY PUBLIC

Page 2

# EXHIBIT "E"

28/11 '01 MER 16:52 FAX 0131 823521   CANOBBIO SPA   ☐002
28/11 01 MER 15:31  0131  5142   CANOBBIO SPA   → CANOBBIO SPA Uff  ☐002
01/01

0131855142   CANOBBIO   HAWB . . : MIL27106592   .11.2001  14:12:47  01/01

| 125 MIL 8815 5406 | Shipper's Account Number | Not Negotiable **Air Waybill** Issued by | KUEHNE & NAGEL S.P.A. LARGO FRATELLI CERVI I-20090 VIMODRONE |
|---|---|---|---|

Shipper's Name and Address
CANOBBIO SPA
VIA ROMA, 3
IT-15053 CASTELNUOVO SCRIVIA

Copies 1, 2 and 5 of this Air Way ill are originals and have the same validity

Consignee's Name and Address
THE NATIONAL HISPANIC
2586 LANE AVENUE NORTH
JACKSONVILLE FLORIDA 32254 USA

**KN ⚓**
**KUEHNE & NAGEL**

Issuing Carrier's Agent Name and City
KUEHNE & NAGEL S.P.A.
LARGO FRATELLI CERVI
I-20090 VIMODRONE

Accounting Information
SHPRS REF :406
2710-3211-111,0:5

Agent's IATA Code    Account No.
58-4-7069 / 0015

Airport of Departure (Addr. of First Carrier) and Requested Routing
MILAN

NON VALE FATTURA AI FINI IVA
03353320157

| To | By First Carrier | Routing and Destination | to | by | to | by | Currency | CHGS Code | WT/VAL PPD COLL | Other PPD COLL | Declared Value for Carriage | Declared Value for Customs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ATL | BA3693/01 | | | | | | USD | C | | | NVD | NCV |

Airport of Destination
ATLANTA  GA

Amount of Insurance
XXX

INSURANCE - If Carrier offers insurance, and such insurance is requested in accordance with conditions on reverse hereof, indicate amount to be insured in figures in box marked Amount of Insurance

Handling Information
ATTACHED: SET OF DOCUMENTS  COMMERCIAL INVOICE
PLS CONTACT IMMEDIATLY MR ROBERTO SOTO PHONE 904 607 2159
OR MR ERNESTO VILANOVA PH 787 769 8100

| No. of Pieces RCP | Gross Weight | kg lb | Rate Class Commodity Item No. | Chargeable Weight | Rate Charge | Total | Nature and Quantity of Goods (incl. Dimensions or Volume) |
|---|---|---|---|---|---|---|---|
| 18 | 18129,0 | K Q | | 18129,0 | 1,40 | 25380,6 | STEPS FOR CIRCUS EX WORKS |
| | | | | | | | VOL: 71.545 CBM. |
| 18 | 18129,0 | | | | | 25380,6 | |

| Prepaid | Weight Charge | Collect | Other Charges |
|---|---|---|---|
| | 25380,60 | | PUA  1176,00   INA   303,00   TXC   3081,00 |
| | Valuation Charge | | SCC  2536,06   MYC  1812,90 |
| | Tax | | |

Shipper certifies that the particulars on the face hereof are correct and that insofar as any part of the consignment contains dangerous goods, such part is properly described by name and is in proper condition for carriage by air according to the applicable Dangerous Goods Regulations.

Total Other Charges Due Agent
1479,00

Total Other Charges Due Carrier
7431,96

KUEHNE & NAGEL  S.P.A.
EUGENIA ZERBINI
Signature of Shipper or his Agent

Total Prepaid   Total Collect
54291,56

Currency Conversion Rates   CC Charges in Dest. Currency
28/NOV/2001 MILANO
Executed on (Date)  at (Place)

KUEHNE & NAGEL S.P.A.
Signature of Issuing Carrier or its Agent

MIL27106592

Kuehne & Nagel SpA
Largo F.lli Cervi
I-20090 Vimodrone (MI)
Italy

Tel:   +39 02 26 07 41
Fax:   +39 02 21 07 45 54
Email: knmil.ad@kuehne-nagel.com
Internet: www.kuehne-nagel.com

Deutsche Bank sp. E
Via Palestina 5 Milano
ABI 03104, CAB 01603
Acc. No. 446.300.071
Partita IVA IT dts 540 08 + 62

**KUEHNE & NAGEL S.p.A.**

# EXHIBIT "F"

34

**Programmazione Produzione**

Da:              CANOBBIO spa - Produzione [produzione@can bbio.com]
Inviato:         mercoledi 28 novembre 2001 19.43
A:               'EVA'
Oggetto:         SHIPMENT BY AIR

36 104

**URGENT ATTENTION MR ERNESTO VILLANOVA**

WE HAVE CONTACTED THE INTERNATIONAL FORWARDER AND WE INFORM YOU THE PENALTY TO CANCEL THE FLIGHT BOOKED IS  THE  75 % OF THE FREIGHT.

AS AGREED AND  CONSIDERING THAT THE  COST OF CANCELLATION  IS VERY EXPENSIVE , WE HAVE CONFIRMED THE SHIPMENT BY AIR  AS PER YOUR INSTRUCTIONS.

WE INVITE TO CONTACT THE AGENT OF KUEHNE & NAGEL  OF ATLANTA AT THE FOLLOWING ADRESS:

235 SOUTHFIELD PARKWAY
USA - FOREST PARK GA A 30297 ATLANTA
TEL 001-404-6752800
FAX 001-404-6752801

**MISS CHERYL WHITE**

IN ORDER TO COORDINATE THE SHIPMENT AND THE SETTLEMENT OF THE CHARGES.

YOUR FAITHFULLY.

REGARDS.

CANOBBIO SPA
CANOBBIO FEDERICO

1

# EXHIBIT "G"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| THE NATIONAL HISPANIC | § | |
| CIRCUS, INC. A NEW YORK | § | |
| NOT-FOR-PROFIT CORPORATION | § | |
|     Plaintiff | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-02-135 |
| | § | |
| REX TRUCKING, INC., A TEXAS | § | |
| CORPORATION, AND THE MASON | § | JURY DEMANDED |
| AND DIXON LINES, INC. A MICHIGAN | § | |
| CORPORATION | § | |
|     Defendants | § | |

## DEFENDANT, THE MASON AND DIXON LINES, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIM

COMES NOW, Defendant, **THE MASON AND DIXON LINES, INC.** ("Defendant") and files this, its Second Amended Answer and Counterclaim to Plaintiff, **THE NATIONAL HISPANIC CIRCUS, INC.'S** ("Plaintiff"), Second Amended Complaint and Jury Demand (the "Complaint") and specifically adopts, reasserts, realleges, and re-avers as follows:

### I.

## DEFENDANT'S SECOND AMENDED ANSWER

## INTRODUCTION

1.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 1 of the Complaint.

2.    Defendant admits that Plaintiff alleges that this action arises from Rex Trucking, Inc. ("Rex") and/or Defendant's alleged failure to deliver Plaintiff's bleachers prior to Plaintiff's scheduled performance in Chicago, Illinois on August 31, 2001, as a result of trailers being allegedly stolen shortly after Rex and/or Defendant allegedly took exclusive possession of the

1

trailer containing the bleachers. However, Defendant denies any inference that the claims or causes of actions alleged in the Complaint are supportable under the facts or law.

3.    Defendant admits that Rex Trucking and/or its assets were purchased by the Mason and Dixon Lines, Inc. However, Defendant is without knowledge as to form a belief as to the specific date of the purchase.

4.    Defendant admits that Plaintiff seeks redress for financial losses and damages it allegedly suffered as a result of the loss of the trailer and bleachers. However, Defendant denies any inference that the alleged claims or causes of action are supportable under the facts or law.

## II.

## JURISDICTION AND VENUE

5.    Defendant admits that Plaintiff affirmatively pleads that it seeks monetary damages and other relief in excess of $75,000.00, exclusive of costs and interest. Further, Defendant admits that the controversy is between citizens of different States.

6.    Defendant denies that Defendant entered into a contract and provided services to Plaintiff in the State of Texas.

7.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 7 of the Complaint.

## III.

## THE PARTIES

8.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 8 of the Complaint.

9.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 9 of the Complaint.

10.    Defendant admits the averment contained in Paragraph 10 of the Complaint.

2

IV.

FACTUAL ALLEGATIONS

11.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 11 of the Complaint.

12.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 12 of the Complaint as it relates to Rex. As Paragraph 12 relates to Defendant, Defendant denies the averment contained therein.

13.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 13 of the Complaint as it relates to Rex. As Paragraph 13 relates to Defendant, Defendant denies the averment contained therein.

14.     Defendant denies the averment contained in Paragraph 14 of the Complaint.

15.     Defendant admits that the trailer and bleachers never arrived in Chicago. However, Defendant denies the remaining averments contained in Paragraph 15 of the Complaint.

16.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment regarding a delay, if any, in setting up for the circus. However, Defendant admits that Plaintiff rented bleachers at a cost of $9,000.00

17.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 17 of the Complaint.

18.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 18 of the Complaint as that Paragraph relates to the number of performances. Further, Defendant is without knowledge or information sufficient to form a belief as to the subsequent damages, if any, that resulted from the alleged loss of the bleachers.  Additionally, Defendant denies that Plaintiff is entitled to recover

consequential damages under the terms of the contract it allegedly entered into with Rex and/or for Defendant.

19.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 19 of the Complaint.

20.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 20 of the Complaint.

21.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averment contained in Paragraph 21 of the Complaint.

22.    Defendant admits that Plaintiff, through its attorneys, made a demand of $293,844.46. However, Defendant denies that Defendant owes this amount to Plaintiff for failure to transport and deliver the bleachers.

23.    Defendant denies the averment contained in Paragraph 23 of the Complaint. Specifically, Defendant states that it paid for the cost of renting replacement bleachers.

## V.

## FIRST CLAIM FOR RELIEF (COUNT 1)

## CARMACK AMENDMENT

24.    Defendant denies that it violated the Carmack Amendment, 49 U.S.C. §14701. By way of further of pleading, Defendant denies that Plaintiff was required to purchase replacement bleachers.

## VI.

## SECOND CLAIM FOR RELIEF (COUNT II)

### BREACH OF AGREEMENT

25.    Defendant reasserts each and every response to Paragraph 1 through 24 of the Complaint with the same force and effect as it set forth in full herein.

26.    Defendant denies the averment confainted in Paragraph 26 of the Complaint.

27.    Defendant denies that an agreement existed between it and Plaintiff, entitling Plaintiff to loss of ticket sale revenues in the amount of $156,000.00.

