48

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 3 1 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| THE NATIONAL HISPANIC CIRCUS, INC., A New York not-for-profit Corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION No. B-02-135 |
| REX TRUCKING, INC., a Texas Corporation, and THE MASON AND DIXON LINES, INC., a Michigan Corporation | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S RESPONSE TO**
**MASON AND DIXON LINES**
**MOTION FOR SUMMARY JUDGMENT**

Comes now, The National Hispanic Circus, plaintiff, and would reply to the motion for

summary judgment as follows:

## I. FACTS[1]

On or about August 27, 2001 the Circus and Mason and DixonLines d/b/a Rex Trucking

entered into an agreement pursuant to which Rex Trucking was to provide drivers and trucks to

transport from Harlingen, Texas to Chicago, Illinois Circus trailers, one of which contained ½ of the

complete set of bleachers. ( See Plaintiff's MSJ Appendix 1, Deposition of Rigoberto Santiago pp.

9, Appendix 2, Deposition of Edwin Rivera p. 20)  Mason And Dixon was required to deliver the

---

[1] Plaintiff herein incorporates by reference all exhibits included in the Plaintiff's Appendix to the response to
the Motion for Summary Judgment.

Response to Motion for Summary Judgment Page 1

Circus' trailers and their respective loads to Chicago, Illinois prior to August 31, 2001, the commencement date of the Circus' scheduled tour in Chicago. ( See Plaintiff's MSJ Appendix 2, Deposition of Edwin Rivera p. 19, Appendix 3, 2001 Circus Schedule, Appendix 4, Bills of Lading)

Shortly after Mason and Dixon took possession of the trailers, the truck transporting the Circus' trailer containing the bleachers disappeared.(See Plaintiff's MSJ Appendix 5, Incident Report, Appendix 6, Email to missing driver Ted Tilley)    As a result of the disappearance of the trailer and the loss of the bleachers, the Circus was delayed in setting up the circus and was forced to rent bleachers to carry out its performances in Chicago. (See Plaintiff's MSJ Appendix 2, Deposition of Edwin River p. 26-28) Mason and Dixon's President Leo Blumenauer expressly agreed that the Circus would be reimbursed for the replacement bleachers. (See Plaintiff's MSJ Appendix 7 Deposition of Leo Blumenauer, p. 19)  The cost of renting replacement bleachers was $9,000.00. ( See Plaintiff's MSJ Appendix 8, 2/19/02 correspondence regarding missing bleachers) The rented bleachers, however, provided approximately $1/3^{rd}$ (300) fewer seats than the Circus' stolen bleachers.   (See Plaintiff's MSJ Appendix 8, 2/19/02 correspondence regarding missing bleachers, Appendix 2, Deposition of Edwin Rivera p. 26-27)

Based on the success of the show, the Circus extended its original tour dates in Chicago of August 29, 2001 through September 9, 2001, by one week, through September 16, 2001. ( See Plaintiff's MSJ Appendix 1, Deposition of Rigoberto Garcia p. 15, Appendix 8, 2/19/02 correspondence regarding missing bleachers)  However, as a result of the fewer bleacher seats, the Circus suffered losses of $6,000.00 per performances for at least 9 performances or more. (See Plaintiff's MSJ Appendix 8, 2/19/02 correspondence regarding missing bleachers, Appendix 1, Deposition of Rigoberto Garcia p. 15).

During the Circus' performance in Chicago the bleachers had not been recovered and the Circus was preparing for the remainder of its 2001 National Tour. The Circus, therefore, was required to purchase new bleachers from Canobbio, the Circus' supplier for its tent and its bleachers, in Italy. (See Plaintiff's MSJ Appendix 2, deposition of Edwin Rivera p. 42-43) The Circus' bleachers are specially made in Italy based on the design of the tent. (See Plaintiff's MSJ Appendix 2, deposition of Edwin Rivera p. 42-43)

On or about September 19, 2001, having received no word on the location of the bleachers, the Circus special ordered new bleachers from Canobbio. The cost of the new bleachers was $87,500.00 and the Circus was required to prepay because of the special order.(See Plaintiff's MSJ Appendix 9, Bleacher Order date 9/19/01 and Invoice 10/23/01, Appendix 8, 2/19/02 correspondence regarding missing bleachers, Appendix 2, deposition of Edwin Rivera p. 43-44). Further, as these bleachers are not off the shelf but are constructed only after an order, the Circus had to order them timely in the hope that the bleachers would arrive in time for the Miami show on November. (See Plaintiff's MSJ Appendix 3, 2001 Circus Schedule, Appendix 2, deposition of Edwin Rivera p. 43-44)

The Circus also incurred shipping costs in the amount of $36,104.00 for shipping the bleachers from Italy to the United States. (See Plaintiff's MSJ Appendix 8, 2/19/02 correspondence regarding missing bleachers, Appendix 10, Shipping Invoice 11/28/01, Shipping Check Dated 11/29/01) In late November of 2001 the trailer was ultimately discovered in Arkansas over 2 months after its disappearance, but the Circus had already paid for the replacement bleachers.(See Plaintiff's MSJ Appendix 2, deposition of Edwin Rivera p. 37-38, 42-43)

## II.  PLAINTIFF'S CLAIMS UNDER THE CARMACK AMENDMENT ARE NOT SUBJECT TO DEFENDANT'S TARIFF.[2]

Defendant invokes the protection of its tariff as limiting Plaintiff's damages in this case to those based on weight of the shipment.  As the court will see, the clear law requires that bills of lading used in shipping comply with the tariff requirements under the Carmack Amendment before a carrier's liability may be limited.  The bills of lading in this case are insufficient as a matter of law and Defendant's tariff limitation is therefore not applicable here.

In *Rohner Gehrig Co. v. Tri-State Motor Transport*, 950 F.2d 1079 (5th Cir. 1992)(en banc) a case exactly on point, a carrier's bills of lading were found insufficient as matter of law.  The court stated:

> . . .[I]f a carrier desires to limit its liability it must file one or more tariffs that set forth terms and conditions of shipment, freight rates available, and information relevant to shipping, including limitation of liability. Central to the scheme of limitation of liability is the requirement that each rate listed in the tariffs specify a "released rate," which is the maximum dollar liability per unit of weight for which the carrier will be liable. Also central to the I.C.C.'s liability limitation scheme is the requirement that there be a written agreement between the shipper and the carrier. The B.O.L. (Bill of Lading)is the form most frequently used for such agreements. If the carrier is to limit its liability, the written agreement between shipper and carrier must contain a so-called "inadvertence clause." The inadvertence clause specifies the released rate and states that such rate will apply unless the shipper declares otherwise." *See id.* (emphasis added)

While Tri-State's bills of lading provided a phrase stating "unless a greater value is declared, the shipper hereby releases the value to $5,000 per ton of 2,000 pounds for each article" the 5th

---

[2]  Plaintiff concedes without argument that the Carmack Amendment preempts State Law cause of actions regarding this shipment, and only pled those actions in the alternative should discovery have determined the Carmack Amendment not applicable. This response therefore does not address the Motion for Summary Judgment in regards to the preempted state law claims.

Circuit found the bills of lading did not have a complete inadvertence clause and especially that they did not have the necessary released rate clause stating "The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding _____ per ____." *See id.* at 1082. The court also states that because the Carmack Amendment was specifically adopted by congress to prevent carriers from limiting their liability, that any narrow exception available to that policy must be strictly construed. *See id.* at 183.

The court then analyzed the language of the bills of lading under test enunciated in *Hughes v. United Van Lines*, 829 F.2d 1407 (7th Cir. 1987) *cert denied*, 485 U.S. 913 (1988). The Hughes test requires a carrier to: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. *Id.* at 1415 (citing *Antonio v. Greyhound Van Lines, Inc.*, 591 F.2d 103 (1st Cir.1978)). The 5th Circuit found that the first and fourth prongs were obviously satisfied, but that because the bills of lading did not give the shipper a reasonable opportunity to choose between two or more levels of liability and Tri-State did not obtain the shipper's express agreement as to the limitation of liability, no tariff protection was available to Tri-State. *See id.* at 1084-1085.

Here, as was the case in *Rohner*, the 2nd and 3rd prongs of the *Hughes* test are not met by Defendant Mason and Dixon. If anything, the bills of lading in this case are even less compliant than those in *Rohner* and provide absolutely no released rate clause or provide the shipper any means to choose a declared value or any limit of liability. The bills of lading here do not even contain part of an inadvertence clause, have no blanks or spaces for declaring a higher alternative value and can

meet none of the requirements enunciated in *Rohner*. (See Plaintiff's MSJ Appendix 4, Bills of Lading)

In addition, the tariff filed by Mason and Dixon states that its bills of lading will be governed by the Uniform Straight Bill of Lading of the National Motor Freight Classifications.    (See Plaintiff's MSJ Appendix 11, Mason and Dixon Tariff, para. 2) Attached hereto and incorporated by reference is the Uniform Straight Bill of Lading of the National Motor Freight Classifications. (See Plaintiff's MSJ Appendix 12, Uniform Bill of Lading) It is immediately self-evident that Mason and Dixon Lines' bills of lading have little to no similarity with the Uniform Bill of Lading and do not have the inadvertence clause and liability determination as is expressly contained therein in Notes 1 and 2.   (See Plaintiff's MSJ Appendix 12, Uniform Bill of Lading)

While Plaintiff has relied extensively on *Rohner* due to its similarity, there are other recent cases also denying any tariff limitation of liability because of insufficient language in the bills of lading. *See Celadon Trucking Services, Inc. v. Titan Textile Co., 2003 WL 22410052* (Tex.App.-Houston [14 Dist.], Oct. 2003)(tariff did not apply as agreement must provide shipper a reasonable opportunity to choose between two or more levels of liability) *See Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 838-43 (11th Cir.2003) (holding carrier did not limit its liability under Carmack Amendment because it did not give shipper a reasonable opportunity to choose between two or more levels of liability).

What is abundantly clear in this case is that bills of lading used in this shipment do not contain any language (standard or otherwise) allowing for a choice between levels of liability or even for Plaintiff to give a declared value of the goods.  In the few cases cited by defendant as support of its position, the bills of lading contained these standard clauses and there was an <u>express waiver</u>

made by the shipper, in writing. *See e.g. Jackson v. Brook Ledge, Inc.*, 991 F. Supp. 640 (shipper signed express waiver). Therefore, as the bills of lading here were insufficient for Mason and Dixon to apply its tariff provisions, Plaintiff is entitled to all damages available under the Carmack Amendment.

## III. Plaintiff IS ENTITLED TO ITS FULL ACTUAL DAMAGES

Defendant has asserted that Plaintiff is not entitled to consequential damages but are limited to delay in delivery damages. With due respect to opposing counsel, the cases cited by defendant do not stand for that proposition. In fact the defendant's statement that the only allowable damages for temporary loss of goods arise from the delay is quite simply misleading. Both *Moffit* and *Duerrmeyer* stand solely for the proposition that the Carmack Amendment preempts state law claims. In *Duerrmeyer*, 49 F.Supp.2d 934 the court held simply that the Carmack Amendment preempts state law claims even in the absence of damage to goods. *Id.* at 936 -937. Absolutely no reference or holding in those cases states what damages a shipper is entitled to.

However, in *Air Products & Chemicals, Inc. v. Illinois Central Gulf R.R. Co.*, the 5th Circuit stated the following:

> Despite the apparent statutory limitation to recovery of damage caused to the property itself transported, the Supreme Court ... from its earliest interpretation has consistently construed the [Carmack] Amendment as likewise imposing liability upon the carrier for all reasonably foreseeable consequential damages resulting from a breach of the contract of carriage, including those resulting from nondelivery of the shipped goods as provided by the bill of lading .... This broad interpretation of a carrier's liability under its bills of lading was premised upon what the Court conceived to be a paramount object of the legislation--to provide a uniform rule that the carrier issuing the bill of lading would be responsible to the consignee for all loss, damage, or delay arising out of the contract to transport the goods so shipped.

721 F.2d 483, 485-86 (5th Cir.1983) (emphasis added).

Further, in the 5th Circuit a Carmack Amendment Plaintiff is not required to show that its consequential damages were specifically foreseeable. *New Process Steel Corp. v. Union Pacific R. Co.* 2003 WL 22533559 (5th Cir.Tex.2003)(not published)(citing *Hector Martinez and Co. v. Southern Pac. Transp. Co.* 606 F.2d 106 (5th Cir. Tex., 1979). Under the Carmack Amendment, the measure of damages is determined by common law principles as adopted by federal law. *Hector Martinez*, 606 F.2d at 108 & n. 1. A Plaintiff can recover "all reasonably foreseeable damages." *Air Products*, 721 F.2d at 485. Moreover, damages for delay in shipment are available when the harm "was not so remote as to make it unforeseeable to a reasonable [person] at the time of contracting." *Hector Martinez*, 606 F.2d at 110.

"There is only one rule, of universal application, . . . and that is to give compensation for the loss suffered. Frequently, this ideal is found impossible of complete attainment; perhaps generally the market value rule is found to be the nearest approach to reaching the actual loss. But the market value rule is inapplicable when, on the facts, it is not the nearest practicable approach to an ascertainment of the actual loss. Each case must be governed by its own facts." *United States v. Palmer & Parker Co.*, 61 F.2d 455, 459 (1st Cir. 1932). The Carmack Amendment, in compensating the aggrieved party's "full actual loss," does not restrict the measure of damages solely to the diminution in value of the goods involved. *Hector Martinez*, 606 F.2d at 110. (Citing *Great Atlantic & Pacific Tea Co. v. Atchison, T. & Ste. F. Ry.*, 333 F.2d at 708-09.

It would be forseeable to a reasonable fact finder that a delay in shipment of the bleachers for a performing circus would require that the circus obtain temporary rental bleachers rather than cancel a show. It would further be foreseeable that the seating capacity of the Circus would be

reduced by such a delay in shipment and result in a consequential loss of ticket sales. It would also be foreseeable that after weeks with no word of the missing truck that the Circus would need to obtain permanent replacement bleachers in order to perform its contractual show obligations for the rest of the schedule. As for this court's summary judgment determination however, it is more important to note that: "Because questions concerning what is forseeable and what is normal may be the subject of varying inferences. . . . , these issues are generally for the fact finder to resolve." *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473-74 (2d Cir.1995) (quoting *Derdiarian v. Felix Contracting, Corp.*, 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670, 434 N.Y.S.2d 166, 169 (N.Y.1980)).

The summary judgment evidence shows the Circus had no choice but to rent bleachers to carry out its performances in Chicago and that Mason and Dixon expressly agreed that the Circus would be reimbursed for the replacement bleachers. (See Plaintiff's MSJ Appendix 2, Deposition of Edwin River p. 26-28) (See Plaintiff's MSJ Appendix 7 Deposition of Leo Blumenauer, p. 19) The evidence shows that these bleachers contained 300 less seats, resulting in loss of ticket sales. (See Plaintiff's MSJ Appendix 8, 2/19/02 correspondence regarding missing bleachers, Appendix 2, Deposition of Edwin Rivera p. 26-27)   The evidence shows that after no word on the missing truck for over two weeks and, given the long lead time to construct bleachers, that the Circus was required to purchase new bleachers in order to meet its other contractual show obligations. (See Plaintiff's MSJ Appendix 3, 2001 Circus Schedule, Appendix 2, deposition of Edwin Rivera p. 43-44) The evidence shows cost of the new bleachers was $85,500.00 and the Circus was required to prepay because of the special order.(See Plaintiff's MSJ Appendix 9, Bleacher Order date 9/19/01, Appendix 8, 2/19/02 correspondence regarding missing bleachers, Appendix 2, deposition of Edwin Rivera p. 43-44).   The evidence shows the Circus incurred shipping costs in the amount of

$36,104.00 for shipping the bleachers from Italy to the United States. Given this proof, it is improper to grant a summary judgment as to the foreseeable damages available to the Circus.