28.    Defendant denies that an agreement existed between it and Plaintiff, entitling Plaintiff to payment for the purchase and shipment of the new bleachers in the amount of $128,844.46.

29.    Defendant denies the averment contained in Paragraph 29 of the Complaint.

30.    Defendant denies the averment contained in Paragraph 30 of the Complaint.

## VII.

### JURY DEMAND

31.    Defendant denies the averment contained in Paragraph 31 of the Complaint.

32.    The Defendant denies Plaintiff's Prayer for Relief.

## VIII.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

33.    Pleading further, and by way of additional defense, Defendant states that the matters made the basis of this lawsuit, as well as any damages alleged or complained of in the Complaint, were caused, in whole or in part, by the acts, omissions, or other conduct of Plaintiff or other third parties over whom Defendant had no control.

5

## SECOND AFFIRMATIVE DEFENSE

34.    Pleading further, and by way of additional defense, Defendant states that Plaintiff failed to mitigate and reduce its damages as required by law.

## THIRD AFFIRMATIVE DEFENSE

35.    Pleading further, and by way of additional defense, Defendant states the Carmack Amendment, 49 U.S.C. §14701 et seq., applies in that the contract entered into between the parties, if any, required a bill of lading.

## FOURTH AFFIRMATIVE DEFENSE

36.    Pleading further, and by way of additional defense, Defendant asserts the defenses contained in 42 U.S.C. §14706. Specifically, Defendant asserts that the public enemy was the cause of the loss suffered by Plaintiff, if any.

## FIFTH AFFIRMATIVE DEFENSE

36.    Pleading further, and by way of additional defense, Defendant asserts the defenses contained in 42 U.S.C. §14706. Specifically, Defendant asserts that Plaintiff was the cause of the loss suffered by Plaintiff, if any.

## SIXTH AFFIRMATIVE DEFENSE

37.    Pleading further, and by way of additional defense, Defendant asserts that it is entitled to a setoff and/or recoupment for monies owed by Plaintiff to defendant for successful delivery of Plaintiff's property totaling $18,485.00.

V.

## COUNTERCLAIM

COMES NOW, THE MASON AND DIXON LINES, INC. ("Counter-Plaintiff"), for its counterclaim against THE NATIONAL HISPANIC CIRCUS, INC. ("Counter-Defendant") and avers as follows:

## FIRST CAUSE OF ACTION

38.    Made defendant in counterclaim is THE NATIONAL HISPANIC CIRCUS, INC.

39.    On or about August 27, 2001, Counter-Defendant entered into an agreement with Counter-Plaintiff to provide services in the form of hauling Counter-Defendant's property from Harlingen, Texas to Chicago, Illinois.

40.    Despite allegations to the contrary, and without admission of any fault on the part of Counter-Plaintiff, the bulk of the property hauled by Counter-Plaintiff arrived in Chicago on or before the date and time scheduled for its arrival.

41.    Following delivery, Counter-Defendant tendered a Check in the amount of $18,485.00 representing the amounts owed to Counter-Plaintiff for the services provided.

42.    However, prior to negotiation of the instrument by Counter-Plaintiff, payment on the instrument was stopped at the request of Counter-Defendant.

43.    Said instrument represented payment for services not in dispute as well as those in dispute.

44.    To that end, Counter-Plaintiff has not been paid for the services provided.

45.    Counter-Plaintiff asserts that Counter-Defendant is indebted to Counter-Plaintiff in the amount of $18,485.00.

46.    Despite amicable demand, Counter-Defendant has failed to pay the amounts owed.

WHEREFORE, Counter-Plaintiff, THE MASON & DIXON LINES, INC., prays that there be judgment herein in favor of Counter-Plaintiff and against the Counter-Defendant, THE NATIONAL HISPANIC CIRCUS, INC., in the full and true sum of $18,485.00, together with

7

legal interest from judicial demand until paid and for all such other and further relief, both general and special, at law or in equity, to which it may be justly entitled.

Respectfully Submitted,

JEANSONNE & REMONDET, L.L.C.

By: _____
Michael A. Pita
State Bar No. 24034628
Federal Bar No. 32169
ATTORNEY-IN-CHARGE
1200 Smith Street, Suite 2265
Houston, Texas 77002
Telephone: (713) 752-0300
Telecopier: (713) 752-0410

**ATTORNEY FOR DEFENDANT,
THE MASON AND DIXON LINES**

OF COUNSEL:

JEANSONNE & REMONDET, L.L.C.
1200 Smith Street, Suite 2265
Houston, Texas 77002
Telephone: (713) 752-0300
Telecopier: (713) 752-0410

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to the following counsel of record by certified mail, return receipt requested, and/or hand delivery, and/or via facsimile on this the 16th day of July 2003.

Roger Albright
LAW OFFICES OF ROGER ALBRIGHT
3301 Elm Street
Dallas, Texas 75226-1637
VIA CM/RRR# 7003 0500 0004 6564 6257

8

Stephen J. Chapman
BARKER, LEON, FANCHER & MATTHYS, L.L.P.
Tower II- Suite 1200
555 N. Carancahua St.
Corpus Christi, Texas  78478
<u>**VIA CM/RRR # 7003 0500 0004 6465 6264**</u>

G. Stephen Parrott
HOOVER SLOVACEK, LLP
5847 San Felipe, Suite 2200
Houston, Texas 77057
<u>**VIA CM/RRR # 7003 0500 0004 6465 6271**</u>

_____
Michael A. Pita

# EXHIBIT "H"

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

CIVIL ACTION NO. B-02-135

| | | |
|---|---|---|
| THE NATIONAL HISPANIC CIRCUS, INC., A NEW YORK NOT-FOR-PROFIT CORPORATION | ) ) ) ) | |
| Plaintiff | ) ) | DEPOSITION |
| VS. | ) ) | OF |
| REX TRUCKING, INC., A TEXAS CORPORATION, AND THE MASON AND DIXON LINES, INC., A MICHIGAN CORPORATION | ) ) ) ) ) | LEO BLUMENAUER |
| Defendants | ) ) | |


**COPY**

DEPOSITION taken before me, Brenda J. Brink, a Notary

Public within and for the State of Ohio, on the 4th Day of

November, 2003, pursuant to Notice and at the time and

place therein specified, to be used pursuant to the Rules

of Civil Procedure or by agreement of counsel in the

aforesaid cause of action, pending in the United States

District Court for the Southern District of Texas,

Brownsville Division.

3

STIPULATIONS

          It is stipulated and agreed by and between
counsel for the parties hereto that this deposition may be
taken at this time, 1:30 p.m., November 4, 2003, in the
offices of Nagy-Baker Court Reporting, Inc., 26 Market
Street, Suite 810, Youngstown, Ohio.

          It is further stipulated and agreed by and
between counsel that the deposition may be taken in
shorthand by Brenda J. Brink, a Notary Public within and
for the State of Ohio, and may be by her transcribed with
the use of computer-assisted transcription; that the
witness will read and sign the finished transcript of his
deposition.

4

```
 1                              INDEX

 2

 3   CROSS EXAMINATION BY MR. CHAPMAN - PAGE 5

 4   DIRECT EXAMINATION BY MR. PITA - PAGE 44

 5

 6

 7   OBJECTIONS AND MOTIONS:

 8   BY MR. PITA:  PAGE(S) 13, 14, 16, 17, 18, 19, 20, 22, 24,

 9   25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39,

10   40, 42

11   BY MR. CHAPMAN:  PAGE(S) 24, 28

12

13

14   PLAINTIFF'S EXHIBITS INTRODUCED:

15   EXHIBIT 1 - PAGE 11            EXHIBIT 11 - PAGE 28

16   EXHIBIT 2 - PAGE 12            EXHIBIT 12 - PAGE 29

17   EXHIBIT 3 - PAGE 15            EXHIBIT 13 - PAGE 30

18   EXHIBIT 4 - PAGE 17            EXHIBIT 14 - PAGE 31

19   EXHIBIT 5 - PAGE 20            EXHIBIT 15 - PAGE 32

20   EXHIBIT 6 - PAGE 21            EXHIBIT 16 - PAGE 33

21   EXHIBIT 7 - PAGE 22            EXHIBIT 17 - PAGE 34

22   EXHIBIT 8 - PAGE 24            EXHIBIT 18 - PAGE 44

23   EXHIBIT 9 - PAGE 26            EXHIBIT 19 - PAGE 44

24   EXHIBIT 10 - PAGE 27

25
```

 1                    WHEREUPON,

 2                    LEO BLUMENAUER,

 3                    of lawful age, being by me first duly

 4                    sworn to testify the truth, the whole

 5                    truth, and nothing but the truth, as

 6                    hereinafter certified, deposes and

 7                    says as follows:

 8    CROSS EXAMINATION:

 9    BY MR. CHAPMAN:

10    Q            Good afternoon, Mr. Blumenauer.  My name

11    is Steve Chapman.  I represent the National Hispanic

12    Circus in a case filed against the Mason and Dixon Lines.

13    Have you ever had your deposition taken before, sir?

14    A            Yes.

15    Q            Okay.  So you're aware of the process.

16    And I'll ask questions, and you'll give responses.  Your

17    attorney may object.  And unless he instructs you not to

18    answer, you can go ahead and answer.

19    A            Correct.

20    Q            In addition, for the court reporter's

21    sake, if you would answer out loud, not nod your head.

22    Because he's going to say -- she's going to type down nod

23    your head.  He's going to say it was left and right, and

24    I'm going to say it was up and down.  So just answer with

25    an affirmative response or negative response, however you

1           THE WITNESS:  Thank you.

2           MR. PITA:  Take a quick break?

3           MR. CHAPMAN:  Okay.

4    (Discussion off the record)

5 DIRECT EXAMINATION:

6 BY MR. PITA:

7 Q           Mr. Blumenauer, I'm going to show you

8 what was marked -- what was previously marked as Exhibit

9 16 and 17, and I'm also going to show you what I've marked

10 as Exhibit 18.  Collectively, what do those documents

11 refer to; do you know?

12 A           These would refer to the freight charges

13 for the shipments moved by Rex Trucking.

14 Q           Okay.  Do you know, offhand, what the

15 amount of those freight shipments was?

16 A           Shade over $18,000, I believe.

17 Q           Okay.  Have you ever heard of a company

18 called US Trailer Movers?

19 A           Yes.

20 Q           Who is US Trailer Movers?

21 A           That -- now that you say it is -- that's

22 a company -- that's the company Curtis Spiva owns.

23 Q           Okay.  I'm going to show you a document

24 that I'm going to mark as Exhibit 19.