Further, Defendant has alleged that Plaintiffs consequential damages from loss of ticket revenue is so speculative as to be unsupportable. It is undisputed by Defendant that the show in Chicago seated 300 individuals less per show than had the bleachers been delivered. (Appendix 2, Deposition of Edwin Rivera p. 26-27) It is undisputed by Defendant that the show was extended because of the demand to accommodate at least 9 more performances. (See Plaintiff's MSJ Appendix 1, Deposition of Rigoberto Garcia p. 15, Appendix 8, 2/19/02 correspondence regarding missing bleachers) While Mr. Garcia was not able to specifically remember ticket prices, the same question was not asked of other listed fact witness. Further, Mason and Dixon was specifically informed that 300 less seats per performance would equal $6000.00 dollars in damages per performance. (Appendix 8, 2/19/02 correspondence regarding missing bleachers). Dividing $6000.00 by 300 less seats amounts to $20.00 per ticket.

While Defendant asserts there were children at reduced prices mixed with adult prices, there is no need for Plaintiff to present evidence precise to the penny for recovery of damages for loss of ticket sales. While it is true that recovery is not allowed for damages that are speculative or conjectural, "mathematical precision is not required to establish the extent or amount of one's damage." *Brown v. Ames,* 201 F.3d 654, 662 (5th Cir. Tex.2000). *(citing Oyster Creek Financial Corp. v. Richwood Investments II, Inc.,* 957 S.W.2d 640, 649 (Tex. Ct. App. 1997). Damages must be "ascertainable by reference to some fairly definite standard, established experience, or direct inference from known facts," but the Plaintiff does not have to give an actual dollar value to his injury. *Id.* (emphasis added)

While it may be hard for individuals with the Circus to remember exact ticket prices depending on the venue or ticket type, this is not necessary for presentation of the damages question to a jury. Here, Defendant has been notified that the approximate price of a ticket was $20.00 and that Plaintiff seeks recovery for that lost amount. While testimony at trial may not be exact it will be able to specify a range of ticket prices based on the Circus individuals' experience. While Plaintiff is actively seeking the gate receipts from 3 years ago, it may not be able to locate them. This does not mean that Plaintiff may not recover for such consequential damages, but that the jury may decide what the reasonable value is based on the testimony at trial. It is therefore improper to grant summary judgment on the issue of speculative damages.

## IV.  PRAYER

Wherefore, Plaintiff prays theat the court deny the motion for summary judgment and for all further relief in law or equity to which it may be entitled..

Respectfully submitted,

BARKER, LEON, FANCHER
& MATTHYS, L.L.P.
Tower II - Suite 1200
555 N. Carancahua St.
Corpus Christi, Texas 78478
Telephone: (361) 881-9217
Facsimile: (361) 882-9437

Stephen J. Chapman
ATTORNEY IN CHARGE
State Bar No. 24001870
Federal Admission No. 32677
Attorneys for Plaintiff
The National Hispanic Circus

Response to Motion for Summary Judgment Page 11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument

has been served in accordance with the Texas Rules of Civil Procedure on this the ___30___ day

of __December_____, 2003, to all counsel of record as follows:

Mr. Michael Pita
State Bar No. 24001870
Federal Bar No. 32169
1200 Smith Street, Suite 2265
Houston, Texas 77002
(713)752-0300 Phone
(713)752-0410 Fax

_____
Stephen J. Chapman

Response to Motion for Summary Judgment Page 12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| THE NATIONAL HISPANIC | ) | |
| CIRCUS, INC., A New York | ) | |
| not-for-profit Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CIVIL ACTION No. B-02-135 |
| REX TRUCKING, INC., a Texas | ) | |
| Corporation, and THE MASON AND | ) | |
| DIXON LINES, INC., a Michigan | ) | |
| Corporation | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S APPENDIX TO THE RESPONSE TO
MASON AND DIXON LINES MOTION FOR SUMMARY JUDGMENT**

**FIAT**

| | |
|---|---|
| COUNTY OF NUECES | § |
| | § |
| STATE OF TEXAS | § |

BEFORE ME, the undersigned authority, personally appeared Stephen Chapman, who, being by me duly sworn, deposed and said:

1.      My name is Stephen Chapman. I am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts stated in it.

2.      The exhibits attached hereto are all true an correct copies of documents provided by each party during discovery and in almost all cases identified during deposition. The only exhibit not previously produced is exhibit 12, The Uniform Bill of Lading referenced in Defendant's Tariff. This copy was obtained by referencing a trucking company web page at

D: 01131/00032/SSC

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
2                         BROWNSVILLE DIVISION

3

4   THE NATIONAL HISPANIC CIRCUS, INC.,    *
    A New York Not-For-Profit              *
5   Corporation,                           *
                       Plaintiff,          *
6                                          *
                       vs.                 * CIVIL NO. B-02-135
7                                          *
    REX TRUCKING, INC., A Texas            *
8   Corporation, and THE MASON AND DIXON   *
    LINES, INC., A Michigan Corporation.   *
9                       Defendants.        *
    ------------------------------------   *
10

11  The deposition of:

12                    RIGOBERTO GARCIA SANTIAGO,

13  a non-party witness, was held at the offices of

14  SALDAÑA & CARVAJAL, ESQS., Vig Building, 1225 Ponce De Leon

15  Avenue, Santurce, Puerto Rico, on Thursday, October 23,

16  2003, at 1:20 p.m.