25    (Whereupon Plaintiff's Exhibit 19 was marked.)

1  Q                Have you ever seen that document before?

2  A                Yes.

3  Q                What is that document?

4  A                That's a check from National Hispanic

5  Circus to US Trailer Movers for $18,485.

6  Q                Do you know what that check was for?

7  A                It was for payment of the freight

8  charges for moving the shipments.

9  Q                They shipped the circus to Chicago?

10 A                To Chicago; correct.

11 Q                Why was the check made out to US

12 Trailers?

13 A                Don't really know.  It should have been

14 made out to Rex Trucking.  Don't know.

15 Q                Do you know if payment was ever made on

16 that check?

17 A                Stop payment was made on this check.

18                  MR. PITA:  That's all I have.

19                  MR. CHAPMAN:  Off the record just

20 for one second.

21      (Discussion off the record)

22                  MR. CHAPMAN:  Nothing further for

23 me, sir.  I appreciate your time.  I believe we were going

24 to agree that if an unsigned copy or if we need to use an

25 unsigned copy, if the original is not available, we can do

# REX TRUCKING, INC.

505 N. Belt East, Suite 530
Houston, Tx. 77060
(281) 260-8600
(281) 260-8612 fax

*(26192)*

**Bill of Lading**

Load # _13-090-003_
Trk # _1357_  Trl # _____
Driver _Ed McSpadden_

Tarp Required:  Yes _____ No _✓_

Pick Up Date: _____
Shipper: _CIRCO MUNDIAL_
Address: _HARLINGEN, TX_
City/State: _Eran Real (damage)_
Signature: _____
(SHIPPED IN GOOD CONDITION) DATE: _8-27-01_

Delivery Date: _____
Consignee: _CIRCO MUNDIAL_
Address: _4100 S. ASHLAND_
City/State: _CHICAGO, IL_
Signature: _____
(RECEIVED IN GOOD CONDITION) DATE: _8-29-01_

Loading Time In _____ Out _____     Unloading Time In _____ Out _____

**Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed.
Shipper is responsible unless otherwise noted. Payment is due net 15 terms.**

| Pieces | Description Of Work Performed | Miles | Weight |
|--------|-------------------------------|-------|--------|
| 1 | '95 Used Great Dane Trailer - 45 Ft., LIC # 43744-A | PUERTO RICO | |
| | VIN # 1GRAA9025SB103001 | | |
| | UNIT # NHC 51146    F.P.  Damage to Left Top of Trailer (HOLE) | | |

**Received in Apparent Good Order, Except as Noted Above. All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.**

**Bill to:** _____
**Address:** _____
**City/State:** _____
**Phone:** _____
**Cust ref #:** _____

Line haul: _2600_
Stopoff: _____
Tarping: _____
Permits: _____
Other: _____
**Invoice Total:** _____

Beginning Odometer Reading: _____    Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|-------|---------------------|----------|--------------|-------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature: _____    Total Miles: _____
All Logs Must Be Attached

White & Green = Corp. Office          Gold = Driver          Pink = Shipper

PLAINTIFF'S
EXHIBIT
10
11/4/03

# REX TRUCKING, INC

505 N. Belt East, Suite 530
Houston, Tx. 77060
(281) 260-8600
(281) 260-8612 fax

*26161*

**Bill of Lading**

Load # 13-040-001
Trk # 1315  Trl # _____
Driver JOHN D. CUSTER

Tarp Required:  Yes _____ No _____

Pick Up Date: _____
Shipper: CIRCUS LOT
Address: _____
City/State: HARLINGEN
Signature: _____
(SHIPPED IN GOOD CONDITION) DATE:

Delivery Date: 8-29-07
Consignee: CIRCUS LOT
Address: _____
City/State: CHICAGO IL
Signature: _____
(RECEIVED IN GOOD CONDITION) DATE:

Loading Time In _____ Out _____

Unloading Time In _____ Out _____

**Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.**

| Pieces | Description Of Work Performed | Miles | Weight |
|--------|------------------------------|-------|--------|
| 1 | DROP DECK TRAILER | | |
| | | | |
| | | | |

**Received in Apparent Good Order, Except as Noted Above. All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.**

**Bill to:**
Address:
City/State:
Phone:
Cust ref #:

Line haul: 2000
Stopoff: _____
Taping: _____
Permits: _____
Other: _____
**Invoice Total:** _____

Beginning Odometer Reading: _____   Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|-------|---------------------|----------|--------------|-------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature: _____   Total Miles: _____
**All Logs Must Be Attached**

NHC v. Rex Trucking, et al

**PLAINTIFF'S EXHIBIT**
11

# REX TRUCKING, INC

405 N. Belt East, Suite 530
Houston, TX 77060
(281) 260-8600
(281) 260-8612 fax

*86163*

## Bill of Lading

Load #: 3-090-03
Trl #: 1380
Driver: Fred Freeman

Tarp Required:   Yes _____   No _____

Pick Up Date: 8-27-01
Shipper: Mexican Circus
Address:
City/State: Harlingen, TX
Signature:

**(SHIPPED IN GOOD CONDITION) DATE:**

Delivery Date: 8-29-01
Consignee: Mexican Circus
Address:
City/State: Chicago, IL
Signature:

**(RECEIVED IN GOOD CONDITION) DATE:**

Loading Time In _____ Out _____      Unloading Time In _____ Out _____

Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.

| Pieces | Description Of Work Performed | Miles | Weight |
|--------|------------------------------|-------|--------|
| 1 | loaded trailer | | |
| | | | |
| | | | |

Received in Apparent Good Order, Except as Noted Above, All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.

**Bill to:**
**Address:**
**City/State:**
**Phone:**
**Cust ref #:**

Line haul:            2600
Stopoff:
Tarping:
Permits:
Other:
**Invoice Total:**

Beginning Odometer Reading: _____      Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|-------|--------------------|---------| -------------|-------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature: Fred Freeman            Total Miles: _____
**All Logs Must Be Attached**

White & Green = Corp. Office         Gold = Driver         Pink = Shipper

PLAINTIFF'S
EXHIBIT
12
11/4/03

# REX TRUCKING, INC

Bill of Lading

505 N. Belt East, Suite 530
Houston, Tx. 77060
(281) 260-8600
(281) 260-8612 fax

*26199*

Load # _13-090-005_
Trk # _3165_ Trl # _____
Driver _Lee Palian_

Tarp Required:   Yes _____ No _____

Pick Up Date: _8-27-01_ —
Shipper: _Mexican Circus_
Address: _____
City/State: _Harlingen, TX_
Signature: _____
(SHIPPED IN GOOD CONDITION) DATE:

Delivery Date: _8-29-01_
Consignee: _Mexican Circus_
Address: _____
City/State: _Chicago, IL_
Signature: _____
(RECEIVED IN GOOD CONDITION) DATE:

Loading Time In _____ Out _____

Unloading Time In _____ Out _____

**Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.**

| Pieces | Description Of Work Performed | Miles | Weight |
|--------|-------------------------------|-------|--------|
| 1 | loaded trailer | | |
| | | | |
| | | | |

Received in Apparent Good Order, Except as Noted Above. All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.

**Bill to:** _____
**Address:** _____
**City/State:** _____
**Phone:** _____
**Cust ref #:** _____

Line haul: _2600 00_
Stopoff: _____
Tarping: _____
Permits: _Fuel: 285 00    100% to trk_
Other: _____
**Invoice Total:** _____

Beginning Odometer Reading: _____     Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|-------|---------------------|----------|--------------|-------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature: _____          Total Miles: _____
**All Logs Must Be Attached**

White & Green = Corp. Office          Gold = Driver          Pink = Shipper

NHC v. Rex Trucking, et al
Initial Disclosures
38

PLAINTIFF'S
EXHIBIT
13
11/4/03

# REX TRUCKING, II

555 N. Belt East, Suite 530
Houston, Tx. 77060
(281) 260-8600
(281) 260-8612 fax

*26198*

**Bill of Lading**    3-090-004

Load # _01363_
Trk # _1363_ Trl # _O/A_
Driver _Mike Fuller_

Tarp Required:  Yes _____  No _✓_

Pick Up Date: _8/27/2001_          Delivery Date: _8/29/201_
Shipper: _The National Hispanic Circus_  Consignee: _The National Hispanic_
Address: _____          Address: _Ashland_
City/State: _Harlingen, TX_          City/State: _Chicago, IL_
Signature: _____        Signature: _956-491-5681_
          (SHIPPED IN GOOD CONDITION) DATE:          (RECEIVED IN GOOD CONDITION) DATE:

Loading Time In _____ Out _____          Unloading Time In _____ Out _____

**Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.**

| Pieces | Description Of Work Performed | | Miles | Weight |
|---|---|---|---|---|
| 1 | _Loaded Step Deck w/ self contained_ | | | |
| | _generator_ | | | |
| | | | | |

**Received in Apparent Good Order, Except as Noted Above. All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transport according to the applicable regulations of the Department of Transportation.**

Bill to: _See Notation, don't check, etc for her_          Line haul: _$2600_
Address: _____          Stopoff: _____
City/State: _____          Tarping: _____
Phone: _____          Permits: _____
Cust ref #: _____          Other: _____
                    **Invoice Total:** _____

Beginning Odometer Reading: _____          Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|---|---|---|---|---|
| TX | 143.937 | | | |
| MO | 66.37 | | | |
| TX | 243.45 | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature _Mike Fuller_          Total Miles: _____
          **All Logs Must Be Attached**