17

18

19

20

21

22

23

24                    BARBARA DACHMAN, CSR, RPR
                    U.S. OFFICIAL COURT REPORTER
25                         787-722-0132
```

25

26

CERTIFICATE OF NOTARY PUBLIC

**I, LUIS SALDAÑA, ESQ., duly commissioned and qualified in and for the Commonwealth of Puerto Rico,**

DO HEREBY CERTIFY that the deponent, Rigoberto Garcia Santiago, was duly sworn before the commencement of the taking of the deponent's testimony, and that by stipulation of the parties I was excused from the deposition.

**I FURTHER CERTIFY that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the case named in said caption.**

**IN WITNESS WHEREOF I sign these presents and affix my notarial seal in San Juan, Puerto Rico, this _____ day of _____ 20__.**

_____
**Notary Public**

JURAT

**I, RIGOBERTO GARCIA SANTIAGO, certify that I have read the foregoing transcript of my deposition taken on October 23, 2003, and have signed it subject to the following changes:**

**PAGE        LINE                CORRECTION**

**Deponent**        _____

**Date**        _____

**Sworn and subscribed to on this _____ day of _____ 20__.**

**Notary Public**        _____

27

REPORTER'S CERTIFICATE

**I, BARBARA DACHMAN, Official Court Reporter in the United States District Court for the District of Puerto Rico and Registered Professional Reporter with the National Court Reporters Association, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared under my direction.**



_____
BARBARA DACHMAN

Rigoberto Garcia - Exam By Mr. Pita

1    A.    Three.

2    Q.    Were all three of those trucks used to

3    transport their goods from Harlingen to Chicago?

4    A.    True.

5    Q.    How many other trucks were hired to help move

6    the circus from Harlingen to Chicago?

7    A.    I am not sure, but I think there were four.

8    Q.    So according to your recollection, the total

9    number of trucks that were needed to move the circus from

10   Harlingen to Chicago were seven?

11   A.    Um-hmm, correct.

12   Q.    When the trucks were loaded in Harlingen, did

13   you ever see copies of the bills of lading?

14   A.    Negative.

15   Q.    Do you know what a bill of lading is?

16   A.    Yes.

17   Q.    What is your understanding of what a bill of

18   lading is?

19   A.    Well, the bill of lading is a document that

20   describes the cargo that the company is going to transport

21   from the site and the destination.

22   Q.    It lists the goods that are in the trailer,

23   correct? The bill of lading describes the goods that are in

24   the trailer, to your understanding, correct?

25   MR. CHAPMAN:   Objection.

---

Rigoberto Garcia - Exam By Mr. Pita

1    THE DEPONENT:   On the trucks, correct.

2    BY MR. PITA:

3    Q.    Did The National Hispanic Circus own all of

4    the trailers that were used to move the circus from

5    Harlingen to Chicago?

6    A.    That's correct.

7    Q.    You never saw any of the certificates of

8    title or anything for the trailers, did you?

9    A.    I don't understand the question.

10   Q.    I will withdraw it. Don't worry about it.

11   When did the trailers make it up to Chicago?

12   A.    The first ones arrived, ours. And then

13   Tuesday night and Wednesday, the others began to arrive.

14   Q.    "The others," what do you mean by "the

15   others"?

16   A.    The trucks of the company that was hired to

17   bring the trailers.

18   Q.    Okay.

19   So the other three trucks didn't arrived until

20   sometime after the original four trucks arrived, correct?

21   MR. CHAPMAN:   Objection. Form.

22   THE DEPONENT:   That's correct.

23   MR. PITA:   Did I get that backwards?

24   MR. CHAPMAN:   I think it's four and three.

25   They own three and they rent four.

---

11

Rigoberto Garcia - Exam By Mr. Pita

1    BY MR. PITA:

2    Q.    The trucks that were owned by The National

3    Hispanic Circus arrived before the trucks that were not

4    owned by The National Hispanic Circus; is that correct?

5    A.    True.

6    Q.    Did all of the trucks that were not owned by

7    The National Hispanic Circus arrive in Chicago?

8    A.    Negative.

9    Q.    One of the trucks was missing, right?

10   A.    That's correct.

11   Q.    What was in the truck that was missing?

12   A.    Half of the accommodation of the circus. And

13   I will explain. It's split into two.

14   Q.    Half of the bleachers didn't arrive; is that

15   correct?

16   A.    Exactly.

17   Q.    Did you or anybody from the circus ever

18   perform any sort of an investigation as to what happened to

19   the bleachers?

20   A.    At what time?

21   Q.    During the run of the Chicago show.

22   A.    No, I did not.

23   Q.    You didn't personally conduct any sort of

24   investigation?

25   A.    Negative.

---

12

Rigoberto Garcia - Exam By Mr. Pita

1    Q.    What about after the run of the Chicago show?

2    Did you personally conduct any sort of investigation to find

3    where the bleachers went?

4    A.    Negative.

5    Q.    So you can't offer any testimony as to the

6    actions that The National Hispanic Circus took to find the

7    bleachers, can you?

8    A.    That's right.

9    Q.    Okay.

10   At some point after the bleachers were lost, did

11   The National Hispanic Circus rent replacement bleachers?

12   A.    We waited until the last minute to see if the

13   truck would arrive with the bleachers. Since it didn't

14   arrive, then we proceeded to rent some small bleachers,

15   which is what we were able to get.

16   MR. PITA:   I am going to object to the

17   non-response to the question.

18   BY MR. PITA:

19   Q.    Were you involved at all in the rental of the

20   replacement bleachers?

21   A.    Indirectly. I was helping Mr. Ed Rivera.

22   Q.    What were your duties in obtaining the

23   replacement bleachers?

24   A.    Well, helping him out as to obtain them,

25   going with him to the place where we rented them to see if

Rigoberto Garcia - Exam By Mr. Pita

1 they were suitable to meet the fire department standards,
2 because we had to do that.
3      Q.   Do you remember the name of the company that
4 you rented the replacement bleachers through?
5      A.   Negative.
6      Q.   Do you remember how many companies you
7 looked -- do you remember how many companies you called in
8 order to look for replacement bleachers?
9      A.   Not exactly.
10      Q.   Do you remember how much the replacement
11 bleachers cost?
12      A.   No, I had nothing to do with the payment.
13      Q.   The circus rented replacement bleachers,
14 correct?
15      A.   Um-hmm.
16      Q.   How many people did the replacement bleachers
17 that the circus rented seat?
18      A.   Ours?
19      Q.   No, the ones that you rented.
20      A.   About 300 people.
21      Q.   My understanding is that the load that was
22 lost contained about half of the bleachers that were owned
23 by The National Hispanic Circus; is that correct?
24      A.   That's correct.
25      Q.   Half of the bleachers did arrive on time; is

Rigoberto Garcia - Exam By Mr. Pita

1 that correct?
2      A.   Correct.
3      Q.   The bleachers that were owned by The National
4 Hispanic Circus, when assembled and put together, including
5 the ones that were lost, how many people did those bleachers
6 seat?
7      A.   Completely, or the half that was lost?
8      Q.   Completely.
9      A.   About 1,980 people.
10      Q.   All right.
11      So half the bleachers sat about a thousand, right?
12      A.   That's correct.
13      Q.   So with the replacement bleachers and that
14 one-half of the bleachers, the entire seating capacity for
15 the circus was about 1300 people?
16      A.   Correct.
17      Q.   Okay.
18      Were you involved at all in ticket sales for the
19 circus?
20      A.   Yes, I was also in charge of the ticketing as
21 well.
22      Q.   How much did a ticket for the circus cost?
23      A.   In Chicago?
24      I don't remember exactly, because it varied from
25 venue to venue sometimes.

Rigoberto Garcia - Exam By Mr. Pita

1      Q.   Did the circus offer different prices for
2 adults as opposed to children?
3      A.   That's correct.
4      Q.   At some point during the run of the Chicago
5 show, the show was extended; is that correct?
6      A.   That's correct.
7      Q.   How many shows were added?  Do you recall?
8      A.   About nine.
9      Q.   Okay.
10      How many shows were originally scheduled?  Do you
11 recall?
12      A.   About 17 or 18.  I don't remember exactly.
13      Q.   Now, my understanding from Mr. Rivera's
14 testimony is that after the Chicago show, The National
15 Hispanic Circus was originally supposed to have shows in New
16 York, Philadelphia, and Miami; is that correct?
17      A.   That's correct.
18      Q.   And the --
19      A.   But originally -- not until the last day that
20 we stayed.  In other words, without the extension.
21      Q.   What did the extension have to do with the
22 New York show?
23      A.   9/11.
24      Q.   You didn't have any shows -- you didn't have
25 the shows in New York because of 9/11, correct?

Rigoberto Garcia - Exam By Mr. Pita

1      A.   That's correct.
2      Q.   But you still had shows after 9/11 in
3 Chicago; is that correct?
4      A.   Until the 16th, if my memory serves me
5 correctly.
6      Q.   To your knowledge, the decision to have the
7 shows in Chicago had nothing to do with the loss of the
8 bleachers, right?
9      MR. OQUENDO:   That's objectionable.
10      MR. CHAPMAN:   Objection as to form.
11 BY MR. PITA:
12      Q.   You can go ahead and answer the question.
13      THE INTERPRETER:   I am sorry, what was the
14 question again?  To your knowledge?
15      MR. PITA:   To his knowledge.
16      THE INTERPRETER:   The decision to what?
17      MR. PITA:   The cancellation of the shows in
18 New York didn't have anything to do with the loss of the
19 bleachers; is that correct?
20      MR. CHAPMAN:   The same objection.
21      THE DEPONENT:   In other words, not going to
22 New York?
23 BY MR. PITA:
24      Q.   Didn't have anything to do with losing the
25 bleachers.

D-0113 / 00032 / 80-0

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION


THE NATIONAL HISPANIC CIRCUS, INC.,   *
A New York Not-For-Profit             *
Corporation,                          *
                    Plaintiff,        *
                                      *
            vs.                       *  CIVIL NO. B-02-135
                                      *
REX TRUCKING, INC., A Texas           *
Corporation, and THE MASON AND DIXON  *
LINES, INC., A Michigan Corporation.  *
                    Defendants.       *
------------------------------------- *


The deposition of:

                    EDWIN RIVERA,

a non-party witness, was held at the offices of

SALDAÑA & CARVAJAL, ESQS., Vig Building, 1225 Ponce De Leon

Avenue, Santurce, Puerto Rico, on Thursday, October 23,

2003, at 10:15 a.m.


                BARBARA DACHMAN, CSR, RPR
                U.S. OFFICIAL COURT REPORTER
                     787-722-0132

.3

REPORTER'S CERTIFICATE

I, BARBARA DACHMAN, Official Court Reporter in the United States District Court for the District of Puerto Rico and Registered Professional Reporter with the National Court Reporters Association, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared under my direction.

_____

BARBARA DACHMAN

19

### Edwin Rivera - Exam By Mr. Pita

1    that was owned by The National Hispanic Circus was placed in

2    those 12 trailers that were used to transport from Harlingen

3    to Chicago; is that correct?

4         A.    That's correct.

5         Q.    Prior to the movement of the circus from

6    Harlingen to Chicago, as the security chief, were you ever

7    made aware of any threats that were made upon the circus by

8    any ex-employees?

9         A.    Never.

10        Q.    Do you know who Ed Migley is?

11        A.    Yes, I know him.  I met him.

12        Q.    Who is Ed Migley?

13        A.    He was the circus manager.

14        Q.    At some point when the circus was moved from

15   Harlingen to Chicago -- my understanding is that the circus

16   was moved on August 27th; is that correct?

17        A.    That's correct.

18        Q.    And when was the circus supposed to arrive in

19   Chicago?

20        A.    We had a schedule, a timetable, of being

21   there by the 29th already.  More or less.

22        Q.    Did the trailers arrive in Chicago by the

23   29th?

24        A.    Not all of them.

25        Q.    How many trailers didn't make it up to

### Edwin Rivera - Exam By Mr. Pita

1    Chicago for August 29th?

2          A.    Three arrived, one was missing.

3          Q.    What was in the missing trailer?

4          A.    It was one of the trailers that we had filled

5    with the bleachers.

6          Q.    Was this trailer a flatbed?

7          A.    No, it was closed.

8          Q.    The bleachers that were in the trailer, it

9    was not all of the bleachers, was it?

10         A.    No, it was half of the total amount.

11         Q.    Okay.

12               Do you know, from personal knowledge, how much the

13   full set of bleachers -- what the seating capacity of the

14   full set of bleachers is?

15         A.    My best recollection is that they were

16   designed for 2,000 in total.  It was 2,000 in total.

17         Q.    When the trailer that was carrying the

18   bleachers did not arrive in Chicago, as the security chief,

19   were you ordered to investigate what happened to the

20   trailer?

21         A.    That's correct.  Yes.

22         Q.    What was the first thing you did when you

23   learned that the trailer that was carrying the bleachers did

24   not arrive?

25         A.    I contacted the supervisor in charge of the

## Edwin Rivera - Exam By Mr. Pita

1    any actions that the trucking company took in order to find

2    the bleachers?

3            A.    No, I don't.  I don't know.

4            Q.    Other than the phone calls that you made to

5    this individual, did you personally do anything in order to

6    attempt to locate the bleachers?

7            A.    Yes.

8            Once he told me that he didn't know where it was,

9    I contacted the telephone numbers of the company, for them

10   to tell me the next steps -- what the next steps to follow

11   would be.

12           Q.    What were the next steps that you took after

13   you contacted the telephone numbers that you had?

14           A.    Well, once I didn't obtain any kind of help,

15   I had to inform the circus manager that we had to obtain

16   bleachers, or rent some bleachers.

17           Q.    Okay.

18           Were you involved in renting replacement bleachers

19   for the circus for the Chicago show?

20           A.    Yes, I was.

21           Q.    What did you do in order to obtain these

22   rental bleachers?

23           A.    We called several companies, and one of the

24   companies was able to provide us with some smaller bleachers

25   which in total only seated 300.  No other company in the

### Edwin Rivera - Exam By Mr. Pita

1   city or close to the city had anything to provide us.

2          Q.    Do you know the names of any of the companies

3   that you called?

4          A.    I think I have something here.

5          Chicago Events.   That was the company that

6   provided us with the 300 seats.   It was the only company

7   that was able to help us, out of the companies that we

8   sought in the phone book.

9          Q.    Do you know the names of any of the other

10  companies that you called?

11         A.    No, I didn't write them down because we were

12  calling from the phone book.

13         Q.    To your knowledge, did Mason and Dixon or Rex

14  Trucking agree to pay for replacement rental bleachers?

15         A.    Never.

16         Q.    Were the smaller bleachers -- did Chicago

17  Events have larger bleachers that wouldn't fit in the tent,

18  or was that the largest set of bleachers they could give

19  you?

20         A.    Yes, that's all they could provide.

21         Q.    When did Chicago Events provide the bleachers

22  to you?

23         Let me rephrase that.

24         Were the bleachers provided to you early enough so

25  that the August 29th show could go off, the first show could

28

## Edwin Rivera - Exam By Mr. Pita

1    go off?

2         A.    They arrived that same night.

3         Q.    Just for the record, the document that you

4    identified as Exhibit 1 was the schedule for the show, and

5    this shows that the first show in Chicago was August 31st.

6              Did the bleachers arrive the night of August 31st?

7         A.    That's correct.

8         Q.    So the circus did not have to cancel any

9    shows because of the missing bleachers; is that correct?

10        A.    No.

11        Q.    Do you know how much the circus charged per

12   ticket for a show?

13        A.    No, because that's not my -- no, I don't

14   know.  I am not involved in that.

15        Q.    Okay.

16             Did you ever hire an investigator or call the

17   police after the bleachers had been lost?

18        A.    Yes, I called the FBI.

19        Q.    Do you know the name of the individual that

20   you spoke to at the FBI?

21        A.    Mike Moran.

22        Q.    Could you spell Mr. Moran's last name for me?

23        A.    I am sorry, it's not Moran.  It's Morgan.

24   Mike Morgan.  It's here (indicating) in my little notebook.

25        Q.    What office did Mr. Morgan -- what FBI office

### Edwin Rivera - Exam By Mr. Pita

1          A.    No, it was nothing.  He wasn't able to

2     investigate anything.  He couldn't find anything.

3          Q.    The original run of the show, according to --

4     the original run of the Chicago show, according to

5     Exhibit 1, was August 31st to September 9th.

6               Is that true, to the best of your recollection?

7          A.    Yes, that's my best recollection.

8          Q.    To your best recollection, were all of those

9     shows sold out?

10          A.    That's correct, to the best of my

11     recollection, yes.

12          Q.    The best way to get that information, though,

13     would be to look at the gate receipts; is that correct?

14          A.    I understand so, but I don't work in that.

15          Q.    And then at some point the circus -- the

16     schedule for the circus was extended; is that correct?

17          A.    That's correct.

18          Q.    How long was the show extended?

19          A.    The best of my recollection was one more

20     week.

21          Q.    And about how many shows were added to the

22     original run of the circus?

23          A.    I wouldn't be able to answer that question

24     precisely because I don't work in that.

25          Q.    Do you know why the other show -- the shows

**Edwin Rivera - Exam By Mr. Pita**

1    Q.    To your knowledge, The National Hispanic

2    Circus did not manufacture the bleachers that were lost, did

3    they?

4    A.    That's correct.

5    Q.    Do you know how old the bleachers were that

6    were lost?

7    A.    About a year.

8    Q.    Do you have any knowledge as to how much the

9    bleachers weighed?

10    A.    No.

11    Q.    Do you have any knowledge as to how much the

12    trailer and all its contents -- the trailer that was lost

13    and all its contents weighed?

14    A.    No, negative.

15    Q.    Do you know if the trailer was ever found?

16    A.    Yes, it was found.

17    Q.    To your knowledge, when was the trailer

18    found?

19    A.    I was informed, if my memory serves me

20    correctly, in November.