NHC v Rex Trucking, et al
Initial Disclosures

PLAINTIFF'S
EXHIBIT
14
11/4/03

White & Green = Corp. Office          Gold = Driver          Pink = Shipper

# EXHIBIT "I"

10/20/2003  10:47    3372324926         WESTERN AMERICAN                    PAGE 02

# RULES AND REGULATIONS

## ECONOMY TRANSPORT OF FLORIDA, LLC

## LOUISIANA TRANSPORTATION, INC.
### DBA
### MAGNOLIA TRANSPORT
### REX TRUCKING
### WESTERN AMERICAN

## THE MASON AND DIXON LINES, INC.

## UNIVERSAL AM-CAN, LTD.

## EFFECTIVE:  JANUARY 1, 2001

**PLAINTIFF'S
EXHIBIT**

7

11/4/03

# INDEX

PAGE

ARRIVAL NOTICE................................................................................................2
BILL OF LADING................................................................................................2
CAPACITY LOADS.............................................................................................3
CARGO LOSS & DAMAGE.................................................................................3
COLLECT ON DELIVERY (C.O.D.) SHIPMENTS..............................................4
COLLECTION OF CHARGES..............................................................................4
CONTROL OF VEHICLE......................................................................................5
COUNTY RATES APPLICATION.........................................................................5
CORRECTED BILLS OF LADING........................................................................5
CUSTOMS OR IN BOND FREIGHT.....................................................................5
DELIVERY CHARGES..........................................................................................7
DETENTION WITH POWER..................................................................................7
DETENTION WITH POWER COMPUTATION.......................................................7
DETENTION WITH POWER, CHARGES...............................................................8
DETENTION WITHOUT POWER...........................................................................8
DETENTION WITHOUT POWER COMPUTATION................................................9
DETENTION WITHOUT POWER, CHARGES......................................................10
EXCLUSIVE USE OF VEHICLE...........................................................................10
EXPEDITED SERVICE.........................................................................................13
EXTRAORDINARY VALUE SHIPMENTS.............................................................20
GENERAL APPLICATION OF RATES..................................................................2
GOVERNING LAW................................................................................................10
HAZARDOUS MATERIALS...................................................................................10
MILEAGE COMPUTATION....................................................................................11
NEW YORK CITY CHARGES................................................................................12
ORAL CONTRACT DISCLAIMER.........................................................................12
OVER DIMENSIONAL, ESCORT CHARGES.......................................................15
PACKAGING & LABELING BY SHIPPER.............................................................12
PALLET EXCHANGE............................................................................................17
PALLETS, PLATFORMS, SKIDS.........................................................................17
PAYMENT OF FREIGHT CHARGES....................................................................18
PERMIT SERVICES..............................................................................................12
PREPAYMENT OR GUARANTEE OF CHARGES...............................................19
PROHIBITED OR RESTRICTED ARTICLES........................................................20
PROTECTIVE SERVICE.......................................................................................20
RECONSIGNMENT OR DIVERSION....................................................................21
REDELIVERY........................................................................................................22
RENOTIFICATION CHARGE.................................................................................14

**INDEX CONTINUED**                                                    <u>PAGE</u>

SATURDAY, SUNDAY, HOLIDAY SERVICE.................................................18
SORTING AND SEGREGATING...........................................................22
SPECIAL EQUIPMENT................................................................. .12
SPECIALIZED TRAILER CHARGE........................................................17
STOP-OFF CHARGES..................................................................23
STORAGE...........................................................................25
STRIKE INTERFERANCE...............................................................13
TARP CHARGE.......................................................................13
TEAM DRIVER.......................................................................26
TEMPERATURE CONTROL...............................................................13
TENDERED AS LESS THAN TRUCK LOAD..................................................26
TENDERED AS TRUCKLOAD.............................................................26
TRENCHING OR STRINGING SERVICE....................................................23
UNDELIVERD FREIGHT................................................................13
UNNAMED POINTS OR TERMINAL AREA...................................................27
UNSAFE OPERATION..................................................................27
UNUSUAL CONFIGURATION.............................................................17
USED COMMODITIES..................................................................14
VEHICLES FURNIGHED ABUT NOT USED..................................................27
WEIGHT EXCESSES...................................................................14
WEIGHT EXCESS CHARGES.............................................................14
WEIGHTS-GROSS WEIGHTS.............................................................28
WEIGHT VERIFICATION...............................................................28

10/20/2003  10:47    3372324926    WESTERN AMERICAN    PAGE 05

**PAGE 1**

## APPLICATION OF TARIFF

**This tariff contains rules, rates and charges for shipments moving under provisions of tariffs governed by this publication.  A copy of this tariff is available to Carrier's customers upon request.  The rules and regulations contained herein shall apply for all shipments unless a written contract is executed between an officer of Carrier and Shipper, which contains terms and conditions contrary to the provisions of this tariff.**

10/20/2003  10:47    3372324926                 WESTERN AMERICAN                    PAGE 08

**PAGE 2**

**1.    ARRIVAL NOTICE**

    **A. Actual tender of delivery at consignee's  location constitutes the Notice of the arrival of a shipment.**

    **B. If the shipment is not actually tendered for deliver, notice of arrival will be given to the consignee not later than the next business day following the arrival of the shipment.**

        **a.   The notice will be given by telephone, mail or computer.  The notice, however transmitted will specify the point of origin, the consignor and the commodity and weight of the shipment.**

**2.    BILL OF LADING**

    **A. All shipments handled by Carrier are governed by the Uniform Straight Bill of Lading Terms and Conditions shown in the National Motor Freight Classifications modified by the rules, regulations and charges published in this Tariff.  No deviation from these standard terms and conditions will be applicable in connection with shipments handled by Carrier except upon written agreement signed by an officer of Carrier.  Terms and conditions of preprinted bills of lading tendered to Carrier by either the consignee or other third party at the time of shipment and signed by Carrier" driver or dock worker will not apply except upon written agreement of an officer of Carrier.  Carrier will accept all bills of lading so tendered by shipper at the time of shipment subject to the terms and conditions shown herein and as modified in this Rules Tariff.**

**3.    GENERAL APPLICATION OF RATES**

    **A. Line-haul charges from or to points where direct service is authorized by carrier's certificates will not apply from or to points not directly accessible to truck service because of weight, size or hazardous material restrictions, or because of geographical location.**

    **B. Rates published "for the Account of" will apply only when freight charges are paid by the named account.  Rates published "From the Facilities of" apply when freight originates at that specific location, without regard to the party responsible for payment.**

    **C. Except as provided above, "Freight All Kinds" (FAK) rates will not apply when rates are published in the same or any other applicable tariff on commodities specifically named.**

**JANUARY 1, 2001**

**PAGE 3**

4. __CAPACITY LOADS__
 A. A separate Bill of Lading and Shipping Order must be used for each shipment and in no case may a single truckload shipment exceed the carrying capacity of the vehicle.

 B. Each and every standard truck bearing a capacity load of freight will be assessed freight charges based on the actual weight or the applicable truckload minimum weight, but not less than 40,000 pounds, whichever is greater and at the applicable truckload rate.

 C. The term "Capacity Load" of freight shall be considered to mean:
  a. The quantity of freight which, in the manner loaded, so fills a standard vehicle that no additional articles in shipping form tendered can be loaded in or on the vehicle; or
  b. The quantity of freight which because of unusual shape or dimensions or because of necessity for segregation or separation from other freight requires the entire capacity of standard vehicle; or
  b. That quantity of freight that can be legally loaded in or on a vehicle because of the weight or size limitations of state or regulatory bodies.

5. __CARGO LOSS & DAMAGE__
 A. Subject to the provision contained in Paragraphs 29 and 40, Carrier shall be liable to the consignor, consignee or other third party for all freight loss and damages provided under the former Carmack Amendment to the Interstate Commerce Act (ie.49U.S.C. 14706). Carrier shall not be liable for any economic loss or consequential damages to such parties beyond actual manufactured loss to the goods themselves.
 B. The handling and disposition of all cargo loss and damage claims shall be handled pursuant to the regulations contained in 49 C.F.R. Part 370.
 C. A claim for loss, damage or injury to cargo shall not be paid by Carrier unless the claim is filed in writing within nine (9) months of the delivery date of the shipment or, if no delivery, the date of the occurrence resulting in the claim. Claims for concealed loss or damage must be reported to Carrier within forty-eight (48) hours after delivery of the shipment, and Carrier shall have the privilege of inspecting such shipments upon a claim being made. All claims for loss, damage or injury to cargo must contain, at a minimum, the following information:

**JANUARY 1, 2001**

## PAGE 4

    a. **Contain facts sufficient to identify the shipment (or shipments) of property involved.**

    b. **Assert liability for alleged loss, damage or injury to the cargo.**

    c. **Make claim for the payment of a specified or determinable amount of money.**

    d. **Each claim must be supported by the original bill of lading, the completed delivery receipt, if any, and documentation of the value of the cargo so lost or damaged.**

**D. Upon payment of any loss or damage claim, Carrier or its assignee shall become subrogated to all rights and remedies, if any, of the consignor, consignee or other third party with respect to such loss, and such parties agree to cooperate with Carrier in pursuing any subrogation rights or remedies.**

## 6.   COLLECT ON DELIVERY (C.O.D.) SHIPMENTS

**A. This service is not provided.  As such, Carrier will not be liable for collecting any COD charges even if the bill of lading is designated as a COD delivery.**

## 7.   COLLECTION OF CHARGES

**A. When a party other than the Consignor or Consignee as shown on the Bill of Lading and Shipping Order, and other than a bank or freight payment plan, is responsible for paying the freight charges, such party's name and address must be clearly shown in the body of the Bill of Lading and Shipping Order at the time of original tender.**

**B. Shipments subject to the provisions of this item will be accepted only when the Consignor has established credit with the Carrier and guarantees to pay all lawfully accrued charges if the third party fails to do so within the time allowed under the credit policy of the company.**

**C. The non-recourse provisions of Section 7 of the Bill of Lading contract will be null and void on shipments tendered under the provisions of this item.**

**JANUARY 1, 2001**

**8.     CONTROL OF VEHICLE**

**A. Except as otherwise provided in EXCLUSIVE USE OF VEHICLE, no shipment is entitled to the exclusive use of the vehicle in which it is to be transported and the carrier has control of the vehicle with the unrestricted right to**

   **a.  Select the vehicle for the transportation of a shipment.**

   **b.  Transfer the shipment to another vehicle.**

   **c.  Load other freight on the same vehicle.**

   **d.  Remove locks or seals applied to the vehicle.**

   **e.  Utilize the services of another carrier to handle all or part of the shipment.**

**9.     CORRECTED BILLS OF LADING**

**A. Corrected Bills of Lading and Shipping Orders, changing the terms of collection will be accepted only under the condition that the published tariff charge applicable under the original terms of collection will apply.**

**10.    COUNTY RATES APPLICATION**

**A. When portions of a city are located in more than one county, the county in which the main post office is located shall be used.**

**11.    CUSTOMS OR IN BOND FREIGHT**

**A. Shipments moving under United States customs Bond for U.S. Customs clearance at a point in the United States will be assessed a charge. Such charges shall be in addition to all other applicable charges. On shipments requiring the use of more than one trailer, such trailer shall be considered as a separate shipment for the purposes of this provision and subject to the following charge.**

   **a. $150.00 per shipment**

**B. Line haul charges on shipments requiring the U.S. Customs clearance at a point other than the final destination will be assessed on the basis of rates and charges applicable from point of origin to the point of U.S. Customs clearance, plus the rates and charges applicable from points of U.S. Customs clearance to the final destination. No beyond line haul charges will apply when the final destination is located within the terminal service area of the points of U.S. Customs Clearance.**