21    Q.    Were you informed -- to your knowledge, were

22    you informed in the beginning, middle, or latter part of

23    November?

24    A.    It was about mid-November, if my memory

25    serves me correctly.

### Edwin Rivera - Exam By Mr. Chapman

1    I thank you very much for your time.

2                    MR. CHAPMAN:  I have a few questions for you,

3    Mr. Rivera, just to clarify some things and in case you are

4    not available to testify at trial, so that we cover some

5    areas.

6                    (To the interpreter) And you can translate that.

7                        (Whereupon, the interpreter translates to the

8                        deponent.)

9                                EXAMINATION

10   BY MR. CHAPMAN:

11                   Q.    Now, just to clarify something that was

12   testified earlier.

13                   As far as the invoice exhibits -- I believe it's

14   either 2 or 3 through 5 -- you have no personal knowledge of

15   those exhibits, do you, sir?

16                   A.    That's correct.

17                   Q.    Now, you also mentioned earlier that the

18   Chicago shows were all sold out.  Did you actually have to

19   turn people away from the shows?

20                   A.    In each show we turned about 300 people away,

21   average.

22                   Q.    If you would have had the bleachers, would

23   you have been able to seat those individuals?

24                   MR. PITA:  Objection.  Form.

25                   THE DEPONENT:  Yes, positively.

Edwin Rivera - Exam By Mr. Chapman

1  accommodate those people.

2  BY MR. CHAPMAN:

3       Q.   Do you recall when you first suggested that

4  the circus needed to order bleachers from Canobbio?

5       A.   No, that's the management who made the

6  decision on their own.

7       Q.   Do you recall whether the bleachers were

8  ordered during the Chicago show?

9       A.   Yes.  Yes.

10      Q.   Do you understand anything about how the

11  construction of the bleachers takes place at Canobbio?

12      A.   Well, as we were explained the first time we

13  received the bleachers, they explained to us the way that

14  they manufacture them and how we had to instruct to set them

15  up.

16      Q.   Are these bleachers special made to fit your

17  tent?

18           MR. PITA:  Objection.  Form.

19           THE DEPONENT:  That's correct.

20  BY MR. CHAPMAN:

21      Q.   When you ordered replacement bleachers, did

22  they have replacement bleachers in storage that they could

23  just provide you, or did they have to manufacture them?

24           MR. PITA:  Objection.

25           THE DEPONENT:  No, negative.  They had to

### Edwin Rivera - Exam By Mr. Chapman

1   order them.  They said that they had to stop and make them

2   to our measurements.

3   **BY MR. CHAPMAN:**

4         **Q.**   Do you know if the circus had to pay in

5   advance in order to get these replacement bleachers?

6         **A.**   Yes, that's what the management told me, that

7   they had to pay in advance, plus the premium.  In other

8   words, an extra advance because it was a new order.

9               **THE INTERPRETER:**  Excuse me.

10              "Because it was a quick order, a special order."

11              **THE DEPONENT:**  (In English) Rush order.

12  **BY MR. CHAPMAN:**

13        **Q.**   Do you recall how the bleachers were

14  delivered to the circus?

15        **A.**   (In Spanish) I heard the management say they

16  had to bring them in by plane.

17        **Q.**   Did the circus have to pay for that, or was

18  that done by Canobbio?

19              **MR. PITA:**  Objection.  Form.

20              **THE DEPONENT:**  The management told me they

21  had to pay it all.

22  **BY MR. CHAPMAN:**

23        **Q.**   Now, in addition to 9/11, which you've talked

24  about, did the absence of the bleachers cause any problems

25  with opening up the shows after Chicago?

Edwin Rivera - Exam By Mr. Chapman

1          MR. PITA:  Objection.  Form.

2          THE DEPONENT:  Positive, because we had to

3     look for bleachers in every city.

4     BY MR. CHAPMAN:

5          Q.   How long did it take before the bleachers

6     could be delivered from the time they were ordered?  If you

7     know.

8          A.   I don't remember exactly.  I can't remember.

9          Q.   And was it a matter of days?

10         A.   No, no, they were saying that it took four

11    months.

12         Q.   Now, when you became aware that the bleachers

13    were missing, you testified earlier that you spoke with a

14    contact person; is that correct?

15         A.   Yes, that's correct, and when that person

16    wasn't able to tell me anything about the trailer, I started

17    to contact the transportation company.

18         Q.   Okay.

19              How many different times did you call, if you can

20    remember?

21         A.   Well, I called constantly, on a daily basis,

22    and one company, the one I called, told me that I had to

23    call another company because they had sold the company.  And

24    then when I called the other company, they told me they

25    didn't know anything.  So I went back to the first company.

# THE NATIONAL HISPANIC CIRCUS, INC.
## TRIX *CIRCO MUNDIAL*

## OUR YEAR 2001 SEASON

1. Los Angeles .......... April 27 – May 10[1] ...... San Fernando Swap Meet, S.Fernando, CA.

2. Tuscon, AZ .......... May 11 – 20 ........... Southgate Shopping Center

3. Phoenix .............. May 25 – June 3[2] ..... Metrocenter Mall    *10 days*

4. El Paso .......... June 8 – 17[3] ........... Coliseum Parking Lot    *10 days*

5. San Antonio ........ June 22 – July 1 ...... Windsor Park Mall[4]    *10 days*

6. Houston .............. July 6 – 15 ............. t/b/d    *10 days*

7. Dallas .............. July 20 – 29 ........... t/b/d    *10 days*

8. Corpus Christi ........ August 3 – 12 .......... Fair Park (?)    *10 days*

9. McAllen-Harlingen ... August 17 – 26 ........ Bella Vista Mall    *10 days*

10. Chicago .............. August 31 – Sept. 9[5] ... Cicero & 31st St. (Cicero)    *10 days*

11. New York #1 ....... Sept. 14 – 23[6] ....... t/b/d[7]    *10 days*

12. New York #2 ....... Sept. 26 – Oct. 8[8] ...... t/b/d    *13 days*

13. New York #3 ....... Oct. 12 – 21 ........... t/b/d    *10 days*

14. New York #4 ....... Oct. 26 – Nov. 4 ....... t/b/d    *10 days*

15. Philadelphia ........ Nov. 9 – 18 ............. t/b/d[9]    *10 days*

16. Miami .............. Nov. 21 – Dec. 2[10] ..... Bicentennial Park    *12 days*

*145 days on this schedule*
*X 170.01 = $24,650.00*
*fn Primary C6L*
*X5  (#1mm) $3700.00*
*X5  (#3mm) $4700.00*
*5/9/01*

DEPOSITION
EXHIBIT

# REX TRUCKING, INC

505 N. Belt East, Suite 530
Houston, Tx. 77060
(281) 260-8600
(281) 260-8612 fax

(26161)

**Bill of Lading**

Load # _13-040-001_
Trk # _1315_ Trl # _____
Driver _JOHN D. CUSTER_

Tarp Required:  Yes _____ No _____

Pick Up Date: _____
Shipper: _CIRCUS LOT_
Address: _____
City/State: _HARLINGEN_
Signature: _____
(SHIPPED IN GOOD CONDITION) DATE:

Delivery Date: _8-29-07_
Consignee: _CIRCUS LOT_
Address: _____
City/State: _CHICAGO IL_
Signature: _____
(RECEIVED IN GOOD CONDITION) DATE:

Loading Time In _____ Out _____          Unloading Time In _____ Out _____

**Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.**

| Pieces | Description Of Work Performed | Miles | Weight |
|--------|------------------------------|-------|--------|
| 1 | DROP DECK TRAILER | | |
| | | | |
| | | | |

**Received in Apparent Good Order, Except as Noted Above. All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.**

**Bill to:** _____
**Address:** _____
**City/State:** _____
**Phone:** _____
**Cust ref #:** _____

Line haul: _2000_
Stopoff: _____
Tarping: _____
Permits: _____
Other: _____
**Invoice Total:** _____

Beginning Odometer Reading: _____ Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|-------|---------------------|----------|--------------|-------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature: _____          Total Miles: _____
All Logs Must Be Attached

White & Green = Corp. Office          Gold = Driver          Pink = Shipper

NHC v. Rex Trucking, et al

**PLAINTIFF'S EXHIBIT**
11
11/4/03

REARTRUCKINS, INC.            Bill of Lading
305 N. Belt East, Suite 530          Load # _____  12-090-002
Houston, TX 77060                 Unit # _____ Trailer # _____
(281) 260-8600                    Driver _Fred Freeman_
(281) 260-8612 fax                 Tarp Required:  Yes    No

86163

Pick Up Date: _8-22-01_            Delivery Date: _8-27-01_
Shipper: _Mexican Circus_          Consignee: _Mexican Circus_
Address: _____           Address: _____
City/State: _Harlingen, IL_        City/State: _Chicago, IL_
Signature: _____         Signature: _____
(SHIPPED IN GOOD CONDITION) DATE:        (RECEIVED IN GOOD CONDITION) DATE:

Loading Time In _____ Out _____   Unloading Time In _____ Out _____

Claims for damage and / or shortage must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.

| Pieces | Description Of Work Performed | Miles | Weight |
|--------|------------------------------|-------|--------|
| 1 | loaded trailer | | |
| | | | |
| | | | |

Received in Apparent Good Order, Except as Noted Above, All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.

Bill to: _____            Line haul: _2600_
Address: _____            Stopoff: _____
City/State: _____         Tarping: _____
Phone: _____              Permits: _____
Cust ref #: _____         Other: _____
                                    **Invoice Total:** _____

Beginning Odometer Reading: _____   Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|-------|---------------------|----------|--------------|-------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature: _Fred Freeman_       Total Miles: _____
All Logs Must Be Attached

White & Green = Corp. Office        Gold = Driver        Pink = Shipper

PLAINTIFF'S EXHIBIT
tabber
12
11/4/03

# REX TRUCKING, INC.

505 N. Belt East, Suite 530
Houston, Tx. 77060
(281) 260-8600
(281) 260-8612 fax

*26192*

**Bill of Lading**

Load # *13-090-003*
Trk # *1357*   Trl # _____
Driver *Ed McSpadden*
Tarp Required:  Yes _____  No ✓

Pick Up Date: _____
Shipper: *CIRCO MUNDIAL*
Address: *HARLINGEN, TX*
City/State: *Frank Zeala (damage)*
Signature: _____
(SHIPPED IN GOOD CONDITION) DATE: *8-27-01*

Delivery Date: _____
Consignee: *CIRCO MUNDIAL*
Address: *4100 S. ASHLAND*
City/State: *CHICAGO, IL*
Signature: _____
(RECEIVED IN GOOD CONDITION) DATE: *8-29-01*

Loading Time In _____ Out _____        Unloading Time In _____ Out _____

**Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.**

| Pieces | Description Of Work Performed | Miles | Weight |
|---|---|---|---|
| 1 | '95 Used Great Dane Trailer - 45 Ft, LIC # 43744-A | PUERTO RICO | |
| | VIN # 1GRAA9025SB103001 | | |
| | UNIT # NHC 51146    F.P.  Damage to Left Top of Trailer (HOLE) | | |

**Received in Apparent Good Order, Except as Noted Above. All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.**

**Bill to:** _____
**Address:** _____
**City/State:** _____
**Phone:** _____
**Cust ref #:** _____

Line haul: *2600*
Stopoff: _____
Tarping: _____
Permits: _____
Other: _____
**Invoice Total:** _____

Beginning Odometer Reading: _____       Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature: _____       Total Miles: _____
All Logs Must Be Attached

PLAINTIFF'S EXHIBIT
*10*
*11/4/03*
cobber

White & Green = Corp. Office        Gold = Driver        Pink = Shipper

REX TRUCKING, I                                    Bill of Lading          3-090-004

862 N. Belt East, Suite 530          Load # _01363_
Houston, Tx. 77060                   Trk # _1363_ Trl # _O/A_
(281) 260-8600                       Driver _Mike Tuler_
(281) 260-8612 fax                   Tarp Required:  Yes _____  No _✓_

_26198_

Pick Up Date: _8/27/2001_          Delivery Date: _8/29/2001_
Shipper: _US National Hispanic Circus_  Consignee: _US National Hispanic_
Address: _____          Address: _Ashland_
City/State: _Harlingen, TX_        City/State: _Chicago, IL_
Signature: _____         Signature: _956-991-5681_
        (SHIPPED IN GOOD CONDITION) DATE:        (RECEIVED IN GOOD CONDITION) DATE:

Loading Time In _____ Out _____     Unloading Time In _____ Out _____

**Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.**

| Pieces | Description Of Work Performed | Miles | Weight |
|--------|-------------------------------|-------|--------|
| 1 | _Loaded Step deck w/self contained_ | | |
|   | _generator_ | | |
|   | | | |

Received in Apparent Good Order, Except as Noted Above. All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transport according to the applicable regulations of the Department of Transportation.

Bill to: _____          . Line haul: _2600_
Address: _____          _ Stopoff: _____
City/State: _____       _ Tarping: _____
Phone: _____            _ Permits: _____
Cust ref #: _____       _ Other: _____
                                  **Invoice Total:** _____

Beginning Odometer Reading: _____  Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|-------|---------------------|----------|--------------|-------------|
| TX | 143.937 | | | |
| MO | 66.37 | | | |
| TX | 243.45 | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature _Mike Tuler_     Total Miles: _____
        **All Logs Must Be Attached**

White & Green = Corp. Office        Gold = Driver        Pink = Shipper

NHC v Rex Trucking, et al
Initial Disclosures

PLAINTIFF'S
EXHIBIT
14
11/4/03

REX TRUCKING, INC.
505 N. Belt East, Suite 530
Houston, Tx. 77060
(281) 260-8600
(281) 260-8612 fax

Bill of Lading

Load # _13-090-005_
Trk # _3105_  Trl # _____
Driver _Joe Patton_

(26199)

Tarp Required:   Yes _____   No _____

Pick Up Date: _8-27-01-_          Delivery Date: _8-29-01_
Shipper: _Mexican Circus_        Consignee: _Mexican Circus_
Address: _____        Address: _____
City/State: _Harlingen, TX_      City/State: _Chicago, IL_
Signature: _____       Signature: _____
(SHIPPED IN GOOD CONDITION) DATE:   (RECEIVED IN GOOD CONDITION) DATE:

Loading Time In _____ Out _____     Unloading Time In _____ Out _____

**Claims for damage and / or shortages must be filed within 30 days of shipment and must be noted on the bill of lading or the claim will not be allowed. Shipper is responsible unless otherwise noted. Payment is due net 15 terms.**

| Pieces | Description Of Work Performed | Miles | Weight |
|--------|-------------------------------|-------|--------|
| 1 | loaded trailer | | |
| | | | |
| | | | |

**Received in Apparent Good Order, Except as Noted Above. All Hazardous Material Shipments must have this certification signed by the shipper or their representative: This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation.**

**Bill to:** _____          Line haul: _2600_
**Address:** _____          Stopoff: _____
**City/State:** _____       Tarping: _____
**Phone:** _____            Permits: _Fine: 285⁰⁰   100% to trk_
**Cust ref #:** _____       Other: _____
                                       **Invoice Total:** _____

Beginning Odometer Reading: _____   Ending Odometer: _____

| State | Gal. Fuel Purchased | Route(s) | Loaded Miles | Empty Miles |
|-------|--------------------|----------|--------------|-------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Driver Signature: _____     Total Miles: _____
**All Logs Must Be Attached**

White & Green = Corp. Office          Gold = Driver          Pink = Shipper

NHC v Rex Trucking, et al
Initial Disclosures
38

PLAINTIFF'S
EXHIBIT
13
11/4/03

PLAINTIFF'S
EXHIBIT
4
11/4/03

# Cherokee Insurance Company
### P.O. Box 159; Warren, Michigan 48090
### Telephone 800-201-0450 or Fax 810-795-3130

*PHYS DAM:*
*CARGO*

Reference #

Insured: REX TRUCKING     Contact Name: WENDY WAGUESPACK

**Auto Loss Report**

| Driver TED TILLEY / OWNER: FRED FREEMAN | Plate 7830 | 1989 | Make INTL | Model | Year 1022216S |
|---|---|---|---|---|---|
| 3341 GAY AVE. | | STOLEN | | | |
| Driver City FORT WORTH | State TX | Zip 76111 | Trailer CUSTOMER TRAILER | Make | Model | Year 1995 GDANE |
| Phone 817-834-0271 | Social Security 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 | | Damaged STOLEN | | |
| First Report at Location HARLINGEN TX | | | Cargo (Type) TRAILER W/ BLEACHERS | | |
| Was To Go at Location CHICAGO, IL | | | Damaged? Yes  (No) | | |
| Was Turned Around MESQUITE TX (LAST KNOWN LOCATION) | | | Location of Tractor/Trailer UNKNOWN | | |
| Date of Accident 8/27/01 | Time (AM or PM) UNKNOWN | Under Dispatch? (Yes)   No | | I.C.C. Carrier LA TRANS INC |
| Located at Accident LAST KNOWN MESQUITE TX | | | City | State |
| Officer at Scene Yes (No) | Police Dept FT WORTH | Police Report # 01739064 | Officer Name/Police Telephone# DET STOCKTON  817-877-8260 | | |
| Ticket(s) Issued to Whom? NO | | | Charge MISSING PERSONS / STOLEN TRUCK | | |

**Other Vehicle or Property Involved (Use another sheet for additional vehicles involved)**

| Name of Vehicle GREAT DANE | Year 1995 | Type VAN | License No. | State MEXICO | Contact Number ROBERTO SORTO |
|---|---|---|---|---|---|
| Other N/A | | | | NATIONAL HISPANIC | Age |
| Owner of Other Vehicle | | Address | | CIRCUS @ 787-769-8100 | |
| Describe Damage STOLEN | | | | | |
| Estimated Cost of Repairs | | | | | |

**Property Damage (other than vehicles)**

| Owner of Property | | Address | |
|---|---|---|---|
| Describe Damage | | | |
| Estimated Cost of Repairs | | | |

**Persons Injured or Deceased**

| Name | Address | Telephone# | Age |
|---|---|---|---|
| Name | Address | Telephone# | Age |
| Name | Address | Telephone# | Age |

**Accident Witnesses**

| Name | Address/City/State | Telephone# |
|---|---|---|
| Name | Address/City/State | Telephone# |

**Co-Driver**

| | Address/City/State | Telephone# |
|---|---|---|

**Draw Diagram of Accident.**
Show your vehicle as No. 1. Show other vehicle as No. 2 as the collision occurred.

Show direction and distance traveled before crash by solid line. Show direction and distance traveled after crash by dotted line.

| Vehicle Defects | Roadway | 2-Lane | Light |
|---|---|---|---|
| No Defects | Straight | 2-Lane | Daylight |
| Tires | Curve | 3-Lane | Dawn |
| Brakes | | 4-Lane | Dusk |
| Engine | On Grade | Divided | Dark |
| Lights | Level | Other | |
| Fuel Line | Interact | | Weather |
| Coasting | | Lanes marked | Clear |
| Steering | Dry | Lanes Unmarked | Rain |
| Wheel or Part | Wet | No Pass Defined | Snow |
| Axle | Muddy | Holes, Ruts | Sleet |
| Spring or Part | Snow | Loose Material | Fog |
| Other | Icy | Other | Other |

Indicate North By Arrow

**Account of Accident.**

I was going _____ at approximately _____ (M.P.H.)

This time was _____ and the other party in vehicle No. 2 was going _____ at approximately _____ (M.P.H.)

**DESCRIPTION OF ACCIDENT:**

42,

THIS DRIVER WAS AND IS STILL MISSING. WE'RE AFRAID THE WORST HAS HAPPENED. I HAVE BEEN DEALING W/ NICK SAGE IN OPERATIONS DISCUSSING WHAT ACTION TO TAKE. THE TRUCK AND DRIVER HAVE BEEN LISTED W/ MISSING PERSONS AND THE OWNER FILED THE TRUCK AS STOLEN ON 10/5/01. SO THEREFORE I AM REPORTING ON IT AT THIS TIME. IN TURN THE NATIONAL HISPANIC CIRCUS REPORTED JUST LAST WEEK THAT THEIR TRAILER WAS NOT IN MEXICO SO THEY WANT A CARGO CLAIM FILED. I HAVE INCLUDED MY DOCUMENTATION THAT HAS TRANSPIRED BETWEEN NICK AND I & THE CUSTOMER.

Date Completed: 10/8/01    Signature:

**EQUIPMENT IN HIJACKED TRAILER?**

DRIVER - TED TILLY

ADRESS: 429 HALCOM RD.
       Ft. WORTH  76117 TEXAS

AGE - 39

TRUCK - 89 INT.

COLOR - BLUE

CABOVER.

PLATE No. OKLAHOMA  1XRAY/INDA

3 YEARS WORKING FOR COMPANY

INSURANCE Co. LEXINGTON

POLICEY No. 735 6175

PHONE - 337-235-3131

FBI - CASE No. 337-235-1047

MISSING PERSONS CASE. No 01642503

REX TRUCKING

CONTACT: CURTIS SPIVA

CEL. PHONE - 817-271-0407

OFFICE No  800-625-~~0050~~ 5796