**C. Import freight moving in Bond may not be included in the same shipment on the same bill of lading and shipping order with freight not moving in Bond.**

**JANUARY 1, 2001**

**PAGE 6**

**D. Shipments moving under U.S. Customs Bond will not be allowed to stop in transit or split pick up or split delivery.**

**E. Detention charges, if any will be assessed against the party responsible for the line haul charges. For the purpose of applying storage rules and charges in connection with shipments moving under U.S. Customs Bond, notification to the Deputy Collector of Customs that a shipment is available for Customs inspection will constitute tender of shipment for delivery.**

**F. Each IT permit (Immediate Transportation Permit) issued for movement of an In Bond shipment will be considered as a separate shipment, and must be accompanied by one bill of lading and shipping order. The provisions of this paragraph will not apply to shipments upon which charges are based on 20,000 pounds or more moving in Bond between steamship company piers or wharves or when such shipments are delivered to a U.S. Customs Bonded Warehouse.**

**G. Shipments tendered in a vehicle sealed by or at the instructions of the consignor or as required by competent authority, will be considered as fully loaded or loaded to capacity. On shipments cleared in route by U.S. Customs, and movement beyond such clearance does not require a seal. Normal rates and charges shall apply to the beyond point.**

**H. Shipments moving from the United States under Tir Carnet issued by the originating carrier are subject to a charge of $100.00 which will be in addition to all other lawfully applicable rates and charges.**
    **a. $100.00 charge per shipment**

**I. When carrier is required to pick up shipping documents or U.S. Customs Release Forms for forwarder or broker for validation prior to pickup of a shipment, a charge of $50.00 per shipment will apply.**
    **a. $50.00 charge per shipment**

**JANUARY 1, 2001**

**PAGE 7**

## 12. DELIVERY CHARGES

A. Pickup or Delivery charges from or to points and places where service is authorized by carrier's certificates, but not directly accessible by truck service because of weight, size or hazardous material restriction, or because of geographical location.

B. This charge is in addition to line haul charges from or to the transfer point and does not include the charge for the other transportation required.

    a. $450.00 special charge per shipment.

## 13. DETENTION WITH POWER GENERAL PROVISIONS

A. When due to no fault, negligence or disability of the carrier, if the loading or unloading of freight is delayed beyond the free time of 2 hours a charge for detention will be billed to the party that is responsible for the payment of freight charges.

B. If a consignee requires notification before delivery for a stated period of time and unloading is delayed due to shipper's failure to notate the Bill of Lading and Shipping Order with that requirement, the shipper will be held responsible for detention charges, and the non-recourse clause in the Bill of Lading contract will not apply.

C. Where disputes arise about detention, Carrier may not deliver the shipment to the consignee until all accrued detention charges are guaranteed to the satisfaction of the Carrier.

## 14. DETENTION WITH POWER, COMPUTATION OF TIME

A. Time consumed in loading or unloading shall commence from the time of arrival of the carrier's vehicle and the presentation to the responsible party at the site that is available to load or unload and shall cease upon a signature being given the carrier by the consignee upon completion of unloading, or the signing by the carrier's representative of the Bill of Lading and Shipping Order on pickup.

B. Where loading or unloading is performed on a pre-arranged schedule, and carrier's vehicle arrives prior to the scheduled time, time shall run from the scheduled time or actual time loading or unloading commences, whichever is earlier.

**JANUARY 1, 2001**

**PAGE 8**

C. Where loading or unloading is to be performed on a pre-arranged schedule, and the carrier for any reason is unable to maintain such schedule, such mutually agreed alternative arrival time shall be used, provided such extended free time does not exceed two hours delay beyond the originally scheduled arrival time.

D. When carrier's employee interrupts loading or unloading to take any normal non-working periods, such time will be excluded from free time or detention time, if free time has been exceeded.

  a.  Two hours free time shall be allowed for each vehicle, loading and/or unloading.

## 15.   DETENTION, WITH POWER, CHARGES

A. When delay per vehicle beyond free time takes place the charge will be:

  a.  $25.00 for each 30 minutes or fraction thereof
  b.  Minimum Charge  $50.00
  c.  Maximum Charge for each 24 hour period  $600.00

B. If shipment remains undelivered through no fault of carrier, and vehicle is remanded to carrier's control, storage charges will begin when detention charges end.

## 16.   DETENTION, VEHICLES WITHOUT POWER, GENERAL PROVISIONS

A. This rule applies when carrier's vehicles without power units are delayed or detained on the premises of consignor, consignee, or on other premises designated by them, or as close thereto as conditions will permit.

  a.  Requests by customer for spotting or placing trailers must be made in writing in advance of the date of shipment and must be in carriers' possession at time of shipment.
  b.  Carrier will not move the trailer until such time as it has received notification that loading or unloading has been completed and the trailer is available for pick up. Consignor, consignee, or other designated party may move the spotted trailer with its own power units, at its own expense and risk for the purpose of loading or unloading. Any damage to Carrier's trailer while at Customer's designated premises will be Customer's responsibility.

**JANUARY 1, 2001**

## PAGE 9

c. Loading or unloading will be performed by consignor, consignee, or other party designated by them. When Carrier's representative assists in loading, unloading or in checking the freight; the detention provisions governing vehicle with power units will apply. In the case of spotting for loading, the Bill of Lading must show "Shipper Load and Count".

d. Carrier responsibility for safeguarding shipments loaded on or in trailers spotted under the provisions of this item shall begin when loading has been completed and the carrier takes possession.

e. Carrier responsibility for safeguarding shipments unloaded from trailers spotted shall cease when the trailer is spotted at or on the site designated by Consignee.

f. Detention will be assessed against the party who will pay the freight charges.

g. Nothing in this provision shall require a carrier to pickup or deliver spotted trailers at hours other than carrier's normal business hours. This shall not be construed as a restriction on carrier's ability to pickup or deliver spotted trailers at hours other than its' normal business hours.

## 17. DETENTION, WITHOUT POWER, COMPUTATION OF TIME

A. Spotted trailers will be allowed 24 consecutive hours of free time for loading or unloading.

B. For trailers spotted for loading or unloading, time commences at the time of placement for loading or unloading as the case may be.

C. Saturday, Sunday and holidays shall be included in the free time calculation.

D. When a trailer is both loaded and reloaded, each transaction will be treated independently of the other, except that when loading is begun before unloading is completed, the free time for loading shall not begin until free time for unloading has elapsed.

E. Consignor shall notify carrier, consignee or other party designated by them, when loading or unloading has been completed and the trailer is available for pickup.

F. When a spotted trailer is changed to a vehicle with power, free time shall cease at the time of the request. Detention provisions governing vehicles with power units will then apply.

G. When prearranged scheduling has been made, time begins from the actual time of spotting if the carrier's vehicle arrives later that the scheduled time. If the carrier's vehicle arrives prior to the scheduled time, time shall begin at the scheduled time of actual time spotting commences whichever is earlier.

**JANUARY 1, 2001**

**PAGE 10**

**18. DETENTION, WITHOUT POWER, CHARGES**
    A. Detention charges after the expiration of free time:
        a. For each of the first and second 24 hour periods, or fraction thereof $50.00.
        b. For each of the third and fourth 24 hour periods, or fraction thereof $60.00.
            d. For the fifth and each succeeding 24-hour period or fraction thereof $70.00.

**19. DISPUTE RESOLUTION**
    A. These Rules and Regulations shall be deemed to have been drawn in accordance with the statutes and laws of the State of Michigan and in the event of any disagreement or dispute, the internal laws of the State shall apply.

**20. EXCLUSIVE USE OF VEHICLE**
    A. When the exclusive use of a vehicle is provided by the carrier at the request of consignor or consignee, the following provisions will apply:
        a. The request must be given in writing or placed on the Bill of Lading and Shipping Order.
        b. Charges are to be paid or guaranteed by the party requesting the services and non-recourse stipulation on the Bill of Lading will not apply.
        c. Charges for this service will be a minimum charge of 150% of the freight charges based on the actual weight or the applicable truckload charge based on 40,000 pounds (full truckload) whichever is greater.

**21. GOVERNING LAW**
    A. All civil actions filed as a result of disputes arising out of the transportation services to be performed by Carrier shall be filed in the court of proper jurisdiction in the State of Michigan, and the laws of the State of Michigan shall apply.

**22. HAZARDOUS MATERIALS**
    A. Shipments of hazardous materials will be subject to an additional charge of .40 cents per mile and a minimum charge of $150.00 per shipment per vehicle used. Line-haul rates and the additional charge for hazardous materials will be computed over the actual route of movement when specific routing is mandated by Local, State or Federal governments.

**JANUARY 1, 2001**

**PAGE 11**

B. Customer is responsible for providing Carrier with a current Material Safety Data Sheet for each hazardous material to be transported and for providing Carrier with a properly completed hazardous material manifest.

## 23.   MILEAGE COMPUTATION

A. Mileage shall be computed from the point of loading to the points of unloading by the shortest practical direct highway miles, and shall be calculated by those miles shown in the Mileage Guide issued by Household Good Carrier's Bureau and reissues thereof or by the computerized version of same.

B. EXCEPTIONS

a. When stopping in transit to load or unload part of the load, the mileage to be used to determine the charges is the aggregate of the mileage from the origin point of the shipment to the final destination via the stop-off points.  Mileage required by the order of loading or unloading and as specified on the Bill of Lading shall be used to determine the applicable charges.

If after receipt of the shipment by the carrier and while in route, the shipper requests stopping in transit in a different order of unloading or loading than as received and specified on the bill of lading, the aggregate mileage of the new route of movement shall apply.  There will be an additional charge for labor required to unload, shift around or reload the freight to accomplish out-of-sequence deliveries.

These charges shall be in addition to all other charges.

(1) $75.00 per hour charge

b.  If the route of movement by virtue of the content of hazardous materials, or because of being overweight or over dimension, the closing or prohibition of use of bridges, tunnels, or highway sections requires a longer route by the Public Authority, charges based on mileage of the required longer route shall apply.

c. CANADIAN CROSSING In the absence of shipper routing on shipping order, border-crossing point will be selected by carrier.

d. MEXICAN CROSSING  In the absence of shipper routing on shipping order, border-crossing point will be selected by carrier.

**JANUARY 1, 2001**

**PAGE 12**

**24.    NEW YORK CITY CHARGES**

    **A.** Shipments originating at or destined to New York, NY (points in the Boroughs of Bronx, Brooklyn, Kings, Manhattan and Queens) and points in Nassau and Suffolk Counties, an additional $150.00 per shipment will be charged in addition to all other lawfully published charges.