FRANK PEALER - CEL PHONE - 956-491-5681

EQUIPMENT IN TRAILER
  ① SEATS
  ② PLATFORM FOR lighting -
  ③ TUBES FOR AIR CONDITIONING

281-260-8600

## rcastille@louisianatransport.com

**From:** <rcastille@louisianatransport.com>
**To:** <Tilley80@yahoo.com>
**Cc:** George Ortiz <George.Ortiz@rextrucking.net>; Leo Blumenauer <lblumenauer@madl.com>
**Sent:** Thursday, November 01, 2001 9:24 AM
**Subject:** Hispanic Circus Case

Mr. Tilley this message is being sent to you to explain the severity of the problem you now face. Due to your disappearance and the disappearance of the truck, trailer and cargo that was in your possession a warrant for your arrest for theft in excess of $ 100,000 has been sent out all across the country as well as to the Federal Bureau of Investigation. It is only a matter of time that the consequences of your alleged actions will be made quite clear to you.

My purpose in this correspondence is not to scare you, the penalties for theft and grand larceny speak for itself. My only purpose is to make you recognize that your cooperation in locating the cargo that was stolen could prove quite helpful in a reduction of your prison term once you are arrested, and you will be arrested. Your time to make this decision grows shorter every day, if you choose to cooperate with us in locating the stolen cargo please contact me at 337-232-6700 extension 222. I urge you to consider the consequences of not taking advantage of this opportunity to make things right and turn yourself over to the authorities.



PLAINTIFF'S
EXHIBIT
2
a/4/03

NHC v. Rex Trucking, et al.
Initial Disclosures
15

11/1/01

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION


CIVIL ACTION NO. B-02-135


| | | |
|---|---|---|
| THE NATIONAL HISPANIC CIRCUS, INC., A NEW YORK NOT-FOR-PROFIT CORPORATION | ) ) ) | |
| Plaintiff | ) ) | DEPOSITION |
| VS. | ) ) | OF |
| REX TRUCKING, INC., A TEXAS CORPORATION, AND THE MASON AND DIXON LINES, INC., A MICHIGAN CORPORATION | ) ) ) ) | LEO BLUMENAUER |
| Defendants | ) ) | |


DEPOSITION taken before me, Brenda J. Brink, a Notary Public within and for the State of Ohio, on the 4th Day of November, 2003, pursuant to Notice and at the time and place therein specified, to be used pursuant to the Rules of Civil Procedure or by agreement of counsel in the aforesaid cause of action, pending in the United States District Court for the Southern District of Texas, Brownsville Division.

47

1

2

3

4                       REPORTER'S CERTIFICATE

5

6          I HEREBY CERTIFY that the above and foregoing is a

7   true and correct transcript of all the testimony introduced

8   and proceedings had in the taking of the testimony in the

9   above-entitled matter, as shown by my stenotype notes taken

10  by me at the time said testimony was taken.

11

12                        _Brenda J. Brink_____
                          Brenda J. Brink
13                        Registered Professional Reporter

14

15

16

17

18

19

20

21

22

23

24

25

NAGY-BAKER COURT REPORTING, INC.
(330) 746-7479
1-800-964-3376

1  somewhere like that, at a salvage yard or a wreckage yard.

2  Q                Do you have any idea how they ended up

3  there?

4  A                No, sir.

5  Q                Did anyone ever find Ted Tilley?

6                   MR. PITA:  Objection to form.

7  A                They found someone.  I don't know if it

8  was Ted Tilley.  I think they were looking for two people,

9  Tilley and Freeman.  They found him -- they found one of

10 them once when they got arrested up in the northwest.

11 Q                Okay.

12 A                And then lost him again.

13 Q                Now, you mentioned earlier that you gave

14 approval to the Hispanic Circus to lease replacement

15 bleachers; is that correct?

16 A                Correct.

17 Q                Who did you speak with about that?

18 A                George Ortiz.

19 Q                Okay.  But that's your employee;

20 correct?

21 A                Yes.

22 Q                Okay.  And who did he speak to about --

23 with the Hispanic Circus about renting replacement

24 bleachers?

25                   MR. PITA:  Objection to form.

# OQUENDO RAMIREZ ZAYAS TORRES MARTINEZ LLP
## ATTORNEYS AND COUNSELLORS AT LAW

315 EAST KINGSBRIDGE ROAD, BRONX, NEW YORK 10458
Telephone (718) 220-5700   Facsimile (718) 220-8898

February 19, 2002

Certified Mail
Return Receipt Requested

Ralph Castille
Western American Transportation
103 Row One
Lafayette, Louisiana 70508

      Re:    The National Hispanic Circus, Inc.

Dear Mr. Castille:

I represent The National Hispanic Circus, Inc. (the "Circus").

On or about August 27, 2001 the Circus hired Rex Trucking, Inc., a division of Louisiana Transportation, Inc. to provide drivers and trucks to transport from Harlingen, Texas to Chicago, Illinois, seven (7) Circus trailers, one of which contained a set of bleachers.

The Circus' trailers and their respective loads were placed under Rex Trucking's sole and exclusive custody, care, supervision, direction and control. Rex Trucking had exclusive control over its drivers and its trucks, in addition to the means, methods, and details of delivering the trailers to the Circus in Chicago.

As you know, the truck transporting the Circus' trailer containing the bleachers was stolen and the trailer and bleachers never arrived in Chicago.

As a consequence, the Circus was forced to rent bleachers to carry out its 26 performances in Chicago from August 31, 2001 through September 16, 2001. The cost of renting replacement bleachers was $9,000.00. The rented bleachers, however, provided approximately 1/3 fewer seats than the Circus' bleachers. The Circus, therefore, suffered consequential damages of $6,000.00 per performance over 26 performances for a total of $156,000.00.

Ralph Castillo
Western American Transportation
Page Two
February 19, 2002

In addition, the Circus was required to purchase new bleachers from Italy. The cost of the new bleachers was $92,740.00. The Circus also incurred shipping costs in the amount of $36,104.46 for shipping the bleachers from Italy to the United States. The Circus suffered damages in the amount of $128,844.46 for the purchase and shipment of the new bleachers.

My client incurred damages totaling $293,844.46 as a result of the cost of rented bleachers, the resulting loss of ticket sale revenues and the costs related to purchasing replacement bleachers. Accordingly, the Circus hereby demands payment in the amount of **$293,844.46** in damages as a result of the loss of its bleachers.

Please send payment to my office at 315 East Kingsbridge Road, Bronx, New York 10458. If I do not receive payment by March 4, 2002 an immediate legal action will be commenced to collect this debt plus costs and attorney's fees without further notice.

Very truly yours,

Ricardo E. Oquendo

REO;mcd

c. E. Vilanova
   Jorge Ortiz, Rex Trucking, Inc.

C.A.: 5.01.10.01 CR: 1C

CIRCO MUNDIAL-THE NATIONAL HISPAN

CIRCUS INC.- PO BOX 3557 - CAROLI

00 0.00.00

00984 PUERTO RICO

PI/CF. COD. 750

FATTURA N. 348 DEL 26.09.2001

BANCA D'APPOGGIO

PAGAMENTO GIA' EFFETTUATO

PCC 9990000210211                                    1 USA$ 26250    USA$ 26

- GRADAS PARA CIRCO DE 42 M DIAMETRO
- RECONSTRUCCION 50% DE LAS GRADAS
  SEGUN PROYECTO ORIGINAL
  REF. CIRCUS AMERICA

****************************************
*          FACTURA DE ANTICIPO         *
****************************************
*             PAGO YA HECHO            *
****************************************

C01/SC001

DEPOSITION
EXHIBIT

6

ND    USA$   26250   ART. 8 LETT.A(ESP)

USA$ 26250                                                              USA$ 2



---

Las gradas para un circo de 42 m de diámetro con 13 filas se compone de:

29   Claros de hierro galvanizado sostenidos por 6
      caballetes de sostén cada uno
1    Juego de plataformas de madera de abeto
      barnizado
1    Juego de bancos de madera de abeto
      barnizado
1    Juego de respaldos de madera de abeto
      barnizado
204  Sillas Mod. S4 ignífugas montadas sobre
      marcos de hierro
1    Juego de planchas salida
1    Juego des cancelas laterales
1    Juego de cancelas posteriores
1    Juego de cancelas anteriores
6    Escaleras vomitorio

        PRECIO                          US$      87.500=


## CONDICIONES DE VENTA

Plazo de entrega:   25/12/2001 con Su pedido inmediato
                    (el 30 de noviembre desgraciadamente no es más posible)

Entrega:            franco nuestra fábrica de Castelnuovo Scrivia (AL) - Italia

Pago :              30% al pedido
                    30% el 31/10/2001
                    saldo antes de la entrega

COPIA USO NON COMMERCIALE



# CANOBBIO

DIREZIONE : Via Roma , 3 - 15053 Castelnuovo Scrivia (AL) - Italia Tel (+39) 0131 823353 (r.a.) Fax (+39) 0131 823521
STABILIMENTO : Strada Sgarbazzolo - 15053 Castelnuovo Scrivia (AL) - ITALIA Telefax (+39) 0131 855142 - CF/P IVA  03363320157
INTERNET . http://www.canobbio.com - e-mail : finance@canobbio.com
Canobbio Spa - Cap. soc. Euro 1,275,000,00 Lv. Sede Legale : Milano -Via Viviani n° 6
Trib. Milano 174942/5101/12 -C.C.I.A.A. Milano 961414 C.C.I.A.A. Alessandria 148920 C/C P . 13260203

| Agente : No Agente | Fatturato a /Messrs : |
| CIRCO MUNDIAL |
| Conai : CONTRIBUTO CONAI ASSOLTO OVE DOVUTO | THE NATIONAL HISPANIC CIRCUS INC. |
| | PO BOX 3557 |

| N° Ordine/Contr. | Data Ordine | Tipo Documento : | OO984   CAROLINA |
| | | F2  ANTICIPATA | PR   PUERTO RICO          Cod: C 3627 |

**INVOICE N°:  404 DATED : 23/10/2001**

Cod.Fisc. / P.I. :

| Condizioni di Pagamento / Terms of Payment : | Banca D'appoggio / Bankers : Nessuna banca d Appoggio |
| C00      PAYMENT ALREADY MADE | Abi :      Cab : |

Dettagli Esenzione Iva o Iva Ridotta :

| N° Comm. Order n°. | Descrizione Commessa / Order - Goods Description | UM | QTA / QTY | Valuta Value | Costo Unitario / Price | Importo Lordo Gross | %Sc | Val.SC. / Disc. | Importo Netto Net | Al Iva |
|---|---|---|---|---|---|---|---|---|---|---|
| PCC  210211 | GRADAS PARA CIRCO DE 42 M DIAMETRO | N. | 1,00 | USA$ | 87.500,00 | 87.500,00 | 0,00 | 0,00 | 87.500,00 | 0,00 NI |
| | RECONSTRUCCION 50% DE LAS GRADAS | | | | | | | | | |
| | SEGUN PROYECTO ORIGINAL | | | | | | | | | |
| | REF. CIRCUS AMERICA | | | | | | | | | |
| | N. 18 BULTOS | | | | | | | | | |
| | PESO NETO KG 17.859= | | | | | | | | | |
| | PESO BRUTO KG 18.129= | | | | | | | | | |
| | MERCADERIA DE ORIGEN ITALIANA | | | | | | | | | |
| PCC ACCPCC | FATTURA DI ACCONTO | N. | -1,00 | USA$ | -26.250,00 | -26.250,00 | 0,00 | 0,00 | -26.250,00 | 0,00 NI |
| | FACTURA DE ANTICIPO N. 348 DEL 26/09/2001 | | | | | | | | | |

RIASSUNTO VALORI PER ALIQUOTE IVA

| AF | T.IMP. | DESCR. ASSOGG. FISCALE | Imponibile IVA | AL.IVA | IMPORTO IVA |
|---|---|---|---|---|---|
| N05 | NI | ART. 8 LETT. A (ESP) | 61.250,00 | 0 | 0,00 |

| Valuta | Importo Netto Merce | Valore Sconto | Totale IVA | | INVOICE TOTAL |
|---|---|---|---|---|---|
| USA$ | 61.250,00 | 0,00 | 0,00 | USA$ | 61.250,00 |

DETTAGLIO SCADENZE DI PAGAMENTO / PAYMENT DETAILS

PAGINA N°. 1



WARNING THIS DOCUMENT CONTAINS JPRINTING SIGNATURE LINE FLUORESCENT FIBERS ANI ICIAL WATERMARK ON REVERSE SIDE

**ERNESTO VILANOVA VELEZ**
G. P O BOX 2534
SAN JUAN, P.R. 00936

ESTA ES UNA EMPRESA LIBRE DE DROGAS

WESTERNBANK PR
SAN PATRICIO
GONZALEZ CHUSTI ST
GUAYNABO PR 00968

010190

101-7270
2215

CHECK NO      DATE              AN
              -29-2001   $36,104

Pay        Thirty Six Thousand One Hundred Four ---46/100

NO      ER 90 DAYS

TO THE ORDER OF        Kuehne & Nagel

**NON-NEGOTIABLE**

⑈010190⑈ ⑆221572702⑆ 38⑈0100088⑈0⑈

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.

NO. 010190

**ERNESTO VILANOVA VELEZ**

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
|      |             |        |

MER 10:52 FAX 0131 823521    CANOBBIO SPA    002

CANOBBIO

| | |
|---|---|
| 2 MIL 8815 5406 | HAW3 . . : MIL27106592 |

Shipper's Account Number

**Not Negotiable**
**Air Waybill**
Issued by

Shipper's Name and Address

CANOBBIO SPA
VIA ROMA, 3
IT-15053 CASTELNUOVO SCRIVIA

KUEHNE & NAGEL S.P.A.
LARGO FRATELLI CERVI
I-20090 VIMODRONE

Copies 1, 2 and 3 of this Air Waybill are originals and have the same validity

Consignee's Name and Address

THE NATIONAL HISPANIC
2586 LANE AVENUE NORTH
JACKSONVILLE FLORIDA 32254 USA

# KN
**KUEHNE & NAGEL**

Issuing Carrier's Agent Name and City

KUEHNE & NAGEL S.P.A.
LARGO FRATELLI CERVI
I-20090 VIMODRONE

Accounting Information

SHPRS REF :404
2710-3211-111,015

Agent's IATA Code    38-4-7065 / 0015    Account No.

Airport of Departure (Addr. of First Carrier) and Requested Routing

MILAN

NON VALE FATTURA, AI FINI IVA
03358320157

| To | By First Carrier | Routing and Destination | to | by | to | by | Currency | CHGS Code | WT/VAL | Other | Declared Value for Carriage | Declared Value for Customs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ATL | BA3693/01 | | | | | | USD | C | PPD COLL | PPD COLL | NVD | NCV |

Airport of Destination

ATLANTA    GA

Amount of Insurance

XXX

**INSURANCE** - If Carrier offers insurance, and such insurance is requested in accordance with conditions on reverse hereof, indicate amount to be insured in figures in box marked 'Amount of Insurance'.

Handling Information

ATTACHED: SET OF DOCUMENTS  COMMERCIAL INVOICE
PLS CONTACT IMMEDIATLY MR ROBERTO SOTO PHONE  904 607 2159
OR MR ERNESTO VILANOVA PH 787 769 6100

SCI

C

| No. of Pieces RCP | Gross Weight | kg lb | Rate Class Commodity Item No. | Chargeable Weight | Rate Charge | Total | Nature and Quantity of Goods (incl. Dimensions or Volume) |
|---|---|---|---|---|---|---|---|
| 18 | 18129,0 | K | | 18129,0 | 1,40 | 25380,60 | STEPS FOR CIRCUS EX WORKS |
| | | | | | | | VOL: 71.565 CBM. |
| 18 | 18129,0 | | | | | 25380,60 | |

| Prepaid | Weight Charge | Collect | Other Charges |
|---|---|---|---|
| | 25380,60 | | PUA  1176,00  INA  303,00  TXC  3081,00 |

Valuation Charge

Tax

SCC  2538,06  MYC  1812,90

| Total Other Charges Due Agent | |
|---|---|
| 1479,00 | |

Shipper certifies that the particulars on the face hereof are correct and that insofar as any part of the consignment contains dangerous goods, such part is properly described by name and is in proper condition for carriage by air according to the applicable Dangerous Goods Regulations.

| Total Other Charges Due Carrier | |
|---|---|
| 7431,96 | |

KUEHNE & NAGEL, S.P.A.
EUGENIA ZERBINI
Signature of Shipper or his Agent

| Total Prepaid | Total Collect |
|---|---|
| | 54291,56 |

28/NOV/2001  KILANO
Executed on  (Date)    at    (Place)    Signature of Issuing Carrier or its Agent

KUEHNE & NAGEL S.P.A.

MIL27106592

Kuehne & Nagel SpA
Largo F.lli Cervi
I-20090 Vimodrone (MI)
Italy

Tel:  +39 06 26 07 41
Fax:  +26 02 25 07 43 54
Email:  khml.ita@kuehne-nagel.com
Internet: www.kuehnenagel.com

Deutsche Bank no. 6
Via Pelestro 5 Milano
ABI 01104, CAB 01603
Acc. No. 406.360.071
Partita IVA  IT der 548 00 - 02

**KUEHNE & NAGEL S.p.A.**

# RULES AND REGULATIONS

**ECONOMY TRANSPORT OF FLORIDA, LLC**

**LOUISIANA TRANSPORTATION, INC.**
**DBA**
**MAGNOLIA TRANSPORT**
**REX TRUCKING**
**WESTERN AMERICAN**

**THE MASON AND DIXON LINES, INC.**

**UNIVERSAL AM-CAN, LTD.**

**EFFECTIVE:  JANUARY 1, 2001**

PLAINTIFF'S
EXHIBIT
7
11/4/03

# INDEX

PAGE

ARRIVAL NOTICE........................................................................2
BILL OF LADING........................................................................2
CAPACITY LOADS.......................................................................3
CARGO LOSS & DAMAGE..................................................................3
COLLECT ON DELIVERY (C.O.D.) SHIPMENTS...............................................4
COLLECTION OF CHARGES................................................................4
CONTROL OF VEHICLE...................................................................5
COUNTY RATES APPLICATION.............................................................5
CORRECTED BILLS OF LADING............................................................5
CUSTOMS OR IN BOND FREIGHT...........................................................5
DELIVERY CHARGES.....................................................................7
DETENTION WITH POWER.................................................................7
DETENTION WITH POWER COMPUTATION.....................................................7
DETENTION WITH POWER, CHARGES........................................................8
DETENTION WITHOUT POWER..............................................................8
DETENTION WITHOUT POWER COMPUTATION..................................................9
DETENTION WITHOUT POWER, CHARGES....................................................10
EXCLUSIVE USE OF VEHICLE............................................................10
EXPEDITED SERVICE...................................................................13
EXTRAORDINARY VALUE SHIPMENTS.......................................................20
GENERAL APPLICATION OF RATES.........................................................2
GOVERNING LAW.......................................................................10
HAZARDOUS MATERIALS.................................................................10
MILEAGE COMPUTATION.................................................................11
NEW YORK CITY CHARGES...............................................................12
ORAL CONTRACT DISCLAIMER............................................................12
OVER DIMENSIONAL, ESCORT CHARGES....................................................15
PACKAGING & LABELING BY SHIPPER.....................................................12
PALLET EXCHANGE.....................................................................17
PALLETS, PLATFORMS, SKIDS...........................................................17
PAYMENT OF FREIGHT CHARGES..........................................................18
PERMIT SERVICES.....................................................................12
PREPAYMENT OR GUARANTEE OF CHARGES..................................................19
PROHIBITED OR RESTRICTED ARTICLES...................................................20
PROTECTIVE SERVICE..................................................................20
RECONSIGNMENT OR DIVERSION..........................................................21
REDELIVERY..........................................................................22
RENOTIFICATION CHARGE...............................................................14

**INDEX CONTINUED**                                                                                            <u>PAGE</u>

SATURDAY, SUNDAY, HOLIDAY SERVICE..................................................................18

SORTING AND SEGREGATING...............................................................................22

SPECIAL EQUIPMENT.........................................................................................12

SPECIALIZED TRAILER CHARGE.............................................................................17

STOP-OFF CHARGES...........................................................................................23

STORAGE........................................................................................................25

STRIKE INTERFERANCE.......................................................................................13

TARP CHARGE..................................................................................................13

TEAM DRIVER..................................................................................................26

TEMPERATURE CONTROL....................................................................................13

TENDERED AS LESS THAN TRUCK LOAD.....................................................................26