**25.    ORAL CONTRACT DISCLAIMER**

    **A.** Except as otherwise provided in this provision, all shipments tendered to Carrier will be transported subject to the rates, rules and regulations provided in this tariff or any addendum or subsequent revisions thereto. Such tariff rates, rules and regulations may not be negated or superseded by any claimed oral contract, promise, representation, or understanding between the parties. Rates, rules and regulations negotiated with a shipper which are not contained in this Tariff will become effective only upon the execution of a written contract between the officers of Carrier and shipper containing such rates, rules and regulations.

**26.    PACKAGING & LABELING BY SHIPPER**

    **A.** All shipments must be packaged securely and properly labeled, and accompanied by a bill of lading completed by the shipper. Carrier shall not be responsible for any loss, damage, penalty or fine that may be caused by the shipper's failure to properly package and label the shipment, or from the shipper" failure to provide Carrier with the complete and accurate bill of lading.

**27.    PERMIT SERVICES**

    **A.** Permit, escort services arranged by the company will be charged with a 20% service fee add on to compensate for the administration cost of securing and acquiring required permits.

**28.    SPECIAL EQUIPMENT**

    **A.** Subject to the availability of the equipment, if requested by the customer, special equipment will be furnished subject to the following charges, which will be in addition to the otherwise applicable truckload rate:

        **a.** .20 (cents) per mile, per vehicle used or 125% of the cost of renting the special equipment, whichever is greater.

**JANUARY 1, 2001**

**PAGE 13**

**29. STRIKE INTERFERANCE**

    **A.** When because of a strike or labor issue with employees, it is impossible to make available for movement any partially loaded or empty trailers detained on premises, a detention charge of $25.00 per day or fraction thereof will be made following the expiration of free time.

**30. TARP CHARGE**

    **A.** When Tarp service is required, additional charges will apply as follows.

        a. Regular Flat-bed      $100.00 per tarping
        b. Over-dimensional     $200.00 per tarping

**31. TEMPERATURE CONTROL**

    **A.** Carrier assumes no responsibility for articles or commodities that require protection from either heat or cold. Any shipment requiring temperature control will be accepted at the shipper's own risk.

**32. UNDELIVERED FREIGHT**

    **A.** If freight cannot be delivered because of the consignee's refusal or inability to accept it, or because the carrier cannot locate the consignee, or if the freight cannot be transported because of an error or omission on the part of the consignor, the carrier will make a diligent effort to notify the consignor promptly that the freight is in storage and the reason therefor.

    **B.** On undelivered shipments, disposition instructions issued prior to tender of delivery will not be accepted as authority to re-ship or return a shipment or to limit storage liability.

    **C.** Undelivered shipments will be subject to storage and or detention charges.

**33. EXPEDITED SERVICE**

    **A.** This provision applies when a specific request is made by a consignor or consignee for expedited service in addition to the normal service of the carrier to meet specific pickup or delivery schedules.
    **B.** If multiple trucks are required to ship the product the charge will be applied to each truck use.
    **C.** When a shipment is tendered under this item the bill of lading and shipping order must be endorsed "EXPEDITED SERVICE REQUESTED" and the "bill to" guarantees all freight charges.

                                         **JANUARY 1, 2001**

**PAGE 14**

**D.** The charges shall be computed subject to a minimum of 135% of the applicable truckload charges.

**34.    RENOTIFICATION CHARGE**

**A.** When the carrier has fully complied with the shipping and delivery instructions and through the fault of the consignee, carrier is unable to tender delivery as scheduled, there will be a renotification charge, in addition to all other applicable charges, of $50.00.

**35.    SHIPMENTS TENDERED IN EXCESS OF MAXIMUM WEIGHT/CHANGES**

**A.** Shipments in excess of a stated maximum weight will be rated at the truckload or volume provisions applicable, and weights in excess shall be rated as a separate shipment.

**36.    SHIPMENTS TENDERED IN EXCESS OF MAXIMUM WEIGHT RESTRICTIONS PREARRANGED WITH CARRIER**

**A.** Excess weight will be rated as follows:

(1) First determine the line haul charges that would apply at the stated maximum weight.

(2) Divide the line haul charges by the stated maximum weight expressed as a hundredweight.

(3) Result is a rate in cents per hundredweight to be applied to the excess weight over the stated maximum in the rate item.

(4) Charges for the excess weight may not be less than the applicable minimum charge for less than truckload.

(5) Charges for excess weight shall be in addition to all other applicable charges.

**B.** No vehicle may be loaded in excess of that quantity of freight which can be transported from origin to destination in or on such vehicle because of weight or size limitations of federal, state or municipal laws or regulations.

**37.    USED COMMODITIES**

**A.** Shipments of any used commodity (not manufactured by the shipper, previously owned and shipping for re-use or as a result of re-sale) will be released at a value not to exceed ten (10) cents per pound per package.  Carrier's liability, if any, for any loss or damage to such shipment, regardless of the cause of the loss or damage, shall not exceed this released value.

**JANUARY 1, 2001**

**PAGE 15**

B. If shipper to tender a shipment with a value in excess of ten (10) cents per pound, the shipper must indicate the released value on the bill of lading. Carrier will assess an additional charge of fifty (50) cents per each $100, or fraction thereof, declared by the shipper in excess of ten (10) cents per pound. Carrier's liability, if any, for loss or damage will be actual loss or damage, or the declared value, whichever is less.

C. If a shipment is accepted without the declaration of released value, it will be considered to have been released to a value not exceeding ten (10) cents per pound per package, and charges assessed on that basis. Carrier's liability, if any, will be limited to ten (10) cents per pound per package. A corrected bill of lading will not be accepted to change the released value once the shipment has been accepted by the carrier.

## 38. OVER DIMENSION FREIGHT, ESCORT CAR AND FLAGMAN CHARGES

A. Arrangements for transporting shipments that contain articles, any of which exceed one or more of the following dimensions.
(1) Nine (9) feet in height.
(2) Eight (8) feet, Six (6) inches in width.
(3) Forty-five (45), (48) or (53) feet in length or any distance beyond the floor of the trailer.

B. Such shipments that are accepted will be subject to a minimum weight of 40M or actual weight and freight charges will be assessed at 150% of the applicable rate.

C. When the weight of the articles exceed Federal, State or Municipal weight regulations, freight charges will be assessed in accordance with the weight of the article and the percentage of the applicable rate as follows.
(1) Up to 75,000 pounds                150%
(2) 75,001 pounds to 125,000 pounds    200%
(3) 125,001 pounds or over             225%

**JANUARY 1, 2001**

**PAGE 16**

D.  When the weight of the articles requires the use of specialized trailers, said equipment will be brought empty to the shipping location at the request of the shipper for an additional charge of $1.40 per mile from the equipment's terminal of origin to the shipping point. For the purpose of this item, specialized equipment will be defined as flatbed or removable side trailers with five or more axles. If the nature of the specialized equipment, in order to comply with Federal, State or Municipal regulation, require use of special highway permits to facilitate the empty movement of the equipment from terminal or origin to the shipping point, then carrier will secure permits as an agent for the shipper or consignee and assess charges equal to the cost of each permit. Permits secured for the empty movement of equipment will not be subject to an additional service charge.

E.  Where regulations or laws of any Federal, State or Municipal government or any subdivision thereof, require use of special highway permits and/or the pilot cars or escort service, carrier will, upon request of the shipper or consignee, and as agent for them, engage third person to perform this service. All charges of the third person must be paid by the shipper or consignee and are in addition to all other lawful charges in the rules and regulations. Such charges may be advanced by the carrier and billed to the shipper or consignee at actual cost of the service plus a 20% service charge. These charges shall be in addition to all other applicable charges and shall be shown separately on the freight bill.

F.  Shipments requiring over-weight bonds or over-dimensional permits, the actual cost plus a 20 percent service charge of the bond or permit for each state or city shall be added to the freight bill subject to a minimum charge of $55.00 for each bond or permit. When the permit specifies route of the movement that shall be used in transporting the shipment, all tolls or fees paid by carrier for the use of bridges, ferries, tunnels or highway shall be in addition to all other applicable charges and shall be shown separately on the freight bill.

G.  When upon request of the shipper and/or consignee or if required by Federal, State, or Municipal regulations or laws, the shipment must be transported via specified accessible route, the mileage, for the purpose of determine the rate applicable, shall be computed via such route.

**JANUARY 1, 2001**

**PAGE 17**

**39.** **SHIPMENTS OF UNUSUAL CONFIGURATION**

    **A.** When a single shipment weighs less than the authorized volume or truckload minimum weight, and the average weight per lineal foot is less than 800 pounds, freight charges will computed on the basis of 800 pounds per lineal foot.

**40.** **SPECIALIZED TRAILER CHARGE**

    **A.** Shipments that contain articles not exceeding 8'6" high, but for which single drop-frame or drop-deck equipment is required by the customer and furnished by the carrier will be charged for at 150% of the truckload rate based on the highest minimum weight in the rate item, or the actual weight if greater, but not less than 40,000 pounds.

    **B.** When double drop frame or drop deck equipment is furnished, the charge will be 175% of the truckload rate.

**41.** **PALLETS, PLATFORMS, OR SKIDS**

    **A.** Any request or provisions noted on the bill of lading or shipping order at the time of movement requesting the return of these shipping devices shall be deemed to be for informational purposes only, and it will not be binding upon the carrier to accomplish or comply with such request or provisions to complete the contract of carriage on the shipment.

    **B.** Weight and space for pallets, platforms, skids, packaging will be considered, for rating purposes, as a part of the shipment. These items will be assessed at the rate applicable to the articles being transported.

**42.** **PALLET EXCHANGE**

    **A.** Service not provided. Carrier will not be responsible for any pallet exchange or return.

**JANUARY 1, 2001**

**PAGE 18**

## 43. PICK-UP OR DELIVERY SERVICE SATURDAY, SUNDAY OR HOLIDAY

A. When consignor or consignee request carrier to pick up or deliver freight on Saturday, Sunday or Holiday, such service shall be subject to an additional charge.

    (1) $200.00 Saturday

    (2) $300.00 Sunday or Holiday

B. The carrier is not obligated to furnish pickup or delivery service on Saturday, Sunday or Holiday.

C. Consignor or consignee may request carrier to place or pick up and empty trailer(s) (vehicles without power units) on holidays, even though the actual pick up and or delivery of freight may occur on a day other than holidays. The charge for this service is $200.00 per vehicle, per day, or fraction thereof.

D. Charges must be either paid by the party requesting the service or guaranteed to the satisfaction of the carrier before pickup or delivery will be made.