TENDERED AS TRUCKLOAD..................................................................................26

TRENCHING OR STRINGING SERVICE.......................................................................23

UNDELIVERD FREIGHT.......................................................................................13

UNNAMED POINTS OR TERMINAL AREA....................................................................27

UNSAFE OPERATION..........................................................................................27

UNUSUAL CONFIGURATION..................................................................................17

USED COMMODITIES..........................................................................................14

VEHICLES FURNIGHED ABUT NOT USED....................................................................27

WEIGHT EXCESSES............................................................................................14

WEIGHT EXCESS CHARGES..................................................................................14

WEIGHTS-GROSS WEIGHTS..................................................................................28

WEIGHT VERIFICATION.......................................................................................28

## APPLICATION OF TARIFF

**This tariff contains rules, rates and charges for shipments moving under provisions of tariffs governed by this publication. A copy of this tariff is available to Carrier's customers upon request. The rules and regulations contained herein shall apply for all shipments unless a written contract is executed between an officer of Carrier and Shipper, which contains terms and conditions contrary to the provisions of this tariff.**

**PAGE 2**

**1.    ARRIVAL NOTICE**
   A. Actual tender of delivery at consignee's location constitutes the
   Notice of the arrival of a shipment.
   B. If the shipment is not actually tendered for deliver, notice of arrival
   will be given to the consignee not later than the next business day
   following the arrival of the shipment.
      a.   The notice will be given by telephone, mail or computer. The
      notice, however transmitted will specify the point of origin, the
      consignor and the commodity and weight of the shipment.

**2.    BILL OF LADING**
   A. All shipments handled by Carrier are governed by the Uniform
   Straight Bill of Lading Terms and Conditions shown in the National
   Motor Freight Classifications modified by the rules, regulations and
   charges published in this Tariff. No deviation from these standard
   terms and conditions will be applicable in connection with shipments
   handled by Carrier except upon written agreement signed by an officer
   of Carrier. Terms and conditions of preprinted bills of lading tendered
   to Carrier by either the consignee or other third party at the time of
   shipment and signed by Carrier" driver or dock worker will not apply
   except upon written agreement of an officer of Carrier. Carrier will
   accept all bills of lading so tendered by shipper at the time of shipment
   subject to the terms and conditions shown herein and as modified in
   this Rules Tariff.

**3.    GENERAL APPLICATION OF RATES**
   A. Line-haul charges from or to points where direct service is
   authorized by carrier's certificates will not apply from or to points not
   directly accessible to truck service because of weight, size or
   hazardous material restrictions, or because of geographical location.

   B. Rates published "for the Account of" will apply only when freight
   charges are paid by the named account. Rates published "From the
   Facilities of" apply when freight originates at that specific location,
   without regard to the party responsible for payment.

   C. Except as provided above, "Freight All Kinds" (FAK) rates will not
   apply when rates are published in the same or any other applicable
   tariff on commodities specifically named.

**JANUARY 1, 2001**

**PAGE 3**

4. <u>**CAPACITY LOADS**</u>

A. A separate Bill of Lading and Shipping Order must be used for each shipment and in no case may a single truckload shipment exceed the carrying capacity of the vehicle.

B. Each and every standard truck bearing a capacity load of freight will be assessed freight charges based on the actual weight or the applicable truckload minimum weight, but not less than 40,000 pounds, whichever is greater and at the applicable truckload rate.

C. The term "Capacity Load" of freight shall be considered to mean:
   a. The quantity of freight which, in the manner loaded, so fills a standard vehicle that no additional articles in shipping form tendered can be loaded in or on the vehicle; or
   b. The quantity of freight which because of unusual shape or dimensions or because of necessity for segregation or separation from other freight requires the entire capacity of standard vehicle; or
   b. That quantity of freight that can be legally loaded in or on a vehicle because of the weight or size limitations of state or regulatory bodies.

5. <u>**CARGO LOSS & DAMAGE**</u>

A. Subject to the provision contained in Paragraphs 29 and 40, Carrier shall be liable to the consignor, consignee or other third party for all freight loss and damages provided under the former Carmack Amendment to the Interstate Commerce Act (ie.49U.S.C. 14706). Carrier shall not be liable for any economic loss or consequential damages to such parties beyond actual manufactured loss to the goods themselves.

B. The handling and disposition of all cargo loss and damage claims shall be handled pursuant to the regulations contained in 49 C.F.R. Part 370.

C. A claim for loss, damage or injury to cargo shall not be paid by Carrier unless the claim is filed in writing within nine (9) months of the delivery date of the shipment or, if no delivery, the date of the occurrence resulting in the claim. Claims for concealed loss or damage must be reported to Carrier within forty-eight (48) hours after delivery of the shipment, and Carrier shall have the privilege of inspecting such shipments upon a claim being made. All claims for loss, damage or injury to cargo must contain, at a minimum, the following information:

**JANUARY 1, 2001**

**PAGE 4**

    a. Contain facts sufficient to identify the shipment (or shipments) of property involved.

    b. Assert liability for alleged loss, damage or injury to the cargo.

    c. Make claim for the payment of a specified or determinable amount of money.

    d. Each claim must be supported by the original bill of lading, the completed delivery receipt, if any, and documentation of the value of the cargo so lost or damaged.

  D. Upon payment of any loss or damage claim, Carrier or its assignee shall become subrogated to all rights and remedies, if any, of the consignor, consignee or other third party with respect to such loss, and such parties agree to cooperate with Carrier in pursuing any subrogation rights or remedies.

**6.    COLLECT ON DELIVERY (C.O.D.) SHIPMENTS**

  A. This service is not provided. As such, Carrier will not be liable for collecting any COD charges even if the bill of lading is designated as a COD delivery.

**7.    COLLECTION OF CHARGES**

  A. When a party other than the Consignor or Consignee as shown on the Bill of Lading and Shipping Order, and other than a bank or freight payment plan, is responsible for paying the freight charges, such party's name and address must be clearly shown in the body of the Bill of Lading and Shipping Order at the time of original tender.

  B. Shipments subject to the provisions of this item will be accepted only when the Consignor has established credit with the Carrier and guarantees to pay all lawfully accrued charges if the third party fails to do so within the time allowed under the credit policy of the company.

  C. The non-recourse provisions of Section 7 of the Bill of Lading contract will be null and void on shipments tendered under the provisions of this item.

**JANUARY 1, 2001**

8. **CONTROL OF VEHICLE**

A. Except as otherwise provided in <u>EXCLUSIVE USE OF VEHICLE,</u> no shipment is entitled to the exclusive use of the vehicle in which it is to be transported and the carrier has control of the vehicle with the unrestricted right to

    a.  Select the vehicle for the transportation of a shipment.

    b.  Transfer the shipment to another vehicle.

    c.  Load other freight on the same vehicle.

    d.  Remove locks or seals applied to the vehicle.

    e.  Utilize the services of another carrier to handle all or part of the shipment.

9. **CORRECTED BILLS OF LADING**

A. Corrected Bills of Lading and Shipping Orders, changing the terms of collection will be accepted only under the condition that the published tariff charge applicable under the original terms of collection will apply.

10. **COUNTY RATES APPLICATION**

A. When portions of a city are located in more than one county, the county in which the main post office is located shall be used.

11. **CUSTOMS OR IN BOND FREIGHT**

A. Shipments moving under United States customs Bond for U.S. Customs clearance at a point in the United States will be assessed a charge. Such charges shall be in addition to all other applicable charges. On shipments requiring the use of more than one trailer, such trailer shall be considered as a separate shipment for the purposes of this provision and subject to the following charge.

    a.  $150.00 per shipment

B. Line haul charges on shipments requiring the U.S. Customs clearance at a point other than the final destination will be assessed on the basis of rates and charges applicable from point of origin to the point of U.S. Customs clearance, plus the rates and charges applicable from points of U.S. Customs clearance to the final destination. No beyond line haul charges will apply when the final destination is located within the terminal service area of the points of U.S. Customs Clearance.

C. Import freight moving in Bond may not be included in the same shipment on the same bill of lading and shipping order with freight not moving in Bond.

JANUARY 1, 2001

**PAGE 6**

D.  Shipments moving under U.S. Customs Bond will not be allowed to stop in transit or split pick up or split delivery.

E.  Detention charges, if any will be assessed against the party responsible for the line haul charges.  For the purpose of applying storage rules and charges in connection with shipments moving under U.S. Customs Bond, notification to the Deputy Collector of Customs that a shipment is available for Customs inspection will constitute tender of shipment for delivery.

F.  Each IT permit (Immediate Transportation Permit) issued for movement of an In Bond shipment will be considered as a separate shipment, and must be accompanied by one bill of lading and shipping order.  The provisions of this paragraph will not apply to shipments upon which charges are based on 20,000 pounds or more moving in Bond between steamship company piers or wharves or when such shipments are delivered to a U.S. Customs Bonded Warehouse.

G.  Shipments tendered in a vehicle sealed by or at the instructions of the consignor or as required by competent authority, will be considered as fully loaded or loaded to capacity.  On shipments cleared in route by U.S. Customs, and movement beyond such clearance does not require a seal. Normal rates and charges shall apply to the beyond point.

H.  Shipments moving from the United States under Tir Carnet issued by the originating carrier are subject to a charge of $100.00 which will be in addition to all other lawfully applicable rates and charges.
   a.   $100.00 charge per shipment

I.  When carrier is required to pick up shipping documents or U.S. Customs Release Forms for forwarder or broker for validation prior to pickup of a shipment, a charge of $50.00 per shipment will apply.
   a.   $50.00 charge per shipment

JANUARY 1, 2001

**PAGE 7**

## 12.  DELIVERY CHARGES

A. Pickup or Delivery charges from or to points and places where service is authorized by carrier's certificates, but not directly accessible by truck service because of weight, size or hazardous material restriction, or because of geographical location.

B. This charge is in addition to line haul charges from or to the transfer point and does not include the charge for the other transportation required.

    a.  $450.00 special charge per shipment.

## 13.  DETENTION WITH POWER GENERAL PROVISIONS

A. When due to no fault, negligence or disability of the carrier, if the loading or unloading of freight is delayed beyond the free time of 2 hours a charge for detention will be billed to the party that is responsible for the payment of freight charges.

B. If a consignee requires notification before delivery for a stated period of time and unloading is delayed due to shipper's failure to notate the Bill of Lading and Shipping Order with that requirement, the shipper will be held responsible for detention charges, and the non-recourse clause in the Bill of Lading contract will not apply.

C. Where disputes arise about detention, Carrier may not deliver the shipment to the consignee until all accrued detention charges are guaranteed to the satisfaction of the Carrier.

## 14.  DETENTION WITH POWER, COMPUTATION OF TIME

A. Time consumed in loading or unloading shall commence from the time of arrival of the carrier's vehicle and the presentation to the responsible party at the site that is available to load or unload and shall cease upon a signature being given the carrier by the consignee upon completion of unloading, or the signing by the carrier's representative of the Bill of Lading and Shipping Order on pickup.

B. Where loading or unloading is performed on a pre-arranged schedule, and carrier's vehicle arrives prior to the scheduled time, time shall run from the scheduled time or actual time loading or unloading commences, whichever is earlier.

**JANUARY 1, 2001**

**PAGE 8**

C. Where loading or unloading is to be performed on a pre-arranged schedule, and the carrier for any reason is unable to maintain such schedule, such mutually agreed alternative arrival time shall be used, provided such extended free time does not exceed two hours delay beyond the originally scheduled arrival time.

D. When carrier's employee interrupts loading or unloading to take any normal non-working periods, such time will be excluded from free time or detention time, if free time has been exceeded.

    a.  Two hours free time shall be allowed for each vehicle, loading and/or unloading.

15.    **DETENTION, WITH POWER, CHARGES**

A. When delay per vehicle beyond free time takes place the charge will be:

    a.  $25.00 for each 30 minutes or fraction thereof
    b.  Minimum Charge  $50.00
    c.  Maximum Charge for each 24 hour period  $600.00

B. If shipment remains undelivered through no fault of carrier, and vehicle is remanded to carrier's control, storage charges will begin when detention charges end.

16.    **DETENTION, VEHICLES WITHOUT POWER, GENERAL PROVISIONS**

A. This rule applies when carrier's vehicles without power units are delayed or detained on the premises of consignor, consignee, or on other premises designated by them, or as close thereto as conditions will permit.

    a.  Requests by customer for spotting or placing trailers must be made in writing in advance of the date of shipment and must be in carriers' possession at time of shipment.
    b.  Carrier will not move the trailer until such time as it has received notification that loading or unloading has been completed and the trailer is available for pick up. Consignor, consignee, or other designated party may move the spotted trailer with its own power units, at its own expense and risk for the purpose of loading or unloading. Any damage to Carrier's trailer while at Customer's designated premises will be Customer's responsibility.

**JANUARY 1, 2001**

**PAGE** 9

    c.  Loading or unloading will be performed by consignor, consignee, or other party designated by them. When Carrier's representative assists in loading, unloading or in checking the freight; the detention provisions governing vehicle with power units will apply. In the case of spotting for loading, the Bill of Lading must show "Shipper Load and Count".

    d.  Carrier responsibility for safeguarding shipments loaded on or in trailers spotted under the provisions of this item shall begin when loading has been completed and the carrier takes possession.

    e.  Carrier responsibility for safeguarding shipments unloaded from trailers spotted shall cease when the trailer is spotted at or on the site designated by Consignee.

    f.  Detention will be assessed against the party who will pay the freight charges.

    g.  Nothing in this provision shall require a carrier to pickup or deliver spotted trailers at hours other than carrier's normal business hours. This shall not be construed as a restriction on carrier's ability to pickup or deliver spotted trailers at hours other than its' normal business hours.

**17.   DETENTION, WITHOUT POWER, COMPUTATION OF TIME**

    A.  Spotted trailers will be allowed 24 consecutive hours of free time for loading or unloading.

    B.  For trailers spotted for loading or unloading, time commences at the time of placement for loading or unloading as the case may be.

    C.  Saturday, Sunday and holidays shall be included in the free time calculation.

    D.  When a trailer is both loaded and reloaded, each transaction will be treated independently of the other, except that when loading is begun before unloading is completed, the free time for loading shall not begin until free time for unloading has elapsed.

    E.  Consignor shall notify carrier, consignee or other party designated by them, when loading or unloading has been completed and the trailer is available for pickup.

    F.  When a spotted trailer is changed to a vehicle with power, free time shall cease at the time of the request. Detention provisions governing vehicles with power units will then apply.

    G.  When prearranged scheduling has been made, time begins from the actual time of spotting if the carrier's vehicle arrives later that the scheduled time. If the carrier's vehicle arrives prior to the scheduled time, time shall begin at the scheduled time of actual time spotting commences whichever is earlier.

**JANUARY 1, 2001**

**PAGE 10**

**18.   DETENTION, WITHOUT POWER, CHARGES**
   A.  Detention charges after the expiration of free time:
      a.  For each of the first and second 24 hour periods, or fraction thereof  $50.00.
      b.  For each of the third and fourth 24 hour periods, or fraction thereof $60.00.
         d.  For the fifth and each succeeding 24-hour period or fraction thereof $70.00.

**19.   DISPUTE RESOLUTION**
   A.  These Rules and Regulations shall be deemed to have been drawn in accordance with the statutes and laws of the State of Michigan and in the event of any disagreement or dispute, the internal laws of the State shall apply.

**20.   EXCLUSIVE USE OF VEHICLE**
   A.  When the exclusive use of a vehicle is provided by the carrier at the request of consignor or consignee, the following provisions will apply:
      a.   The request must be given in writing or placed on the Bill of Lading and Shipping Order.
      b.  Charges are to be paid or guaranteed by the party requesting the services and non-recourse stipulation on the Bill of Lading will not apply.
      c.  Charges for this service will be a minimum charge of 150% of the freight charges based on the actual weight or the applicable truckload charge based on 40,000 pounds (full truckload) whichever is greater.

**21.   GOVERNING LAW**
   A.  All civil actions filed as a result of disputes arising out of the transportation services to be performed by Carrier shall be filed in the court of proper jurisdiction in the State of Michigan, and the laws of the State of Michigan shall apply.