## 44. PAYMENT OF FREIGHT CHARGES

A. When payment is extended as provided in 49 CFR Part 377 and the payer of the freight charges fails to make payment in 30 days, the following can be assessed on each unpaid freight bill, in addition to all other lawful freight and assessorial charges as provided in the Rules and Regulations.

    (1) A charge of 50% of the unpaid balance, Minimum charge $100.00 plus the reimbursement for all collection and legal costs, including reasonable attorney fees.

B. This item is only applicable to the nonpayment of original, separate and independent freight bills and does not apply to the aggregate "balance due" claims sought for a collection on any past shipments by a bankruptcy trustee, or any other person or agent.

C. This item shall not apply to instances of clerical or ministerial error such as non-receipt of carrier's freight bill, or a shippers payment check lost in the mail, or a carrier mailing the freight bill to the wrong address.

D. This item shall not apply in any way to a charge for transportation service if the carrier's bill of lading independently provides that the shipper is liable for fees incurred by the carrier in collection of freight charges on that transportation service.

**JANUARY 1, 2001**

**PAGE 19**

E. The shipper and the consignee shall be liable, jointly and severally, for all unpaid charges on account of a shipment pursuant to the Bill of Lading Contract, tariff or contract between the parties under which the shipment moved; and, to pay and/or indemnify carrier for all claims, fines, penalties, damages, costs and other sums, including attorneys' fees, which may be incurred by carrier by reason of any violation of the shipment contract/tariff or any other default of the shipper or consignee or their agents. Under this paragraph, carrier is entitled to recover all of his costs, including attorneys' fees, of collecting delinquent freight bills.

## 45. PREPAYMENT OR GUARANTEE OF CHARGES

A. Unless otherwise provided, shipments will be accepted subject to the following provisions:

(1) A prepaid shipment is one on which the charges for transportation service rendered at the request of the consignor, including charges for any accessorial services performed at the request of the consignor are to be paid by the shipper.

(2) A collect shipment is one which the charges for transportation service including accessorial services rendered at the request of the consignee, or requested by the consignor for consignee, are to be paid by the consignee.

(3) A shipment on which charges are to be paid by a party other than the consignor or consignee will be accepted provided that the consignor has established credit with the carrier picking up the shipment at origin and guarantees to pay the charges if the third party fails to do so within the time allowed.

(4) If, in the judgement of the carrier picking up a shipment at origin, the forced sale of the goods would not realize the total charges due at destination, the shipment must be prepaid.

(5) If a shipment is required to be prepaid, it will be accepted on a collect basis if the consignor has established credit with the carrier picking up the shipment at origin and the consignor guarantees to pay the charges if the consignee fails to do so within the time allowed under the credit policy. Such a shipment will not be accepted as a collect shipment if the consignor executes Section 7 of the Bill of Lading.

**JANUARY 1, 2001**

**PAGE 20**

## 46. PROTECTIVE SERVICE

A. Regular shipments subject to volume truckload rates do not include cost of furnishing protective service against heat or cold.

B. When shipments require protection against heat or cold, there will be a service charge of 50 cents per mile above the standard price schedule.

## 47. PROHIBITED OR RESTRICTED ARTICLES

A. The following property will not be accepted for shipment nor as premiums accompanying other articles:

| | |
|---|---|
| Bank Bills | Museum Exhibits or Articles of Antiquity |
| Coins, Monetary | Notes |
| Currency | Original Works of Art |
| Deeds | Postage Stamps |
| Drafts | Precious Stones |
| Letters | Revenue Stamps |
| Valuable papers | |

B. Articles of extraordinary value will not be accepted for shipment or as premiums accompanying other articles.

C. Carrier is not obligated to receive freight, liable to impregnate or otherwise damage other freight or carrier's equipment. Such freight may be accepted and receipted for "subject to delay for suitable equipment", or may, for lack of suitable equipment, be refused.

D. Carrier shall not be liable for any loss or damage to any prohibited or restricted articles should the consignor tender such articles to carrier in contradiction of this provision.

## 48. EXTRAORDINARY VALUE SHIPMENTS

A. Articles of extraordinary value, as defined below, will be accepted for shipment or as premiums accompanying other articles, providing the shipper requests excess liability coverage as provided.

B. Articles tendered with an invoice value exceeding $100,000 or $10.00 per pound whichever is less will be considered to be of extraordinary value. Such articles will not be accepted for transportation unless the shipper requests liability coverage. Articles inadvertently accepted with an invoice value exceeding $100,000 but without excess coverage will be considered to have been released by the shipper at $100,000.

C. In the event of loss of and or damage to any shipment, carrier's liability will not exceed the maximum liability of $100,000.00 per shipment unless the shipper has requested excess liability coverage prior to shipment.

**JANUARY 1, 2001**

**PAGE 21**

D. If shipper desires to tender a shipment requiring carrier liability in excess of $100,000.000, the shipper must indicate in writing on the bill of lading at the time of shipment the total dollar amount of excess coverage requested. The maximum excess liability is $900,000 per shipment, for a total of $1,000,000.00,

E. Carrier will assess an additional charge equal to 5% of the otherwise applicable line haul charges for each $25,000 or fraction thereof in excess of initial maximum liability coverage, subject to minimum excess coverage charge of $75.00 for each $25,000 of coverage. Such charge is in addition to the freight charges otherwise accruing to the shipment. Charges are to be paid by the party responsible for payment of the otherwise applicable freight charges.

## 49.   RECONSIGNMENT OR DIVERSION

A. Definitions of Reconsignment or Diversion:  For the purpose of this rule, the terms "reconsignment" and "diversion" are considered to be synonymous and the use of either will be considered to mean:
   1. A change in the name of the consignor or consignee.
   2. A change in the place of delivery within the original destination point.
   3. A change in the destination point.
   4. Relinquishment of a shipment at point of origin.

B. Conditions:
   1. Requests for reconsignment must be made in writing or confirmed in writing. The carrier must be satisfied that the party making the request has the authority to do so. Conditional or qualified requests will not be accepted.
   2. Carrier will make a diligent effort to execute a request for reconsignment but will not be responsible if such service is not effected.
   3. All charges applicable to the shipment whether accrued or accruing must be paid or guaranteed to the satisfaction of the carrier before reconsignment will be made.
   4. Only entire shipments, not portions of shipments may be reconsigned.
   5. An order for reconsignment of a shipment moving under uniform bills of lading will not be considered valid, unless and until the original bill of lading is surrendered for cancellation, endorsed or exchange.

**JANUARY 1, 2001**

**PAGE 22**

C. **Charges:**
1. **If a reconsignment occurs prior to tender of delivery the charge will be $25.00 plus 125% of the original quoted rate to the reconsignment point.  Minimum charge $100.00.**
2. **If a reconsignment occurs after tender of delivery the charge will be $100.00 plus 125% of the original quoted rate to the reconsignment point.  Minimum charge $100.00.**

D. **Where request is made by shipper, before a shipment has left carrier's terminal at point of origin for return of a shipment to the original place of shipment, or delivery thereof to another carrier at point of origin, or relinquish possession to shipper or another carrier at carrier's terminal, such service will be subject to a charge of $150.00 per shipment.**

**50.  REDELIVERY**

A. **When a shipment is tendered for delivery and through no fault of the carrier such delivery cannot be accomplished, no further tender will be made except upon request.  Additional tenders and final delivery will be subject to the following provisions.**
1. **If one or more additional tenders or final delivery of the shipment are made a minimum charge of $250.00 per vehicle will be made for each such tender and for the final delivery.**
2. **All charges accruing under the provisions of this rule must be paid or guaranteed to the satisfaction of the carrier, by the party or parties requesting redelivery before the shipment is redelivered.**

**51.  SORTING AND SEGREGATING**

A. **Upon instructions of consignee, carrier will sort or segregate freight into individual lots and place such segregated lots on the platform, dock, conveyor, pallet, dolly, buggy or similar device provided by the consignee for receipt of freight within or adjacent to the vehicle. The charge for this service shall be 75 cents per 100 pounds; subject to a minimum charge of $100.00 per shipment which shall be in addition to all other charges assessed and the consignee or party requesting the service should be responsible for payment of the charge.**

**JANUARY 1, 2001**

**PAGE 23**

## 52. TRENCHING OR STRINGING SERVICE

A. The additional use of carrier's vehicle at point of destination for the purpose of trenching or stringing will be permitted, subject to the following terms and conditions:

1. Nothing in this rule shall compel carrier to perform service at or to the sites not accessible to trucks.

2. Service under this rule shall be performed upon request of consignor or consignee.

3. Charge for service performed shall be $75.00 per hour and does not include unloading by the carrier.

4. Charges for service performed under this item shall be in addition to all other lawful accrued charges.

## 53. STOP-OFF CHARGES

A. Shipments subject to truckload rates and truckload minimum weights, received from one shipper at one point at one time for one consignee at one destination and covered by one bill of lading, may be stopped for partial loading and or partial unloading, subject to the following provisions:

1. Each stop-off is limited to one placement of the truck.

2. Stop-offs for partial loading or partial unloading will not be permitted on shipments moving "In Bond" or where Section 7 of the bill of lading has been executed.

3. The substitution of freight for that originally loaded or any exchange of contents at a point or place of stop-off is prohibited.

4. All of the component parts of a shipment must be loaded and in transit before any stop is made for partial unloading.

B. Each stop for either partial loading or partial unloading, but not both on the same shipment, will be subject to a stop-off charge of $55.00 per stop, excluding the stops for initial pick-up and final delivery.

C. A vehicle transfer charge of $55.00 will be assessed for each transfer of a vehicle from one loading or unloading site to another.

D. Line-haul charges will be determined as follows:

1. Shipments will be rated as if the entire shipment moved from each place where any portion of the shipment is picked up to each place where any portion of the shipment is delivered and the highest of such charges will apply to the entire shipment. In determining charges, apply rates in effect on date of shipment from point of origin.

**JANUARY 1, 2001**

**PAGE 24**

2. **Point to Point Rates (Specific Commodity Rates):** If the total distance from initial origin to final destination via the stop-off point or points exceeds 105% of the shortest route mileage from initial origin to final destination, or if the route movement, by virtue of the content of hazardous materials, or because of over-weight or over-dimension, or the closing or prohibition of use of bridges, tunnels, or highway section by any public authority, that distance in excess of 105% will charged at $1.75 per mile, but total freight charges to be not less than provided in D1. above.

3. **Distance Commodity Rates:** Charges on shipments stopped for completion of loading or partial unloading shall be assessed on the basis of the applicable truckload rate and minimum weight (or actual weight if greater). The mileage to be used to determine the charge is the mileage from the original point via the stop-off points determined via the order of stop-off(s) as loaded for delivery by the shipper. The greatest mileage between any point of loading and any point of unloading will determine initial origin and final destination.