**22.   HAZARDOUS MATERIALS**
   A.  Shipments of hazardous materials will be subject to an additional charge of .40 cents per mile  and a minimum charge of $150.00 per shipment per vehicle used. Line-haul rates and the additional charge for hazardous materials will be computed over the actual route of movement when specific routing is mandated by Local, State or Federal governments.

**JANUARY 1, 2001**

**PAGE 11**

B. Customer is responsible for providing Carrier with a current Material Safety Data Sheet for each hazardous material to be transported and for providing Carrier with a properly completed hazardous material manifest.

## 23.    MILEAGE COMPUTATION

A. Mileage shall be computed from the point of loading to the points of unloading by the shortest practical direct highway miles, and shall be calculated by those miles shown in the Mileage Guide issued by Household Good Carrier's Bureau and reissues thereof or by the computerized version of same.

B. EXCEPTIONS

a. When stopping in transit to load or unload part of the load, the mileage to be used to determine the charges is the aggregate of the mileage from the origin point of the shipment to the final destination via the stop-off points. Mileage required by the order of loading or unloading and as specified on the Bill of Lading shall be used to determine the applicable charges.

If after receipt of the shipment by the carrier and while in route, the shipper requests stopping in transit in a different order of unloading or loading than as received and specified on the bill of lading, the aggregate mileage of the new route of movement shall apply. There will be an additional charge for labor required to unload, shift around or reload the freight to accomplish out-of-sequence deliveries. These charges shall be in addition to all other charges.

(1) $75.00 per hour charge

b.  If the route of movement by virtue of the content of hazardous materials, or because of being overweight or over dimension, the closing or prohibition of use of bridges, tunnels, or highway sections requires a longer route by the Public Authority, charges based on mileage of the required longer route shall apply.

c. CANADIAN CROSSING In the absence of shipper routing on shipping order, border-crossing point will be selected by carrier.

d. MEXICAN CROSSING  In the absence of shipper routing on shipping order, border-crossing point will be selected by carrier.

JANUARY 1, 2001

24. **NEW YORK CITY CHARGES**

    A. Shipments originating at or destined to New York, NY (points in the Boroughs of Bronx, Brooklyn, Kings, Manhattan and Queens) and points in Nassau and Suffolk Counties, an additional $150.00 per shipment will be charged in addition to all other lawfully published charges.

25. **ORAL CONTRACT DISCLAIMER**

    A. Except as otherwise provided in this provision, all shipments tendered to Carrier will be transported subject to the rates, rules and regulations provided in this tariff or any addendum or subsequent revisions thereto. Such tariff rates, rules and regulations may not be negated or superseded by any claimed oral contract, promise, representation, or understanding between the parties. Rates, rules and regulations negotiated with a shipper which are not contained in this Tariff will become effective only upon the execution of a written contract between the officers of Carrier and shipper containing such rates, rules and regulations.

26. **PACKAGING & LABELING BY SHIPPER**

    A. All shipments must be packaged securely and properly labeled, and accompanied by a bill of lading completed by the shipper. Carrier shall not be responsible for any loss, damage, penalty or fine that may be caused by the shipper's failure to properly package and label the shipment, or from the shipper'' failure to provide Carrier with the complete and accurate bill of lading.

27. **PERMIT SERVICES**

    A. Permit, escort services arranged by the company will be charged with a 20% service fee add on to compensate for the administration cost of securing and acquiring required permits.

28. **SPECIAL EQUIPMENT**

    A. Subject to the availability of the equipment, if requested by the customer, special equipment will be furnished subject to the following charges, which will be in addition to the otherwise applicable truckload rate:

        a. .20 (cents) per mile, per vehicle used or 125% of the cost of renting the special equipment, whichever is greater.

**JANUARY 1, 2001**

**PAGE 13**

**29.    STRIKE INTERFERANCE**

A. When because of a strike or labor issue with employees, it is impossible to make available for movement any partially loaded or empty trailers detained on premises, a detention charge of $25.00 per day or fraction thereof will be made following the expiration of free time.

**30.    TARP CHARGE**

A. When Tarp service is required, additional charges will apply as follows.

a. Regular Flat-bed          $100.00 per tarping
b. Over-dimensional        $200.00 per tarping

**31.    TEMPERATURE CONTROL**

A. Carrier assumes no responsibility for articles or commodities that require protection from either heat or cold. Any shipment requiring temperature control will be accepted at the shipper's own risk.

**32.    UNDELIVERED FREIGHT**

A. If freight cannot be delivered because of the consignee's refusal or inability to accept it, or because the carrier cannot locate the consignee, or if the freight cannot be transported because of an error or omission on the part of the consignor, the carrier will make a diligent effort to notify the consignor promptly that the freight is in storage and the reason therefor.

B. On undelivered shipments, disposition instructions issued prior to tender of delivery will not be accepted as authority to re-ship or return a shipment or to limit storage liability.

C. Undelivered shipments will be subject to storage and or detention charges.

**33.    EXPEDITED SERVICE**

A. This provision applies when a specific request is made by a consignor or consignee for expedited service in addition to the normal service of the carrier to meet specific pickup or delivery schedules.
B. If multiple trucks are required to ship the product the charge will be applied to each truck use.
C. When a shipment is tendered under this item the bill of lading and shipping order must be endorsed "EXPEDITED SERVICE REQUESTED" and the "bill to" guarantees all freight charges.

JANUARY 1, 2001

**PAGE 14**

D. The charges shall be computed subject to a minimum of 135% of the applicable truckload charges.

### 34. RENOTIFICATION CHARGE

A. When the carrier has fully complied with the shipping and delivery instructions and through the fault of the consignee, carrier is unable to tender delivery as scheduled, there will be a renotification charge, in addition to all other applicable charges, of $50.00.

### 35. SHIPMENTS TENDERED IN EXCESS OF MAXIMUM WEIGHT/CHANGES

A. Shipments in excess of a stated maximum weight will be rated at the truckload or volume provisions applicable, and weights in excess shall be rated as a separate shipment.

### 36. SHIPMENTS TENDERED IN EXCESS OF MAXIMUM WEIGHT RESTRICTIONS PREARRANGED WITH CARRIER

A. Excess weight will be rated as follows:
  (1) First determine the line haul charges that would apply at the stated maximum weight.
  (2) Divide the line haul charges by the stated maximum weight expressed as a hundredweight.
  (3) Result is a rate in cents per hundredweight to be applied to the excess weight over the stated maximum in the rate item.
  (4) Charges for the excess weight may not be less than the applicable minimum charge for less than truckload.
  (5) Charges for excess weight shall be in addition to all other applicable charges.
B. No vehicle may be loaded in excess of that quantity of freight which can be transported from origin to destination in or on such vehicle because of weight or size limitations of federal, state or municipal laws or regulations.

### 37. USED COMMODITIES

A. Shipments of any used commodity (not manufactured by the shipper; previously owned and shipping for re-use or as a result of re-sale) will be released at a value not to exceed ten (10) cents per pound per package. Carrier's liability, if any, for any loss or damage to such shipment, regardless of the cause of the loss or damage, shall not exceed this released value.

JANUARY 1, 2001

**PAGE 15**

B. If shipper to tender a shipment with a value in excess of ten (10) cents per pound, the shipper must Indicate the released value on the bill of lading. Carrier will assess an additional charge of fifty (50) cents per each $100, or fraction thereof, declared by the shipper in excess of ten (10) cents per pound. Carrier's liability, if any, for loss or damage will be actual loss or damage, or the declared value, whichever is less.

C. If a shipment is accepted without the declaration of released value, it will be considered to have been released to a value not exceeding ten (10) cents per pound per package, and charges assessed on that basis. Carrier's liability, if any, will be limited to ten (10) cents per pound per package. A corrected bill of lading will not be accepted to change the released value once the shipment has been accepted by the carrier.

## 38. OVER DIMENSION FREIGHT, ESCORT CAR AND FLAGMAN CHARGES

A. Arrangements for transporting shipments that contain articles, any of which exceed one or more of the following dimensions.
  (1) Nine (9) feet in height.
  (2) Eight (8) feet, Six (6) inches in width.
  (3) Forty-five (45), (48) or (53) feet in length or any distance beyond the floor of the trailer.

B. Such shipments that are accepted will be subject to a minimum weight of 40M or actual weight and freight charges will be assessed at 150% of the applicable rate.

C. When the weight of the articles exceed Federal, State or Municipal weight regulations, freight charges will be assessed in accordance with the weight of the article and the percentage of the applicable rate as follows.
  
|  |  |
|---|---|
| (1) Up to 75,000 pounds | 150% |
| (2) 75,001 pounds to 125,000 pounds | 200% |
| (3) 125,001 pounds or over | 225% |

**JANUARY 1, 2001**

**PAGE 16**

D. When the weight of the articles requires the use of specialized trailers, said equipment will be brought empty to the shipping location at the request of the shipper for an additional charge of $1.40 per mile from the equipment's terminal of origin to the shipping point. For the purpose of this item, specialized equipment will be defined as flatbed or removable side trailers with five or more axles. If the nature of the specialized equipment, in order to comply with Federal, State or Municipal regulation, require use of special highway permits to facilitate the empty movement of the equipment from terminal or origin to the shipping point, then carrier will secure permits as an agent for the shipper or consignee and assess charges equal to the cost of each permit. Permits secured for the empty movement of equipment will not be subject to an additional service charge.

E. Where regulations or laws of any Federal, State or Municipal government or any subdivision thereof, require use of special highway permits and/or the pilot cars or escort service, carrier will, upon request of the shipper or consignee, and as agent for them, engage third person to perform this service. All charges of the third person must be paid by the shipper or consignee and are in addition to all other lawful charges in the rules and regulations. Such charges may be advanced by the carrier and billed to the shipper or consignee at actual cost of the service plus a 20% service charge. These charges shall be in addition to all other applicable charges and shall be shown separately on the freight bill.

F. Shipments requiring over-weight bonds or over-dimensional permits, the actual cost plus a 20 percent service charge of the bond or permit for each state or city shall be added to the freight bill subject to a minimum charge of $55.00 for each bond or permit. When the permit specifies route of the movement that shall be used in transporting the shipment, all tolls or fees paid by carrier for the use of bridges, ferries, tunnels or highway shall be in addition to all other applicable charges and shall be shown separately on the freight bill.

G. When upon request of the shipper and/or consignee or if required by Federal, State, or Municipal regulations or laws, the shipment must be transported via specified accessible route, the mileage, for the purpose of determine the rate applicable, shall be computed via such route.

**JANUARY 1, 2001**

**PAGE 17**

**39.   SHIPMENTS OF UNUSUAL CONFIGURATION**

A. When a single shipment weighs less than the authorized volume or truckload minimum weight, and the average weight per lineal foot is less than 800 pounds, freight charges will computed on the basis of 800 pounds per lineal foot.

**40.   SPECIALIZED TRAILER CHARGE**

A. Shipments that contain articles not exceeding 8'6" high, but for which single drop-frame or drop-deck equipment is required by the customer and furnished by the carrier will be charged for at 150% of the truckload rate based on the highest minimum weight in the rate item, or the actual weight if greater, but not less than 40,000 pounds.

B. When double drop frame or drop deck equipment is furnished, the charge will be 175% of the truckload rate.

**41.   PALLETS, PLATFORMS, OR SKIDS**

A. Any request or provisions noted on the bill of lading or shipping order at the time of movement requesting the return of these shipping devices shall be deemed to be for informational purposes only, and it will not be binding upon the carrier to accomplish or comply with such request or provisions to complete the contract of carriage on the shipment.

B. Weight and space for pallets, platforms, skids, packaging will be considered, for rating purposes, as a part of the shipment. These items will be assessed at the rate applicable to the articles being transported.

**42.   PALLET EXCHANGE**

A. Service not provided. Carrier will not be responsible for any pallet exchange or return.

**JANUARY 1, 2001**

**PAGE 18**

**43.   PICK-UP OR DELIVERY SERVICE SATURDAY, SUNDAY OR HOLIDAY**

   A. When consignor or consignee request carrier to pick up or deliver
      freight on Saturday, Sunday or Holiday, such service shall be subject
      to an additional charge.
      (1) $200.00  Saturday
      (2) $300.00  Sunday or Holiday

   B. The carrier is not obligated to furnish pickup or delivery service on
      Saturday, Sunday or Holiday.

   C. Consignor or consignee may request carrier to place or pick up and
      empty trailer(s) (vehicles without power units) on holidays, even
      though the actual pick up and or delivery of freight may occur on a
      day other than holidays.  The charge for this service is $200.00 per
      vehicle, per day, or fraction thereof.

   D. Charges must be either paid by the party requesting the service or
      guaranteed to the satisfaction of the carrier before pickup or
      delivery will be made.

**44.   PAYMENT OF FREIGHT CHARGES**

   A. When payment is extended as provided in 49 CFR Part 377 and the
      payer of the freight charges fails to make payment in 30 days, the
      following can be assessed on each unpaid freight bill, in addition to
      all other lawful freight and assessorial charges as provided in the
      Rules and Regulations.
      (1) A charge of 50% of the unpaid balance, Minimum charge $100.00
          plus the reimbursement for all collection and legal costs,
          including reasonable attorney fees.

   B. This item is only applicable to the nonpayment of original, separate
      and independent freight bills and does not apply to the aggregate
      "balance due" claims sought for a collection on any past shipments
      by a bankruptcy trustee, or any other person or agent.

   C. This item shall not apply to instances of clerical or ministerial error
      such as non-receipt of carrier's freight bill, or a shippers payment
      check lost in the mail, or a carrier mailing the freight bill to the
      wrong address.

   D. This item shall not apply in any way to a charge for transportation
      service if the carrier's bill of lading independently provides that the
      shipper is liable for fees incurred by the carrier in collection of
      freight charges on that transportation service.

**JANUARY 1, 2001**

E. The shipper and the consignee shall be liable, jointly and severally, for all unpaid charges on account of a shipment pursuant to the Bill of Lading Contract, tariff or contract between the parties under which the shipment moved; and, to pay and/or indemnify carrier for all claims, fines, penalties, damages, costs and other sums, including attorneys' fees, which may be incurred by carrier by reason of any violation of the shipment contract/tariff or any other default of the shipper or consignee or their agents. Under this paragraph, carrier is entitled to recover all of his costs, including attorneys' fees, of collecting delinquent freight bills.

## 45. PREPAYMENT OR GUARANTEE OF CHARGES

A. Unless otherwise provided, shipments will be accepted subject to the following provisions:

(1) A prepaid shipment is one on which the charges for transportation service rendered at the request of the consignor, including charges for any accessorial services performed at the request of the consignor are to be paid by the shipper.

(2) A collect shipment is one which the charges for transportation service including accessorial services rendered at the request of the consignee, or requested by the consignor for consignee, are to be paid by the consignee.

(3) A shipment on which charges are to be paid by a party other than the consignor or consignee will be accepted provided that the consignor has established credit with the carrier picking up the shipment at origin and guarantees to pay the charges if the third party fails to do so within the time allowed.

(4) If, in the judgement of the carrier picking up a shipment at origin, the forced sale of the goods would not realize the total charges due at destination, the shipment must be prepaid.

(5) If a shipment is required to be prepaid, it will be accepted on a collect basis if the consignor has established credit with the carrier picking up the shipment at origin and the consignor guarantees to pay the charges if the consignee fails to do so within the time allowed under the credit policy. Such a shipment will not be accepted as a collect shipment if the consignor executes Section 7 of the Bill of Lading.

JANUARY 1, 2001

**PAGE 20**

46. **PROTECTIVE SERVICE**
   A. Regular shipments subject to volume truckload rates do not include cost of furnishing protective service against heat or cold.
   B. When shipments require protection against heat or cold, there will be a service charge of 50 cents per mile above the standard price schedule.

47. **PROHIBITED OR RESTRICTED ARTICLES**
   A. The following property will not be accepted for shipment nor as premiums accompanying other articles:

| | |
|---|---|
| Bank Bills | Museum Exhibits or Articles of Antiquity |
| Coins, Monetary | Notes |
| Currency | Original Works of Art |
| Deeds | Postage Stamps |
| Drafts | Precious Stones |
| Letters | Revenue Stamps |
| Valuable papers | |

   B. Articles of extraordinary value will not be accepted for shipment or as premiums accompanying other articles.
   C. Carrier is not obligated to receive freight, liable to impregnate or otherwise damage other freight or carrier's equipment. Such freight may be accepted and receipted for "subject to delay for suitable equipment", or may, for lack of suitable equipment, be refused.
   D. Carrier shall not be liable for any loss or damage to any prohibited or restricted articles should the consignor tender such articles to carrier in contradiction of this provision.

48. **EXTRAORDINARY VALUE SHIPMENTS**
   A. Articles of extraordinary value, as defined below, will be accepted for shipment or as premiums accompanying other articles, providing the shipper requests excess liability coverage as provided.
   B. Articles tendered with an invoice value exceeding $100,000 or $10.00 per pound whichever is less will be considered to be of extraordinary value. Such articles will not be accepted for transportation unless the shipper requests liability coverage. Articles inadvertently accepted with an invoice value exceeding $100,000 but without excess coverage will be considered to have been released by the shipper at $100,000.
   C. In the event of loss of and or damage to any shipment, carrier's liability will not exceed the maximum liability of $100,000.00 per shipment unless the shipper has requested excess liability coverage prior to shipment.

JANUARY 1, 2001

**PAGE 21**

D.  If shipper desires to tender a shipment requiring carrier liability in excess of $100,000.000, the shipper must indicate in writing on the bill of lading at the time of shipment the total dollar amount of excess coverage requested.  The maximum excess liability is $900,000 per shipment, for a total of $1,000,000.00,

E.  Carrier will assess an additional charge equal to 5% of the otherwise applicable line haul charges for each $25,000 or fraction thereof in excess of initial maximum liability coverage, subject to minimum excess coverage charge of $75.00 for each $25,000 of coverage. Such charge is in addition to the freight charges otherwise accruing to the shipment.  Charges are to be paid by the party responsible for payment of the otherwise applicable freight charges.

## 49.  RECONSIGNMENT OR DIVERSION

A.  Definitions of Reconsignment or Diversion:  For the purpose of this rule, the terms "reconsignment" and "diversion" are considered to be synonymous and the use of either will be considered to mean:

1.  A change in the name of the consignor or consignee.
2.  A change in the place of delivery within the original destination point.
3.  A change in the destination point.
4.  Relinquishment of a shipment at point of origin.

B.  Conditions:

1.  Requests for reconsignment must be made in writing or confirmed in writing.  The carrier must be satisfied that the party making the request has the authority to do so.  Conditional or qualified requests will not be accepted.
2.  Carrier will make a diligent effort to execute a request for reconsignment but will not be responsible if such service is not effected.
3.  All charges applicable to the shipment whether accrued or accruing must be paid or guaranteed to the satisfaction of the carrier before reconsignment will be made.
4.  Only entire shipments, not portions of shipments may be reconsigned.
5.  An order for reconsignment of a shipment moving under uniform bills of lading will not be considered valid, unless and until the original bill of lading is surrendered for cancellation, endorsed or exchange.

**JANUARY 1, 2001**

**PAGE 22**

C. Charges:
   1. If a reconsignment occurs prior to tender of delivery the charge will be $25.00 plus 125% of the original quoted rate to the reconsignment point. Minimum charge $100.00.
   2. If a reconsignment occurs after tender of delivery the charge will be $100.00 plus 125% of the original quoted rate to the reconsignment point. Minimum charge $100.00.

D. Where request is made by shipper, before a shipment has left carrier's terminal at point of origin for return of a shipment to the original place of shipment, or delivery thereof to another carrier at point of origin, or relinquish possession to shipper or another carrier at carrier's terminal, such service will be subject to a charge of $150.00 per shipment.

50.  REDELIVERY
   A. When a shipment is tendered for delivery and through no fault of the carrier such delivery cannot be accomplished, no further tender will be made except upon request. Additional tenders and final delivery will be subject to the following provisions.
      1. If one or more additional tenders or final delivery of the shipment are made a minimum charge of $250.00 per vehicle will be made for each such tender and for the final delivery.
      2. All charges accruing under the provisions of this rule must be paid or guaranteed to the satisfaction of the carrier, by the party or parties requesting redelivery before the shipment is redelivered.

51.  SORTING AND SEGREGATING
   A. Upon instructions of consignee, carrier will sort or segregate freight into individual lots and place such segregated lots on the platform, dock, conveyor, pallet, dolly, buggy or similar device provided by the consignee for receipt of freight within or adjacent to the vehicle. The charge for this service shall be 75 cents per 100 pounds; subject to a minimum charge of $100.00 per shipment which shall be in addition to all other charges assessed and the consignee or party requesting the service should be responsible for payment of the charge.

**JANUARY 1, 2001**

**PAGE 23**

52.  **TRENCHING OR STRINGING SERVICE**

    A.  The additional use of carrier's vehicle at point of destination for the purpose of trenching or stringing will be permitted, subject to the following terms and conditions:

        1.  Nothing in this rule shall compel carrier to perform service at or to the sites not accessible to trucks.

        2.  Service under this rule shall be performed upon request of consignor or consignee.

        3.  Charge for service performed shall be $75.00 per hour and does not include unloading by the carrier.

        4.  Charges for service performed under this item shall be in addition to all other lawful accrued charges.

53.  **STOP-OFF CHARGES**

    A.  Shipments subject to truckload rates and truckload minimum weights, received from one shipper at one point at one time for one consignee at one destination and covered by one bill of lading, may be stopped for partial loading and or partial unloading, subject to the following provisions:

        1.  Each stop-off is limited to one placement of the truck.

        2.  Stop-offs for partial loading or partial unloading will not be permitted on shipments moving "In Bond" or where Section 7 of the bill of lading has been executed.

        3.  The substitution of freight for that originally loaded or any exchange of contents at a point or place of stop-off is prohibited.

        4.  All of the component parts of a shipment must be loaded and in transit before any stop is made for partial unloading.

    B.  Each stop for either partial loading or partial unloading, but not both on the same shipment, will be subject to a stop-off charge of $55.00 per stop, excluding the stops for initial pick-up and final delivery.

    C.  A vehicle transfer charge of $55.00 will be assessed for each transfer of a vehicle from one loading or unloading site to another.

    D.  Line-haul charges will be determined as follows:

        1.  Shipments will be rated as if the entire shipment moved from each place where any portion of the shipment is picked up to each place where any portion of the shipment is delivered and the highest of such charges will apply to the entire shipment. In determining charges, apply rates in effect on date of shipment from point of origin.

**JANUARY 1, 2001**

**PAGE 24**

2. **Point to Point Rates (Specific Commodity Rates):** If the total distance from initial origin to final destination via the stop-off point or points exceeds 105% of the shortest route mileage from initial origin to final destination, or if the route movement, by virtue of the content of hazardous materials, or because of over-weight or over-dimension, or the closing or prohibition of use of bridges, tunnels, or highway section by any public authority, that distance in excess of 105% will charged at $1.75 per mile, but total freight charges to be not less than provided in D1. above.

3. **Distance Commodity Rates:** Charges on shipments stopped for completion of loading or partial unloading shall be assessed on the basis of the applicable truckload rate and minimum weight (or actual weight if greater). The mileage to be used to determine the charge is the mileage from the original point via the stop-off points determined via the order of stop-off(s) as loaded for delivery by the shipper. The greatest mileage between any point of loading and any point of unloading will determine initial origin and final destination.

E. **Conditions:**

1. Consignor must prepay all charges and only one freight bill will be issued for the entire shipment. However, charges may be collect when they are guaranteed by the consignor and so noted on the bill of lading at the time of shipment. All charges to be collected from consignee at final destination.

2. When bill of lading requires stop-off to unload a component part of the shipment and carrier is unable during business hours to effect delivery of such freight at the point of place of stop-off, that undelivered portion of such shipment shall then be subject to rules and regulations governing unclaimed freight, storage and redelivery of freight, to the extent that such services are applicable.

3. Except where shipment consists of identical packages or pieces, or where the various lots of freight comprising the shipment are of such nature as to be easily identified and segregated, each piece or package in any shipment stopped for partial unloading must be plainly and durably marked, stenciled or tagged by shipper in such manner that each lot of freight intended for delivery at a particular point or place of stop-off will be readily distinguishable from all other freight in the shipment.

**JANUARY 1, 2001**

7ff

**PAGE 26**

   (c) When carrier does place the freight in a public warehouse, a minimum charge of $150.00 will be made in addition to the applicable warehouse charges, and Carrier shall have no further liability with respect to any loss or damage to the cargo placed in storage.

## 55.   TEAM DRIVER

   A. When requested by shipper, an extra driver will be furnished at the rate of $.75 cents per mile in addition to all other published charges. The bill of lading must bear the notation "Team Driver Requested".

## 56.   TENDERED AS A TRUCKLOAD

   A. All shipments tendered to carrier will be considered as truckload unless otherwise specified and approved.

   B. Shipments will be accepted only on a prepaid basis unless otherwise specified and approved.

## 57.   TENDERED AS LESS-THAN-TRUCKLOAD

   A. Shipments tendered as Less-than-truckload will require special pricing.

   B. Shipment moving under this provision will be accepted either on a prepaid basis or collect basis if Section 7 of the Bill of Lading is not executed.

**JANUARY 1, 2001**

**PAGE 27**

**58.    UNNAMED POINTS OR TERMINAL AREA**

  A.  Rules and regulation, published in this tariff, will apply from and to
  points named in this tariff, as well as from and to places within the
  limits specified below:

   1.  If the point of origin or destination is an unincorporated
   community, all places within two and one-half miles by air line of
   the post office of the same name in such unincorporated
   community if the community has a population of less than 2,500;
   within four miles if it has a population of 2,500 but less than
   25,000; and within five and one-half miles if it has a population of
   25,000 or more.

   2.  If the point of origin or destination is an incorporated community
   at any place within the corporate limits, and places as defined.
   With population of less than 2,555 at any place not more than
   two miles from the base municipality. With population of 2,500
   or more but less than 25,000 at any place not more than three
   miles from the base municipality. With population of 25,000 or
   more but less than 100,000 at any place not more than four miles
   from the base municipality. With population of 100,000 or more
   at any place not more than five miles from the base municipality.

   3.  Population figures to be used are those determined by the latest
   US Census Bureau Census, as shown in the standard Rand
   McNally.

**59.    UNSAFE OPERATION**

  A.  Nothing in this tariff shall be construed as making it binding on the
  part of the carrier to receive freight for destination to which, on
  account of conditions of roads, it is impracticable to operate trucks,
  or to make deliveries at location at destination stations to which
  location, account of condition of streets or roadways it is
  impracticable to operate trucks. In such latter cases notice shall be
  given consignee and delivery made at terminal depot, or at other
  practicable location.

**60.    VEHICLES FURNISHED BUT NOT USED.**

  A.  When carrier upon receipt of a request to pick-up a shipment and
  carrier has dispatched a vehicle for such purpose and due to no
  disability, fault or negligence on the part of the carrier, the vehicle is
  not used, a charge of $150.00 per vehicle will be assessed against
  the consignor making such request.

**JANUARY 1, 2001**

**PAGE 28**

B. When a carrier is requested to deadhead a vehicle to a point of origin designated by consignor or consignee and such vehicle is furnished and not used due to no fault of the carrier, a charge for each vehicle of $1.65 per mile subject to a minimum charge of $250.00 will be assessed against the party making such request. The mileage will be computed from the trucks last known location. Mileage to be determined by use of HBG Mileage Guide 13 ICC HGB 100-B, supplements thereto or reissues thereof.

C. Upon arrival of the vehicle with power unit, the consignor will have free time of 60 minutes to inform carrier the vehicle will not be used. If carrier is detained beyond 60 minutes, a charge of $75.00 per hour or fraction thereof per vehicle will be assessed in addition to other applicable charges provided herein.

## 61.   WEIGHT VERIFICATION

A. Carrier will verify the weight of any shipment upon request by either the consignor or consignee. Such verification will only be made while in the custody of the carrier. A charge of $50.00 per shipment or per vehicle will be made for furnishing such verification. This charge is to be paid by the party requesting the service.

## 62.   WEIGHTS – GROSS WEIGHTS

A. Unless otherwise provided, charges shall be computed on actual gross weights, except when estimated weights are authorized such estimated weights shall be used.

B. All and any packaging, dunnage or securement material will be included in the weight of the shipment.

C. Materials required to secure a shipment beyond the normal truck equipment of tarps, straps and chains and the shipper will provide load locks.

D. If additional materials are required to be provided by the carrier the cost of that material will be reimbursed a rate of 130% of purchase price plus $25.00 per hour labor for the time required to acquire the material.

E. When the bill of lading does not accurately reflect the gross weight of a shipment, the carrier can adjust the gross weight to reflect the actual shipment weight. Such adjustments must be supported by certified scale tickets and charges as applicable to the increased gross weight will be applied.

**JANUARY 1, 2001**

**PAGE 29**

F. When the carrier is detained at any federal, state or local government facility due to overweight, and the bill of lading does not accurately reflect the gross weight of the shipment, the shipper will be liable for the cost of any citations issued to the carrier as a result, plus the costs associated with the repositioning or unloading of the shipment to facilitate achieving legal weight.

(1) When carrier is required to dispatch a second unit to assist in repositioning or unloading of a shipment, the charge for this service will be $1.65 per mile, with mileage computed from the point of dispatch to the location of the federal, state or local facility where the original equipment is detained, subject to a minimum charge of $250.00.

(2) The labor charge for the repositioning or unloading of such a shipment shall be at the rate of $25.00 per hour or fraction thereof, per man and shall apply in addition to charges assessed in paragraph F (1) above.

(3) Excess materials not able to be retained as part of the original shipment as a result of federal, state or local weight restrictions, shall be transported at a flat rate of $1.65 per mile with a minimum charge of a$550.00.

NATIONAL MOTOR FREIGHT CLASSIFICATION 100-Z

# RULES

(To be printed on white paper)

# UNIFORM STRAIGHT BILL OF LADING

### ORIGINAL—NOT NEGOTIABLE

Carrier's Pro No. _____
Shipper's Bill of Lading No. _____
Consignee's Reference/P.O. No. _____
Carrier's Code (SCAC)_____

Name of Carrier _____

RECEIVED, subject to individually determined rates or contracts that have been agreed upon in writing between the carrier and shipper, if applicable, otherwise to the rates, classifications and rules that have been established by the carrier and are available to the shipper, on request:

From _____ Date _____
Street _____ City _____ County _____ State _____ Zip _____

the property described below, in apparent good order, except as noted (contents and condition of contents of packages unknown) marked, consigned, and destined as shown below, which said carrier agrees to carry to destination, if on its route, or otherwise to deliver to another carrier on the route to destination. Every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns

Consigned to _____
On Collect on Delivery Shipments, the letters "COD" must appear before consignee's name.

Destination Street _____
City _____ County _____ State _____ Zip _____
Delivering Carrier _____ Trailer No. _____
Additional Shipment Information _____

| Collect on Delivery $ _____ and remit to: _____ | C.O.D. charge | Shipper ☐ |
| Street _____ City _____ State _____ | to be paid by | Consignee ☐ |

| Handling Units No. Type | Packages No. Type | ☉ HM | Kind of Package, Description of Articles, Special Marks and Exceptions (Subject to correction) | Weight (Subject to Correction) | Class or Rate Ref. (For Info. Only) | Cube (Optional) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

☉ Mark "X" to designate Hazardous Materials as defined in DOT Regulations.

NOTE (1) Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property as follows:

"The agreed or declared value of the property is specifically stated by the shipper to be not exceeding _____ per _____."

**NOTE (2) Liability Limitation for loss or damage on this shipment may be applicable. See 49 U.S.C. § 14706(c)(1)(A) and (B).**

NOTE (3) Commodities requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Sec. 2(e) of NMFC Item 360.

Freight charges are PREPAID
unless marked collect.
CHECK BOX IF COLLECT ☐

FOR FREIGHT COLLECT SHIPMENTS:
If this shipment is to be delivered to the consignee, without recourse on the consignor, the consignor shall sign the following statement:

The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.

_____
(Signature of Consignor)

Notify if problem en route or at delivery _____ (for informational purposes only)
                                              Name          Fax No          Tel. No

Send freight bill to: _____
                        Company Name      City      Street      State      Zip

Shipper _____ Carrier _____
    Per _____     Per _____ Date _____

| Shipper Certification | Carrier Certification |
|---|---|
| This is to certify that the above-named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT  Per _____ Date _____ | Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the DOT emergency response guidebook or equivalent document in the vehicle  Per _____ Package Nos _____  Date _____ |