E. **Conditions:**

1. Consignor must prepay all charges and only one freight bill will be issued for the entire shipment. However, charges may be collect when they are guaranteed by the consignor and so noted on the bill of lading at the time of shipment. All charges to be collected from consignee at final destination.

2. When bill of lading requires stop-off to unload a component part of the shipment and carrier is unable during business hours to effect delivery of such freight at the point of place of stop-off, that undelivered portion of such shipment shall then be subject to rules and regulations governing unclaimed freight, storage and redelivery of freight, to the extent that such services are applicable.

3. Except where shipment consists of identical packages or pieces, or where the various lots of freight comprising the shipment are of such nature as to be easily identified and segregated, each piece or package in any shipment stopped for partial unloading must be plainly and durably marked, stenciled or tagged by shipper in such manner that each lot of freight intended for delivery at a particular point or place of stop-off will be readily distinguishable from all other freight in the shipment.

**JANUARY 1, 2001**

**PAGE 25**

4. For carrier's convenience, any portion of the shipment may be picked up, transported, or delivered, in separate trucks and all portions of the shipment need not be transported through the stop-off point or points.

5. Arrangements for any stop-off service provided in this item must be made with the carrier before shipment, or any portion thereof, is tendered for transportation.

6. The entire portion of shipment to be picked up must be available for pickup at time of tender.

7. The shipper must tender the part lots in the order required by the carrier.

8. The party or parties authorized and designated by the shipper to accept or tender freight at a point or place of stop-off may be the same or other than the billed consignee.

9. The bill of lading shall designate the following:

   (a)     Stop-off point or points and places.

   (b)     The weight, quantities, marking and description of articles to be loaded or unloaded.

   (c)     The name and address of the party authorized to tender freight or to accept freight for unloading at point or place of stop-off.

## 54.. STORAGE

A. Freight held in carrier's possession by reason of an act or an omission of the consignor, consignee, or owner, or for customs, clearance or inspection and through no fault of the carrier, will be considered stored immediately and will be subject to the following provisions.

1. Storage charges on freight awaiting line haul transportation or on undelivered freight after arrival notice has been given, will begin the day freight is received by the carrier for storage.

2. Freight placed on company equipment and not moving will be considered to be in storage.

3. Freight stored in carrier's possession will be assessed the following charges.

   (a) $25.00 per hour, 24 hours per day, 7 days per week, minimum charge $250.00.

   (b) Storage charges under this item will end when carrier is enabled to deliver or transport the freight as a result of action by the consignee, consignor owner or customs official.

**January 1, 2001**

10/20/2003  10:53    3372324926    WESTERN AMERICAN    PAGE  13/22

**PAGE 26**

(c) **When carrier does place the freight in a public warehouse, a minimum charge of $150.00 will be made in addition to the applicable warehouse charges, and Carrier shall have no further liability with respect to any loss or damage to the cargo placed in storage.**

**55.    TEAM DRIVER**

A. **When requested by shipper, an extra driver will be furnished at the rate of $.75 cents per mile in addition to all other published charges. The bill of lading must bear the notation "Team Driver Requested".**

**56.    TENDERED AS A TRUCKLOAD**

A. **All shipments tendered to carrier will be considered as truckload unless otherwise specified and approved.**

B. **Shipments will be accepted only on a prepaid basis unless otherwise specified and approved.**

**57.    TENDERED AS LESS-THAN-TRUCKLOAD**

A. **Shipments tendered as Less-than-truckload will require special pricing.**

B. **Shipment moving under this provision will be accepted either on a prepaid basis or collect basis if Section 7 of the Bill of Lading is not executed.**

**JANUARY 1, 2001**

**PAGE 27**

58.   **UNNAMED POINTS OR TERMINAL AREA**

    A. Rules and regulation, published in this tariff, will apply from and to points named in this tariff, as well as from and to places within the limits specified below:

        1. If the point of origin or destination is an unincorporated community, all places within two and one-half miles by air line of the post office of the same name in such unincorporated community if the community has a population of less than 2,500; within four miles if it has a population of 2,500 but less than 25,000; and within five and one-half miles if it has a population of 25,000 or more.

        2. If the point of origin or destination is an incorporated community at any place within the corporate limits, and places as defined. With population of less than 2,555 at any place not more than two miles from the base municipality. With population of 2,500 or more but less than 25,000 at any place not more than three miles from the base municipality. With population of 25,000 or more but less than 100,000 at any place not more than four miles from the base municipality. With population of 100,000 or more at any place not more than five miles from the base municipality.

        3. Population figures to be used are those determined by the latest US Census Bureau Census, as shown in the standard Rand McNally.

59.   **UNSAFE OPERATION**

    A. Nothing in this tariff shall be construed as making it binding on the part of the carrier to receive freight for destination to which, on account of conditions of roads, it is impracticable to operate trucks, or to make deliveries at location at destination stations to which location, account of condition of streets or roadways it is impracticable to operate trucks. In such latter cases notice shall be given consignee and delivery made at terminal depot, or at other practicable location.

60.   **VEHICLES FURNISHED BUT NOT USED.**

    A. When carrier upon receipt of a request to pick-up a shipment and carrier has dispatched a vehicle for such purpose and due to no disability, fault or negligence on the part of the carrier, the vehicle is not used, a charge of $150.00 per vehicle will be assessed against the consignor making such request.

**JANUARY 1, 2001**

**PAGE 28**

B. When a carrier is requested to deadhead a vehicle to a point of origin designated by consignor or consignee and such vehicle is furnished and not used due to no fault of the carrier, a charge for each vehicle of $1.65 per mile subject to a minimum charge of $250.00 will be assessed against the party making such request. The mileage will be computed from the trucks last known location. Mileage to be determined by use of HBG Mileage Guide 13 ICC HGB 100-B, supplements thereto or reissues thereof.

C. Upon arrival of the vehicle with power unit, the consignor will have free time of 60 minutes to inform carrier the vehicle will not be used. If carrier is detained beyond 60 minutes, a charge of $75.00 per hour or fraction thereof per vehicle will be assessed in addition to other applicable charges provided herein.

## 61.  WEIGHT VERIFICATION

A. Carrier will verify the weight of any shipment upon request by either the consignor or consignee.  Such verification will only be made while in the custody of the carrier.  A charge of $50.00 per shipment or per vehicle will be made for furnishing such verification.  This charge is to be paid by the party requesting the service.

## 62.  WEIGHTS – GROSS WEIGHTS

A. Unless otherwise provided, charges shall be computed on actual gross weights, except when estimated weights are authorized such estimated weights shall be used.

B. All and any packaging, dunnage or securement material will be included in the weight of the shipment.

C. Materials required to secure a shipment beyond the normal truck equipment of tarps, straps and chains and the shipper will provide load locks.

D. If additional materials are required to be provided by the carrier the cost of that material will be reimbursed a rate of 130% of purchase price plus $25.00 per hour labor for the time required to acquire the material.

E. When the bill of lading does not accurately reflect the gross weight of a shipment, the carrier can adjust the gross weight to reflect the actual shipment weight.  Such adjustments must be supported by certified scale tickets and charges as applicable to the increased gross weight will be applied.

**JANUARY 1, 2001**

**PAGE 29**

F.  When the carrier is detained at any federal, state or local government facility due to overweight, and the bill of lading does not accurately reflect the gross weight of the shipment, the shipper will be liable for the cost of any citations issued to the carrier as a result, plus the costs associated with the repositioning or unloading of the shipment to facilitate achieving legal weight.

(1)  When carrier is required to dispatch a second unit to assist in repositioning or unloading of a shipment, the charge for this service will be $1.65 per mile, with mileage computed from the point of dispatch to the location of the federal, state or local facility where the original equipment is detained, subject to a minimum charge of $250.00.

(2)  The labor charge for the repositioning or unloading of such a shipment shall be at the rate of $25.00 per hour or fraction thereof, per man and shall apply in addition to charges assessed in paragraph F (1) above.

(3)  Excess materials not able to be retained as part of the original shipment as a result of federal, state or local weight restrictions, shall be transported at a flat rate of $1.65 per mile with a minimum charge of a$550.00.

# EXHIBIT "J"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| THE NATIONAL HISPANIC CIRCUS, INC. A NEW YORK NOT-FOR-PROFIT CORPORATION<br>Plaintiff | § § § § § | |
| V. | § § | CIVIL ACTION NO. B-02-135 |
| REX TRUCKING, INC., A TEXAS CORPORATION<br>Defendant | § § § § | |
| AND | § § | |
| THE MASON AND DIXON, LINES, INC. A MICHIGAN CORPORATION<br>Defendant/Counter-Plaintiff | § § § § | JURY DEMANDED |
| V. | § § | |
| THE NATIONAL HISPANIC CIRCUS, A NEW YORK NOT-FOR-PROFIT CORPORATION<br>Counter-Defendant. | § § § § | |

## AFFIDAVIT

| | |
|---|---|
| STATES OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, a Notary Public, personally appeared Michael A. Pita, known to me to be the person whose name is subscribed below, who after being duly sworn by me, upon his/her oath deposed and stated:

"My name is Michael A. Pita. I am licensed to practice law in the State of Texas and the Southern District of Texas and I am employed as an attorney with the law firm of JEANSONNE & REMONDET, L.L.C. I am over the age of twenty-one (21) years of age, have never been convicted of a felony, and am fully competent to make this affidavit.

I am the attorney for Defendant, THE MASON AND DIXON LINES, INC., in the above-styled case and am authorized to make this affidavit. I am actively involved in

this case and the facts stated herein are within my personal knowledge true and correct.

Exhibit 'B' attached to Defendant's Motion for Summary Judgment is true and correct copy of the deposition excerpts of the deposition of Edwin Rivera, which was taken in this matter on October 23, 2003.

Exhibit "C" attached to Defendant's Motion for Summary Judgment is a true and correct copy of the deposition excerpts of the deposition of Rigoberto Garcia Santiago, which was taken in this matter on October 23, 2003.

Exhibit "H" attached to Defendant's Motion for Summary Judgment is a true and correct copy of the deposition excerpts of the deposition of Leo Blumenauer, which was taken in this matter on November 4, 2003.

Further, the affiant sayeth not."

_____
MICHAEL A. PITA

SUBSCRIBED AND SWORN BEFORE ME on this the 10th day of December, 2003, to which I witness my hand and official seal.

NORA GALVAN MONTEZ
MY COMMISSION EXPIRES
April 26, 2004

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS